USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-10-2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In the Matter of the Complaint

of                                                                            1:18-Cv-1359 (PAC) (RWL)

ENERGETIC TANK, INC.,
as Owner of the M/V ALNIC MC,                                  **OPINION & ORDER**
for Exoneration from or Limitation of
Liability

------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

Energetic Tank ("Petitioner"), the owner of the M/V ALNIC, petitioned pursuant to 46 U.S.C. §§ 30501 *et. seq.* for exoneration or to limit its liability. It now moves for a ruling that Singapore law applies to all substantive matters of liability and damages. Dkt. 1, at 5; Dkt. 211, at 10. Claimants contend that United States law applies.[1] Dkt. 217, at 1. The Petitioner's motion for application of foreign law is GRANTED; the Court finds that Singapore law is the correct choice of law applicable as to all substantives matters of liability and the availability and calculation of damages in this case.

---

[1] The Claimants in this case include more than 40 members of the MCCAIN's crew who allege personal injuries, representatives for the MCCAIN's sailors who died in the collision, and the U.S. Government. Dkt. 240, at 1. Generally, the Claimants adopt the opposition briefing submitted by the Government, and so the Government's brief is primarily cited in this Opinion. *See* Dkts. 215–20.

## BACKGROUND

The U.S.S. JOHN S. MCCAIN, a United States Navy guided-missile destroyer, collided with the ALNIC, a Liberian-flagged merchant vessel, in the Singapore Strait Traffic Separation Scheme at 0524 on August 21, 2017.[2] Dkt. 210, Ex. A, at 47; Dkt. 211, at 1–2. The MCCAIN was bound for the Changi Naval Base, Singapore, after departing on May 26, 2017 from its home port of Yokosuka, Japan, where it is stationed. Dkt. 210, Ex. A, at 45. The ALNIC also was bound for Singapore. Dkt. 211, at 1. At 0500 on August 21, the MCCAIN sounded reveille to wake the crew before entering the port in Singapore. Dkt. 210, Ex. A, at 63. The Sea and Anchor detail, which is used in the approach to port, was to be stationed at 0600. The MCCAIN entered the Middle Channel of the Singapore Strait at 0520. It was still night and sunrise would not take place until 0658. *Id.* at 45. Approximately four minutes after entering the Middle Channel, at 0524, the MCCAIN and the ALNIC collided at a site approximately 24 nautical miles from the Singapore mainland. *Id.* at 47; Dkt. 217, at 3.

Ten sailors aboard the MCCAIN died in the collision, and 48 more sailors were injured. Dkt. 210, Ex. A, at 43, 57. There were no fatalities and no injuries on the ALNIC. *Id.* at 43. Immediately following the collision, at 0530, the MCCAIN "requested tugboats and pilots from Singapore Harbor to assist in getting the ship to Changi Naval Base." *Id.* at 49. The MCCAIN entered Singapore Harbor around noon on August 21. *Id.* at 58.

Search and rescue efforts began immediately after the collision. *Id.* at 57. Responders from the Republic of Singapore Navy and Coast Guard were at the site of the collision within two and a half hours, and soon half a dozen vessels each from Singapore and Malaysia had

---

[2] "Traffic separation schemes are established by local authorities in approaches to ports throughout the world to provide ships assistance in separating their movements when transiting to and from ports." Dkt. 210, Ex. A, at 45.

arrived at the collision site. *Id.* Several severely injured sailors from the MCCAIN were taken to Singapore General Hospital. *Id.* The Malaysian and Singaporean navies swept within a range of ten nautical miles of the MCCAIN's path for missing sailors. *Id.* The search and rescue efforts continued for more than 80 hours, covered in excess of 2,100 square miles, and included support from the United States, Singapore, Malaysia, Indonesia, and Australia. *Id.* at 58. Singapore's Transport Safety Investigation Bureau ("TSIB") conducted an inquiry into the collision and published a report on March 8, 2018 stating that it had occurred "in the westbound lane of the Singapore Strait, in Singapore territorial waters." Dkt. 216, Ex. B, at 4. The U.S. participated in the investigation, at least to the extent of submitting documents. Dkt. 216, Ex. B, at 16 n. 22, 20 n. 37, 22 n. 39, 23 n. 41, 25 fig. 12, 32 n. 56, 33 n. 57.

The Parties submitted extensive briefing regarding the correct choice of law and the Court heard oral argument on November 14, 2019. Tr., Dkt. 236, at 20:25–38:5.

## DISCUSSION

### I. STANDARD

#### A. Issue of Foreign Law

"A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing." Fed. R. Civ. P. 44.1. "While the Rule requires that the parties give notice of the intent to raise foreign law, the Advisory Committee's Notes make clear that Congress deliberately declined to provide 'any definite limit on the party's time for giving notice of an issue of foreign law.'" *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 585 (2d Cir. 2005) (quoting Fed. R. Civ. P. 44.1 advisory committee's note, 39 F.R.D. 69, 118 (1966)). "[A] litigant must provide the opposing party with reasonable notice that an argument will be raised, but the litigant need not flesh out its full argument at the Rule 44.1 stage." *Id.* at 586.

"Frequently, the proper determination of foreign law can be a complicated task." *Id.* at 586. "Ultimately, the responsibility for correctly identifying and applying foreign law rests with the court." *Id.*

### B. Law of Collisions in Foreign Waters

"If [a] collision occurs in foreign territorial waters, liability and damages are as a general rule determined according to the law of that country." Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 14:10 (6th ed. 2018).[3] "Liability for tort caused by collision in the territorial waters of a foreign country is governed by the laws of that country." *The Mandu*, 102 F.2d 459, 463 (2d Cir. 1939). "How damages in a both-to-blame collision in foreign territorial waters should be apportioned is governed by the *lex loci*." *Lady Nelson, Ltd. v. Creole Petroleum Corp.*, 286 F.2d 684, 686 (2d Cir. 1961) (Friendly, J.); *MAN Ferrostaal, Inc. v. M/V Vertigo*, 447 F. Supp. 2d 316, 324 (S.D.N.Y. 2006) (finding that "Denmark, as the site of the accident, predominates").

## II. ANALYSIS

### A. Notice of Foreign Law

The Petitioner has timely raised the issue of foreign law. Fed. R. Civ. P. 44.1. Petitioner raised the possibility of the application of Singapore law in a July 31, 2018 joint letter from the

---

[3] In Grant Gilmore and Charles L. Black Jr.'s authoritative treatise, *The Law of Admiralty* 471–84 (2d ed. 1975), *Lauritzen* appears in the chapter concerning seaman recovery for injuries and death, but not in the subsequent chapter concerning collisions. The Supreme Court and Second Circuit have relied on both the Gilmore and Black and Schoenbaum treatises repeatedly for their concise statements of accepted principles of maritime law. *See, e.g., The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2281 (2019); *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 19, 24 (2004); *Lewis v. Lewis & Clark Marine*, 531 U.S. 438, 447 (2001); *In re Petition of Germain*, 824 F.3d 258, 264 (2d Cir. 2016); *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 241 n. 2 (2d Cir. 2014); *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 211 (2d Cir. 2009); *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 825, 827 (2d Cir. 2006); *Ammar v. United States*, 342 F.3d 133, 142 (2d Cir. 2003).

Parties, and again at a Scheduling Conference on August 2, 2018. Dkt. 105, at 8; Tr., Dkt. 108, at 15:7–12; Dkt. 227, at 1. Petitioners filed a Rule 44.1 Notice on January 3, 2019, stating that it would raise the Convention for the Unification of Certain Rules of Law Relating to Collisions Between Vessels, signed in Brussels on September 23, 1910 (the "Brussels Convention") as its choice of law. Dkt. 158. Singapore, along with much of the rest of the world (but not the U.S.), has ratified the Convention, and so the Petitioner's specification of Singapore law does not represent a change in course. The requirement for notice under Rule 44.1 is satisfied.

## B. Application of *Lauritzen* by the Parties

The Claimants seek to apply the factors laid out in *Lauritzen v. Larsen*, 345 U.S. 571 (1953), as expanded in *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306 (1970). Another case, *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382 (1959), stated that the *Lauritzen* factors "were intended to guide courts in the application of maritime law generally."[4] *Lauritzen* and the subsequent cases "adopted an interest analysis that looks to: (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the domicile of the injured party; (4) the domicile of the shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations." *Carbotrade S.p.A. v. Bureau Veritas*, 99 F.3d 86, 90 (2d Cir. 1996).

Maritime choice-of-law principles seek to "ascertain[] and valu[e] points of contact between the transaction and the states or governments whose competing laws are involved."

---

[4] The two sentences that come next in *Romero* acknowledge that *Lauritzen* is not the test for all seasons as the Claimants make it out to be: "Of course, due regard must be had for the differing interests advanced by varied aspects of maritime law. But the similarity in purpose and function of the Jones Act and the general maritime principles of compensation for personal injury, admit of no rational differentiation of treatment for choice of law purposes." *Romero*, 358 U.S. at 382. The interests in a collision case are certainly not the same interests present in a Jones Act case.

5

*Lauritzen*, 345 U.S. at 582; *see also Blue Whale Corp. v. Grand China Shipping Dev. Co., Ltd.*, 722 F.3d 488, 498–99 (2d Cir. 2013). The Parties argue that *Lauritzen* and *Rhoditis* supply the appropriate test but apply the pertinent factors to reach opposing results. The Petitioner sees the law of the place as the dominant factor, and the other factors as pointing neither way, while the Claimants emphasize the law of the flag and of the forum as primary, with several other factors also leaning in their favor. Dkt. 211, at 4; Dkt. 217, at 11–14. Regardless of this Court's choice of law, the Parties agree that the International Regulations for Preventing Collisions at Sea (the "COLREGS") govern the ALNIC and MCCAIN as vessels navigating the Singapore Strait. Dkt. 216, at 2; Tr., Dkt. 236, at 21:3–21. The U.S., Singapore, and Malaysia have all accepted the COLREGS. Tr., Dkt. 236, at 21:6–19.

The test under *Lauritzen* is not "mechanical," nor is the list of relevant factors "exhaustive." *Rhoditis*, 398 U.S. at 308–09. "Although *Lauritzen* involved the Jones Act, the Court has held that '[t]he broad principles of choice of law and the applicable criteria of selection set forth in *Lauritzen* were intended to guide courts in the application of maritime law generally.'" *Sundance Cruises Corp. v. Am. Bureau of Shipping*, 7 F.3d 1077, 1082 (2d Cir. 1993) (quoting *Romero*, 358 U.S. at 382). The factors are applied with an "emphasis on applying the law of the state with the most substantial contacts to the event giving rise to the claim." *Carbotrade S.p.A*, 99 F.3d at 90–91. "The essential determination to be made is which interests predominate, with deference to the interest with the most substantial connection to the dispute." *MAN Ferrostaal v. M/V VERTIGO*, 447 F. Supp. 2d 316, 322 (S.D.N.Y. 2006).

Despite the broad statement that the factors are intended to "guide courts in the application of maritime law generally," *Romero*, 358 U.S. at 382, the Claimants have been able to point to but a few comparable cases that implicate the application of the *Lauritzen-Rhoditis*

factors to a collision. *See* Michael Boydston, Note, Cruz v. Chesapeake Shipping *and the Choice-of-Law Problem in Admiralty Actions*, 27 Tex. Int'l L.J. 419, 426 (1992) (observing that cases applying the factors "tend to fall into two categories: tort actions under the Jones Act and common law actions for maintenance and cure"). *But see Cliffs-Nedrill Turnkey Int'l-Oranjested v. M/T Rich Duke*, 734 F. Supp. 142, 148 (D. Del. 1990) ("[T]his interest analysis has been applied to choice of law problems arising from maritime collisions.").

The test laid out in *Lauritzen* and expanded in *Rhoditis*, both Jones Act cases, is entirely unsuited to deciding a choice-of-law question arising in a limitation of liability case after a collision half way around the globe involving the COLREGS, a Liberian-flagged vessel and a U.S. Navy warship based in Japan.[5] The test in *Lauritzen* was explicitly designed, in the language of that case, to resolve "a problem of statutory construction," and define the outer boundary of the Jones Act's expansive promise of relief to "[a]ny seaman." *Lauritzen*, 345 U.S. at 578–79; *Rhoditis*, 398 U.S. at 314 ("*Lauritzen* in enumerating these factors ('contacts') as

---

[5] The facts of the instant case could not look less like *Lauritzen*, which concerned a Danish sailor who signed ship's articles written in Danish and who alleged he had been negligently injured aboard a Danish-flagged vessel with a Danish owner. *Lauritzen*, 345 U.S. at 573, 582–85; *Blue Whale*, 722 F.3d at 498, 499 n. 11 ("[T]he *Lauritzen* factors speak more directly to tort claims."); *Moncada v. Lemuria Shipping Corp.*, 491 F.2d 470, 473 (2d Cir. 1974) (describing *Lauritzen* and its related cases as "precedents construing the Jones Act"). *Cf. Kukias v. Chandris Lines, Inc.*, 839 F.2d 860, 861–62 (1st Cir. 1988) (applying *Lauritzen* where plaintiff "was injured when he fell down a stairway"). Furthermore, the application of its factors by the Claimants here is entirely unconvincing, pointing "indiscriminately to much of the globe." *Sundance Cruises*, 7 F.3d at 1082 (quoting *Sundance Cruises Corp. v. American Bureau of Shipping*, 799 F. Supp. 363, 387 (S.D.N.Y. 1992)). Claimants' attempt to cure this deficiency by arguing for the law of the flag fails. The law of the ship's flag operates on the "old notion that a ship is a floating piece of the flag-state's territory." Symeon C. Symeonides, *Cruising in American Waters:* Spector, *Maritime Conflicts, and Choice of Law*, 37 J. Mar. L. & Commerce 491, 491 (2006). The ALNIC, a "floating piece" of Liberia, is not transmuted into a "floating piece" of the United States simply because Liberia has adopted U.S. general maritime law, as the Claimants contend. *See Lauritzen*, 345 U.S. at 584 ("Nationality is evidenced to the world by the ship's papers and its flag."). Liberia has no claim in this dispute. Only the place of the collision demonstrates the "necessary substantiality" demanded by *Lauritzen*'s line of cases. *Rhoditis*, 398 U.S. at 309 n. 4.

independent considerations, was attempting to focus analysis on those factors that are the necessary ingredients for a statutory cause of action.") (Harlan, J., dissenting); *MAN Ferrostaal*, 447 F. Supp. 2d at 323 ("[T]he concatenation of factors set out in *Lauritzen* is confusing and inconclusive.").

*The Gylfe v. The Trujillo*, 209 F.2d 386, 387 (2d Cir. 1954), argued six months after the Supreme Court's decision in *Lauritzen*, does not mention the case, and holds squarely that "[i]f a collision occurs in territorial waters of the United States, the rights and duties of the parties are governed by our law; if it occurs in British territorial waters, by British law." A Second Circuit collision case decided eight years after *Lauritzen* and two years after that case was extended in *Romero* mentions neither Supreme Court case and declares that "[h]ow damages in a both-to-blame collision in foreign territorial waters should be apportioned is governed by the *lex loci*." *Lady Nelson, Ltd.*, 286 F.2d at 686. *Ishizaki Kisen Co., Ltd. v. United States*, 510 F.2d 875 (9th Cir. 1975), decided 22 years after *Lauritzen* and five years after *Rhoditis*, makes no mention of either case. In *Ishizaki Kisen Co.*, the Ninth Circuit applied Japanese law to a collision between a Japanese vessel and a U.S. Army vessel in a Japanese harbor, stating that "[t]here is no doubt that a collision in foreign territorial waters is governed by the law of the place of collision." *Ishizaki Kisen Co.*, 510 F.2d at 877, 879; *see also Compania Gijonesa de Navegacion, S.A.*, 590 F. Supp. 241, 243 (S.D.N.Y. 1984) ("Because the collision occurred in the territorial waters of Spain, the rights and liabilities of the parties are governed by Spanish substantive law.").

The Government places considerable emphasis on *Lauritzen*'s statement that "[t]he test of location of the wrongful act or omission, however sufficient for torts ashore, is of limited

application to *shipboard* torts," *Lauritzen*, 345 U.S. at 583 (emphasis added). But there is nothing "shipboard" about a collision between two vessels at sea.[6]

In short, Claimants' argument that under *Lauritzen* the law of the place of the wrong has lost its longstanding importance in collision cases between ships of different flags in foreign waters is contradicted by decades of subsequent admiralty practice in this Circuit and others. Their contention that the Court should ignore the sustained prominence of *lex loci* in post-*Lauritzen* collisions and instead blindly follow the logic of seaman injury cases is not tenable. *See, e.g., Karvelis v. Constellation Lines S.A.*, 806 F.2d 49, 50 (2d Cir. 1986); Dkt. 216, at 3.

The other *Lauritzen* factors are like a weathervane in a windstorm — always spinning, but never pointing in one direction. There being no applicable contract here, the parties agree that the factor can be disregarded. *See* Dkt. 211, at 8; Dkt. 215, at 7; Dkt. 217, at 12. The law of the ship's flag, which the Claimants strongly favor, is not persuasive because the ships are of two different flags. The Liberian flag is one of convenience, and the U.S. flag is on a vessel that is homeported in another country, Japan. While the injured parties are predominantly U.S. Navy sailors, it cannot be the case that U.S. law applies every time a Navy ship is involved in a collision anywhere in the world. And the Court cannot ignore that while the ALNIC's crew escaped fatalities and personal injuries, the ALNIC was damaged in the collision. The owner of the ALNIC, Energetic Tank, is a Liberian corporation, and the ship's manager is based in Greece, so the factors for domicile and base of operations are unhelpful. The inaccessibility of

---

[6] As with other excerpts pushed forward by the Government, this statement from *Lauritzen* makes more sense in its context: "The test of location of the wrongful act or omission, however sufficient for torts ashore, is of limited application to shipboard torts, because of the varieties of legal authority over waters she may navigate." *Lauritzen*, 345 U.S. at 583. The *Lauritzen* court was clearly concerned with how liability for the same shipboard act (*e.g.*, a sailor negligently injured aboard ship) may vary from locale to locale as a single ship went on its voyage. That concern is not present in this case.

9

the foreign forum also leads nowhere. *See Kreta Shipping, S.A.*, 1 F. Supp. 2d 282, 285 (S.D.N.Y. 1998) ("This factor . . . has traditionally been given little weight in the *Lauritzen* analysis."). The Second Circuit has said that "the law of the forum [is] generally of little relevance in United States courts," and, indeed, it is of little relevance here. *Rationis Enters.*, 426 F.3d at 587 ("Inaccessibility of a foreign forum . . . is not relevant, because a New York court is fully capable of applying foreign law in this case."). The Second Circuit has also found it appropriate, when faced with *Lauritzen* questions, to "adjust[] [the factors] to the particular facts of th[e] case." *Carbotrade*, 99 F.3d at 91. Here, the only factor that points convincingly to any relevant body of law is the place of the wrong.

### C. The Site of the Collision

Claimants contend that both Malaysia and Singapore "could assert" claims of sovereignty over the waters where the collision took place, and thus it is impossible to find that Singapore law applies. Dkt. 217, at 4. The Government states that Malaysia and Singapore have long contested sovereignty over the area in question, particularly two rock features, Pedra Branca and Middle Rocks, near the site of the collision. Dkt. 217, at 3–4. The two nations took their dispute to the International Court of Justice, which found in a 2008 judgment that Singapore possessed sovereignty over Pedra Branca and Malaysia possessed sovereignty over Middle Rocks. Case Concerning Sovereignty Over Pedra Branca / Pulau Batu Puteh, Middle Rocks and South Ledge (Malaysia v. Singapore), Judgment, 2008 I.C.J. 12, 101 (May 23). But that does not mean that U.S. law is the correct choice. The Claimants only pretend that this Court must resolve whether Singapore or Malaysia has jurisdiction over the collision site. This is said to present a political

10

question.[7] Dkt. 217, at 5. The Claimants state that the collision occurred 24 nautical miles from Singapore's mainland, but only 7.7 nautical miles from the nearest Malaysian land. Dkt. 217, at 3. Claimants further contend that the International Court of Justice "purposefully and explicitly left unresolved" competing claims between Singapore and Malaysia to the waters in which the collision occurred. Dkt. 217, at 1.

Petitioner responds that its "contention that the collision occurred in Singapore territorial waters was based on the clear and unequivocal assertions and exercise of jurisdiction by Singapore in this matter." Dkt. 227, at 3. It argues that "[i]t was no accident or coincidence" that the two vessels "were in Singapore waters, and neither party could claim surprise by being subject to Singapore law by virtue of having voluntarily entered its waters." Dkt. 211, at 6. Further, it argues that Singapore is the "principal 'manager[]' of traffic" in the Strait, stands to suffer from a major accident in the Strait, and "has a very substantial interest in seeing that its maritime law uniformly applies to collisions between foreign vessels within its waters." *Id.* Singapore, in its investigation report, described the collision as having occurred "in Singapore territorial waters," while Malaysia did not produce a report. Dkt. 227, at 3–4. Other than pointing out the dispute, the Claimants do not suggest how choosing Singapore over Malaysian law has any substantive bearing on the case.

---

[7] The Government cites to only one case for this proposition, *Al-Tamimi v. Adelson*, 916 F.3d 1 (D.C. Cir. 2019), and fails to indicate what portion of that decision is supposed to speak to the issue before this Court. Dkt. 217, at 5, 15. The "one jurisdiction-stripping political question" identified by the D.C. Circuit, namely, "*who has sovereignty over the disputed territory*," is not a question the Court needs to resolve in its present choice of law analysis. *Al-Tamimi*, 916 F.3d at 13 (emphasis in original). Even in *Al-Tamimi*, the Circuit Court found that the "political question [was] extricable," and ruled that "the court *could* rule in the plaintiff's favor on all counts without addressing *who has sovereignty over the disputed territory*." *Id.* (emphases in original).

11

Contrary to the Government's apparent position, "not every matter touching on politics is a political question." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 229 (1986); *see also Citizens for Responsibility & Ethics in Washington v. Trump*, 939 F.3d 131, 158 (2d Cir. 2019) ("The federal courts have the responsibility to resolve 'Case and Controversies' arising under the Constitution and laws of the United States."). "[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962). "In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofksy ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404, 5 L. Ed. 257 (1821)). The Government and other Claimants do not argue that the location of this collision is one with a "history of . . . management by the political branches," nor that it is not "susceptib[le] to judicial handling in the light of its nature and posture in the specific case." *Baker*, 369 U.S. at 211. If they were to confront the question of whether difficult choice of law questions in admiralty are dedicated to a political branch, they would have to face, among other obstacles, Article III's specific grant of "all Cases of admiralty and maritime Jurisdiction" to the federal courts. U.S. Const. art. III, § 2, cl. 1. The Claimants simply assert, without confronting any of these bedrock principles, that the location of this collision constitutes a political question that makes it necessary for this Court to apply U.S. law to this case. The argument fails.

The Court does not adjudicate any rights to the waters, or otherwise implicate delicate international relations. The Court holds only, based on venerable choice of law considerations firmly within the judiciary's grasp, that Singapore law is more appropriate to this case than U.S. law. "This is a familiar judicial exercise." *Zivotofsky*, 566 U.S. at 196.

Both vessels were *en route* to Singapore when the collision occurred, and concededly were in the Singapore Traffic Separation Scheme. Dkt. 227, at 10. There is no doubt that Singapore acted at all times as though the collision took place in its waters. It provided emergency aid and vessels. It provided hospital care for the injured U.S. sailors. The Singapore's Transport Safety Investigation Bureau conducted an inquiry concerning the causes of the collision at sea. Dkt. 216, Ex. B. The U.S. Government accepted Singapore's aid and assistance and participated in the Singapore investigation by submitting information to the Investigation Bureau.[8] The application of Malaysian law is a phantom question of law and fact. Both Singapore and Malaysia have ratified the Brussels Convention. Dkt. 217, Ex. 9, 369–70. No party suggests there is any difference between Malaysian and Singapore law applicable to this collision.

While there was also a "dispute" in *Cliffs-Nedrill*, 734 F. Supp. at 148, "between the parties concerning the location of the collision," Petitioners cite far more than the "one piece of evidence" that supported the finding that Aruba law applied. As in *Cliffs-Nedrill*, "the place of the collision is the only common denominator between the parties," "[t]he parties voluntarily placed themselves in the jurisdiction and cannot claim surprise that its law will be applied to them," and Singapore "has a strong interest in regulating conduct" in the Strait and Traffic Separation Scheme that bear its name. *Id.* at 149; *see also Kriti Filoxenia Special Mar. Enters. v. Ya-Sa Denizcilik Sanayi Ve Ticaret A.S.*, Civil Action No. 10-326, 2010 WL 4812922, at *5 (E.D. La. Nov. 17, 2010) ("The common denominator in this case is Nigeria, the place of the allision.").

---

[8] Singapore's report states that it drew in part on "[i]nformation obtained from the US Navy and redacted statements provided by the US Coast Guard." Dkt. 216, Ex. B, at 16 n. 22.

13

All these considerations and the overwhelming weight of authority guide the Court's finding that United States law does not apply as to liability in this case. Foreign law, specifically Singapore law, is the proper choice of law to determine substantive issues of liability and damages.

## CONCLUSION

The Petitioner's motion for application of foreign law is GRANTED. The Court holds that Singapore law provides the appropriate body of substantive law in this admiralty case. The Clerk of Court is directed to close the motion at Docket 209.

Dated: New York, New York
January 10, 2020

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge