UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                                    )
IN THE MATTER OF THE COMPLAINT      )
OF ENERGETIC TANK, INC., AS              )          Case No. 1:18-cv-1359 (PAC)
OWNER OF THE M/V ALNIC MC,            )
FOR EXONERATION FROM OR                )
LIMITATION OF LIABILITY                    )
_____)


# <u>UNITED STATES' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ............................................................................. 2

I.    THE COLLISION ........................................................................................... 2

     A.  Background .......................................................................................... 2

     B.  Into the Singapore Strait ..................................................................... 2

     C.  MCCAIN's Steering Casualty (5:20:40) ............................................. 10

     D.  MCCAIN Displays Not-Under-Command Lights (5:21:25) ................... 11

     E.  ALNIC's Radar Shows MCCAIN Veering to Port (5:21:52) ................. 18

     F.  ALNIC's "Collision Alarm" Blares (5:22:42) ...................................... 24

     G.  The Collision (5:23:58) ...................................................................... 29

II.   ALNIC COULD HAVE AVOIDED COLLISION, BUT DID NOTHING ..................... 30

     A.  The Collision Was Avoidable ............................................................. 30

     B.  Having Failed to Avoid Collision, Nolasco Took No Action to Mitigate Damage ... 33

     C.  Nolasco's Post-Collision Actions Aggravated the Damage ................... 34

III.  ALNIC AND HER OWNERS LIED AND CONSPIRED TO COVER THE TRUTH .... 38

     A.  Crew Lies at Commencement of Litigation ......................................... 38

     B.  Petitioner Covered-up the Cover-up ................................................... 40

IV.   ALNIC'S MASTER AND OWNERS KNEW ALNIC SAILED THE SINGAPORE
      STRAIT WITH AN UNDERMANNED BRIDGE ................................................ 42

     A.  Stealth Knew ALNIC Was Undermanning the Bridge in the Singapore Strait .......... 42

     B.  Zisimos Falsified Outward-facing Safety Records ................................. 45

    C.  Zisimos Knew ALNIC Was Incompetent in Stealth's Safety Management System . 46

V.      DAMAGES ........................................................................................................ 47

PROPOSED CONCLUSIONS OF LAW ..................................................................... 47

I.      ALNIC WILL NOT BE EXONERATED ....................................................... 47

    A.  Singapore Law on Collisions ..................................................................... 47

    B.  ALNIC's Violations of the COLREGS Caused the Collision .................................... 48

    C.  Absent Witnesses and Fraudulent Conduct ............................................... 61

II.     APPORTIONMENT OF 70% FAULT TO ALNIC ........................................... 69

III.    LIMITIATION OF LIABILITY IS DENIED ................................................. 74

IV.   PETITIONER'S CLAIM FOR CONTRIBUTION IS NOT ALLOWED ........................ 78

V.      DAMAGES ........................................................................................................ 80

CONCLUSION .......................................................................................................... 81

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In the Matter of the Complaint<br>of<br>ENERGETIC TANK, INC.,<br>as Owner of the M/V ALNIC MC,<br>for Exoneration from or Limitation of Liability | Case No. 1:18-cv-1359 (PAC) (RWL)<br><br>**UNITED STATES' POST-TRIAL<br>PROPOSED FINDINGS OF FACT<br><u>AND CONCLUSIONS OF LAW</u>** |
| --- | --- |

The United States submits these post-trial proposed findings of fact and conclusions of law

pursuant to the Court's instruction. Transcript and Record of Trial ("RT") 768:15-16.

## INTRODUCTION

On August 21, 2017, in the Singapore Strait, the bulbous bow of ALNIC MC collided into

the side of USS JOHN S MCCAIN. Energetic Tank, as owners of ALNIC, filed a petition seeking

exoneration from or limitation of liability. The United States and other Claimants answered and

filed claims. Petitioner filed no answer.[1]  Before trial, the United States and Energetic stipulated

to the amount of their principal damages: $185,000,000 and $442,445 respectively. ECF 310-1.

The Court, sitting in admiralty, held Phase 1 of trial from November 1-8, 2021 to apportion fault

to the vessels, and to set prejudgment interest.   The Court is prepared to rule.

---

[1] Petitioner filed no Answer, and so did not deny the allegations made by Claimants.  In this circumstance, it is black-letter law that those allegations, other than ones relating to the *amount* of damages, are admitted. Fed. R. Civ. P. 8(b)(6) ("Effect of Failing to Deny.  An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied.").  *See also S.E.C. v. Razmilovic*, 738 F.3d 14, 19 (2d Cir. 2013) ("The complaint's well-pleaded allegations . . . are deemed admitted"); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992) ("Those allegations were deemed admitted upon ELUL's failure to timely answer."); *Am. Tugs, Inc. v. 3HD Supply LLC*, No. 16 CV 3462-LTS, 2018 WL 4112817, at *1 (S.D.N.Y. Aug. 29, 2018) (in admiralty) ("In light of Defendants' failure to respond to the complaint, Plaintiff's well-pleaded factual allegations are deemed admitted."); *Pineda v. Tokana Cafe Bar Restorant, Inc.*, No. 16-CV-1155 (JPO), 2017 WL 1194242, at *1 (S.D.N.Y. Mar. 30, 2017) ("Because Defendants have failed to answer the complaint, they have conceded Plaintiffs' well-pleaded allegations of liability."); *Citizens Concerned for Separation of Church & State v. City & Cty. of Denver*, 628 F.2d 1289, 1298 (10th Cir. 1980) ("The purpose thus served is that allegations in the complaint not denied will stand admitted and will not be at issue at trial . . . .").  While Petitioner did file a counterclaim against (and only against) the United States, which contains a blanket denial of liability ("Owner denies that it is liable to any of the Claimants"), this fails to state a general or specific denial in a responsive pleading as required by Fed. R. Civ. P. 8(b)(3).

## PROPOSED FINDINGS OF FACT

## I. THE COLLISION

### A. Background

1.　　USS JOHN S MCCAIN (DDG 56) ("MCCAIN") is an Arleigh Burke Class Guided Missile Destroyer, a commissioned warship owned and operated by the United States through the United States Navy.  ECF 34 (U.S. Claim) ¶ 5.

2.　　At all relevant times, MCCAIN was forward deployed to the United States Navy's 7th Fleet and, along with her crew, was engaged in active duty military service.  *Id.* ¶ 6-7.

3.　　Commander Alfredo Sanchez, U.S. Navy, was in command of MCCAIN.  RT (Sanchez) 133:12-14.  Although now retired, he testified live at trial.  *Id.* at 133:5-6.

4.　　M/V ALNIC MC ("ALNIC") is a Liberian flagged tank vessel, owned by Energetic Tank, Inc., a shell corporation formed under the laws of Liberia with a sole "President/Secretary/ Treasurer" and no employees.  Exh. 3003 (Interrogs. 3, 5), ECF 34 ¶ 8-10, ECF 40 ¶ 4.

5.　　ALNIC was managed and operated by Petitioner's agent, Stealth Maritime Corp. ("Stealth"), a corporation formed under the laws of Liberia but operating from offices in Athens, Greece.  ECF 34 (Claim) ¶ 18.

6.　　Ritchie Nolasco was master of ALNIC from the time Stealth assumed management of the vessel in April 2017 until the collision.  Exh. 3003 (Resp. to Interrog. 9).  Having perjured himself in deposition, he did not return to the United States to testify live at trial.

### B. Into the Singapore Strait

7.　　In the early morning of August 21, 2017, MCCAIN was bound for Singapore from classified operations in the South China Sea.  Exh. 116 (MCCAIN Log).  ALNIC was on a voyage that began in Taiwan on August 15, 2017.  Exh. 11 (Voyage Plan); Exh. 13 (ALNIC Log).

8.      Before entering the Singapore Traffic Separation Scheme ("TSS"), ALNIC had been overtaken on her starboard side by the M/V TEAM OSLO at 0.15 nautical miles.  Exh. 592 (Radar) (showing past CPA as 0.13 nm); RT (Putty) 391:9-12 ("She was about [a cable] and a half, yes.").  MCCAIN was lined up to overtake ALNIC next, at a distance of 0.3 nm.  RT (Hight) 523:15-18 ("Yeah, three cables is fair.").

9.      From 0400 until the collision, the weather was clear.  ECF 34 ¶ 20.

*i.      The ALNIC Watch Before the Red-Over-Red*

10.     Just before 0520, ALNIC entered the Singapore Strait.  Exh. 4028 (Wilske Tool); ECF 34 ¶ 14-15.  At that time, Nolasco was required by Stealth's Safety Management System (SMS) to set Bridge Manning Level (BML) III.[2]  Exh. 9B (SMS Vol. M4) at 28; Exh. 3038 (Chelios) at 44:17-20 ("[W]hen the ALNIC was transiting Singapore Strait, what level of bridge manning level was she supposed to have had?  A.  III."); Exh. 3047 (Nolasco Dep.) 43:8-24.

11.     As Petitioner has admitted, "**pursuant to Liberian Maritime Regulations and the ISM Code**, Stealth Maritime Corporation had implemented, and **the vessel was required to operate under**, the Company's Safety Management System (SMS)."  Exh. 3012 (Resp. to Req. for Admis. 62) (emphasis added).  *See also* Exh. 3045 (Zisimos) at 24:3-10 ("Q. [T]he ships have . . . to comply with that SMS; correct?  A. Yes, correct.  Q. That – that's the requirement of the ISM code, which is an international treaty; right?  A. Right.).

12.     Stealth's SMS was not merely an "internal procedure manual," but was certified by the Government of the Republic of Liberia as compliant with the International Safety Management (ISM) Code, and without it ALNIC could not have been operated on an international voyage.  Exh.

---

[2] Stealth named their Safety Management System their "General Management System" or GMS.  The two terms are synonymous.  The SMS exists to ensure safety of the vessel, and to prevent loss of life and collisions at sea.  Exh. 3012 (Resp. to Req. for Admis. 63); Exh. 3047 (Nolasco) at 33:19-34:2.

3012 (Resp. to Req. for Admis. 60); Exh. 3045 (Zisimos) at 25:3-5 ("[W]ould it be allowed under Liberian law to embark on an international voyage?  A. No.").[3]

13.     In sum, Stealth and Nolasco were required under the ISM Code to post an Anti-Collision Officer, and otherwise comply with BML III, when sailing in the Singapore Strait.  ECF 34 ¶ 19 (Stealth was obliged by the ISM Code to implement and abide by the provisions of the SMS); RT (Putty) 416:4-8 ("A. The safety management system is what required the ALNIC to have Bridge Manning Level III.  The safety management system falls under the ISM code. The ISM code falls under SOLAS.").[4]

14.     BML III is the highest level of readiness in Stealth's SMS.  Exh. 9B (SMS Vol. M4) at 30 ("This watch is the most critical and calls for the most rigorous attention to priorities."); Exh. 3047 (Nolasco) 43:25-44:3.

15.     Under BML III, Nolasco was required to post the following five watchstanders. Exh. 9B at 28 (Table 6); Exh. 3038 (Chelios) at 45:8-22; Exh. 3047 (Nolasco) at 45:24-46:2.

16.     <u>Conning Officer</u>.  First, the Master was required to conn the ship and "supervise the overall watch organization."  Exh. 9B at 28-30.

17.     <u>Anti-Collision Officer</u>.  Second, Nolasco was required to have an "**anti-collision Officer**" who "must have no responsibilities other than to operate the vessel's Radar / ARPA . . . ."

---

[3] The ISM Code is codified as Chapter IX of the SOLAS Convention (International Convention for the Safety of Life at Sea) and entered into force on July 1, 1998.

[4] For these reasons, the Court rejects Petitioner's argument  that:

> The anti-collision officer is not a position required under the COLREGS, the ISM code, or any other legislation or regulation.  It is a creation of the vessel's GMS, which is an internal procedure manual.  And claimants' argument that violation of one's GMS is a violation of the ISM code or any other law is completely unsupported.

RT (Pet'r's Closing) 755:19-24.

*Id.* at 30.  His only job was "to make sure [ALNIC] doesn't get involved in a collision."  Exh. 3047 (Nolasco) 86:14-21; Exh. 3038 (Chelios) at 87:22-88:5 ("His job as anti-collision officer is to . . . provide that information to the conning officer, in this case the master, so the master in this case can avoid a collision; correct?  A. Correct.").

18.     <u>Navigation and Communications Officer</u>.  Third, BML III requires that "[o]ne Officer must be dedicated to navigation and communication duties . . . ."  Exh. 9B at 30.

19.     <u>Helmsman</u>.  Fourth, Nolasco was required to have a dedicated helmsman in hand steering.  *Id.* at 28 (requiring "Manual Steering" in BML III), 31 ("Helmsmen shall have no other duties when assigned to the helm."); RT (Jandayan) 621:1-8 (agreeing that when going through Singapore Strait, an able-bodied seaman was supposed to be on the helm of ALNIC).

20.     <u>Dedicated Lookout</u>.  Fifth, Nolasco was required to have an additional unlicensed watchstander as the dedicated lookout.  Exh. 9B at 21 ("[A] lookout having no other duties must be posted" in heavy traffic, between sunset and sunrise, as well as in the Singapore Strait); *id.* 31 ("The duties of the look-out and helmsperson are separate and the helmsperson shall not be considered to be the look-out while steering.").

21.     Throughout the overtaking, ALNIC's bridge team consisted only of the captain, chief mate, and quartermaster.  At the time of the *collision*, Nolasco was missing the *Anti-Collision* Officer, as well as the dedicated lookout.  His bridge team was 40% undermanned.  Exh. 3005 (Resp. to Interrog. 18); Exh. 3038 (Chelios) at 134:2-15; Exh. 3047 (Nolasco) 101:4-7 (same).

22.     Under BML III, Nolasco was also required to have the helm in manual steering. Exh. 9B at 28 (Table 6); Exh. 3047 (Nolasco) 46:13-16.  Instead, at the time of the collision, he used "Autopilot."  *Id.* at 137:3-8 ("It's on autopilot.").

23.     After getting off watch at 0400, Second Mate Torculas went into the chart room to do pre-arrival paperwork. He kept all the overhead lights on in the chart room while working. RT (Torculas) 64:4-20 ("Q. Now, if all of the curtains were open and you've got the overhead lights on, what would that do to the watchstanders' night vision? A. Their vision will be becoming -- they cannot see around the vessel.").

24.     Torculas was not on watch, was not a part of the bridge team, and was never called forward to help the watch. RT (Torculas) 65:16-66:1; 94:20-24 ("Q. You were not part of the bridge team then? A. Correct, sir."). He remained in the chart room until moments before the collision. *Id.* at 95:15-96-4 ("A few seconds, hits bang. That's it. Q. When you stepped out of the chart room at that point was JOHN MCCAIN or any part of the ship already forward of your own bow? A. Yes, sir, same like a letter T.").

25.     At 0520, Chief Mate Gracia put his head inside the chart room, where the lights were on, to plot ALNIC's fix on the paper chart. Exh. 3047 (Nolasco) 311:18-312:5 (referring to fix on BA Chart 3831) ("Would that be the chief mate that made that? A. That's correct, sir. . . . . That's 5:20 in the morning. Q. And he took a GPS position and plotted it on the chart? A. That's correct, sir."); RT (Torculas) 96:25-97:2 (second mate did not plot before collision).

26.     Plotting the fix on the paper chart took Gracia approximately one to two minutes, after which his night vision was negatively affected. RT (Putty) 319:14-320:9. During that time, he was unable to function as lookout or monitor the radar. Exh 3047 (Nolasco) 62:13:18 ("[H]e's looking down at the chart, and he's fixing the vessel's position by pencil on the chart, he's not standing lookout, is he? A. Correct, sir."); *id.* at 88:2-7 ("But when he's fixing the vessel's position on the chart, he is not looking at radars as a dedicated anti-collision officer; correct? A. Correct, sir. Correct. Correct, sir.").

27.    With the chief mate in the chart room to plot the 0520 fix, Nolasco went to the starboard bridge wing at 5:20:06.  He visually observed MCCAIN overtaking on his starboard side, and then returned inside the pilothouse at 5:21:07.  Exh. 4021 (Stip. Tr.) (giving door opening and closing times); Exh. 3047 (Nolasco) 238:4-7 ("You went out to the bridge wing yourself at about 5:21; is that correct?  A. That's correct, sir.  Roughly that.").

28.    Nolasco then shut the bridge wing door behind him, and did not post a lookout to the starboard bridge wing to keep eyes or ears on MCCAIN.  Instead, he turned his back to the warship, and walked over to the S-band radar, which was located on the port side of the bridge.  Exh. 3047 (Nolasco) 164:5-14 (claiming he used the S-based radar before the collision); *id.* at 244:14-17 (S-band radar on port side).

29.    The quartermaster, AB Ambrocio-Jandayan, was supposed to be the helmsman of the watch.  As things unfolded in the litigation, it came to light that his counterpart, the dedicated lookout of the watch (Ordinary Seaman Secang), was never on watch.  (*See infra* paras. 140-144.)  In effect, Jandayan was serving as both helmsman and lookout, which violated the SMS requirements for BML III.  Exh 3047 (Nolasco) 62:22-24 ("Q. And he's not supposed to be the lookout when he's the helmsman; correct?  A. Correct, sir.").  *See Complaint of Interstate Towing Co.*, 717 F.2d 752, 755 (2d Cir. 1983) ("The need for competent vigilance has prompted repeated holdings that a lookout's sole duty should be that with which he is charged and that one who is assigned the duties of helmsman is not a proper person to act as a lookout.").

30.    As Nolasco was walking away from MCCAIN, at 5:21:19, Jandayan reported, "Warship, I see a warship."  Exh. 4021 (Stip. Tr.); RT (Jandayan) 623:7-11 (reporting MCCAIN

when on the starboard quarter).[5]  Jandayan was inside the pilot house, and not posted to the bridge

wing as required by the Standing Orders.  RT (Jandayan) 628:7-17.

31.    After reporting the warship, Jandayan turned his back to it and physically moved

to the port side to look out the windows on that side of the bridge.  RT (Jandayan) 629:19-630:7.

*ii. The MCCAIN Watch Before the Red-Over-Red*

32.    As MCCAIN was entering the Singapore Strait, CDR Sanchez had 14 crew posted

to the bridge team:  himself (CO), CDR Jessie Sanchez (XO) (Exh. 4041), LTJG Stefani Ahsanov

(OOD) (Exh. 3030), ENS Michael Piscitelli (CONN) (Exh. 4038), LT Andrew Hanna (Navigator)

(Exh. 3043), QMC Phillip Fields (Assistant Navigator), ENS John Taylor (JOOD) (Exh. 4043),

ENS Daniel Coley (JOOW) (Exh. 3039), OS2 Cody Scott (Shipping Officer) (Exh. 4042), BM3

Anthony Gillilan (BMOW) (Exh. 3042), SN Dakota Bordeaux (Helmsman) (Exh. 3034), BMSN

Dontrius Mitchell (Lee Helmsman) (Exh. 3046), QMSN Kristofer Woolson (QMOW) (Exh.

3053), and SR Anthony Neimeier (Port Bridge Wing Lookout) (Exh. 4037).[6]

33.    This was a "modified navigation detail" that provided CDR Sanchez with an

increase of six persons over and above the normal at-sea watch bill.  Exh. 116 (MCCAIN Log)

("0418: Station mod nav detail"); Exh. 44 (Condition III Watch Bill).[7]  The augmented personnel

---

[5] While Petitioner makes much of the conditions of darkness, obviously Jandayan was able to see that MCCAIN was a warship.  RT (Jandayan) 626:1-2 ("I am only see by visual the warship, sir.").

[6] In addition, the senior enlisted sailor of the crew, Command Master Chief Dedrick Walker, was on the bridge in a non-watchstander capacity.  Exh. 3050 (D. Walker).

[7] The Court rejects Petitioner's argument that CDR Sanchez was obliged to follow his subordinates' advice to set the Special Sea and Anchor Detail before entering the Singapore Strait.  The Commanding Officer, for valid reasons he explained at trial, "did not agree with the recommendation."  RT (Sanchez) 172:17-20.  This was his prerogative.  Related, the content of the "Navigation Brief" held the day before the accident is not relevant because its audience was the Special Sea and Anchor detail that was to be posted at 0600 on August 21, 2017.  *See* RT (Sanchez) 182:18-22 ("Q. Okay. But had that procedure or that watch changing, had that been briefed in your navigation brief?  A. No, sir, because that was not part of the navigation station.  So it would not be briefed because it was prior to setting the [full] navigation detail.").

were the Commanding Officer, Executive Officer, Navigator, Assistant Navigator, Shipping Officer, and Lee Helmsman. That is, CDR Sanchez augmented his bridge team by twice the total number of persons on Nolasco's bridge team.

34.     At 0435, MCCAIN's computerized steering system experienced a "major fault." Exh. 136 (Court-martial Stip.) at 4 ("At 0435, the ship experienced a major fault in 1A HPU"); Exh. 96 (Steering Log). Before that fault cleared, CDR Sanchez chose to switch to the "backup manual"[8] mode of steering out of concern that more faults might interfere with the steering of the ship, and to allow technicians sufficient time for troubleshooting. RT (Sanchez) 198:13-199:1, 199:9-16, 200:15-24 ("I took the decision to put it on backup manual because I felt that made the system more reliable because it will take the assisted computing – the computer assisted portion of steering out and it will be more a direct signal."). He was specifically mindful that he was in "a high traffic area, it's high density contacts." *Id.* at 200:10-201:2.

35.     CDR Sanchez's concerns about the Integrated Bridge Navigation System (IBNS) while in heavy traffic were well founded. As he recently experienced, faults could potentially lead to **an unplanned loss of control**. *See, e.g.*, Exh. 446 (documenting "LOSS OF THRUST CONTROL" and transfer to another station); RT (Patat) 287:14-19 ("So when they saw loss of thrust control, for example, it could be a microsecond glitch when it comes to IBNS . . . .").

36.     CDR Sanchez had experienced continuing faults on an ongoing basis since at least August 2016. RT (Sanchez) 155:11-14. MCCAIN reported its problems, noting that IBNS was "unstable and has multiple crashes daily." *Id.* at 157:15-16. Efforts to have a technician rendez-

---

[8] *See* Exh. 4034 (Becker) 39:7-17 (Navy IBNS engineer) ("Computer-assisted manual mode takes additional sensor data . . . and averages those values together to create the current command that will move the rudder left or right. Backup manual mode is a hard-wired control from the steering wheel at the ship control console and the aft steering unit and interfaces directly with a circuit card inside the local control unit and bypasses the ship's network and software for rudder control.").

vous with MCCAIN earlier in the South China Sea patrol were unsuccessful. *Id.* at 160:5-10, 162:21-25. A technician was due in Singapore as soon as MCCAIN arrived. *Id.* at 159:5-12.

**C. MCCAIN's Steering Casualty (5:20:40)**

37. At 5:20:40, **from an unknown cause**, the computer transferred control of steering from MCCAIN's wheel, causing the rudders to move amidships. Exh. 136 (Court-martial Stip.); Exh. 97 (Aft Steering Video); RT (Pet'r's Opening) 24:14-23 ("Push the buttons, and **somehow or another** what happened next? We know from the video in the aft steering station . . . 21:20:39, the helm control shifted from the helm station to the lee helm station . . . .") (emphasis added).

38. The parties agree that MCCAIN's steering gear never suffered a mechanical "casualty." Exh. 136 (Court-martial Stip.). However, there is no explanation for why the computer transferred steering control from the helm. Petitioner notes that when control is in "backup manual" at the helm station, another station "**could** unilaterally take steering control." ECF 328 (Pet'r's Prop. FOF 35(d)) (emphasis added). This leads Petitioner to speculate, without any evidence, that the lee helmsman took steering control while attempting to take thrust control.

39. To "unilaterally take steering control," the lee helmsman would have to "select [his] station name in the steering location box, it will highlight yellow, and then the accept and the cancel buttons in the steering location window the text would turn white, then the operator would press accept and then control would transfer to that station." Exh. 4034 (Becker 30(b)(6)) 75:1-7. But the lee helmsman did not take any of those steps.

40. Rather, the lee helmsman explained the specific steps he took to gain *thrust* control, and that no one else was touching his control screen. RT (Mitchell) 690:1-7 ("Q. [Gillilan] went to the helm station and did what? A. Went over to the control location, hit the drop-down, clicked on lee helm, and sent it over to me, pressed -- yeah, sent it over, the signal over to my console, and

I accepted it."); *id.* at 688:2-10 ("Q. Was there anyone else besides you who was actually entering commands into the lee helm unit during that time? A. No. Q. Like, the bosun's mate of the watch didn't come over and start pressing buttons or anything like that on your unit? A. On my unit, no. Q. Okay. And the helm, did the helm reach over and make any -- enter any commands on the lee helm unit? A. No.").

41.    Without proof of what precipitated the inadvertent transfer of control from the helm to the lee helm station, the Court rejects Petitioner's speculation that the lee helmsman "unilaterally [took] steering control." ECF 328 (Pet'r's Prop. FOF 190) (claiming, without citation, "This is exactly what happened here.").

42.    When control left the ship's wheel, MCCAIN's helmsman immediately noticed that the rudders were moving leftward from a position of 3° right, where he had been carrying them to offset wind and seas. After confirming that the rudders were unresponsive, he announced a loss of steering at approximately 5:21:00. RT (Sanchez) 133:22-23 ("The first notification is we got the helmsman on the bridge notifying that he's got a loss of steering.").

### D. MCCAIN Displays Not-Under-Command Lights (5:21:25)

43.    Reacting to the helmsman's emergency announcement, CDR Sanchez immediately ordered his team to energize the "Not Under Command" masthead lights. RT (Sanchez) 135:4-9 ("[F]irst thing that came out of my – out of my mouth was: Quartermaster, red-over-red."); RT (Fields) 111:4-6 ("Q. Was it Commander Alfredo Sanchez, the CO, that you heard call out the 'energize red-over-red'? A. Yes, sir, it was.").

44.    MCCAIN's Navigator, LT Hanna, responded to the order by properly displaying the lights for a vessel Not Under Command. RT (Hanna) 434:23-25 ("Q. Okay. So now you said that one of the steps you took was to energize the red-over-red; is that right? A. Yes."); *id.* (Coley)

443:17-21 ("[W]hat did you do when you heard the loss of steering announced on the bridge? A. Initially, I moved with the navigator as he turned on the red-over-red running lights, or the red-over-red, not-under-command lights."); Exh. 136 (Court-martial Stip.) ("[L]ight configuration of Red-Over-Red indicating a Vessel Not Under Command, was illuminated.").

45. By the international collision regulations ("COLREGS"[9]), these distinct "red over red" lights in the masthead communicated to all nearby ships that "through some exceptional circumstance," the warship was "unable to maneuver as required by [the COLREGS] and [was] therefore unable to keep out of the way of another vessel." COLREGS Rule 3(f); RT (Putty) 416:12-22 ("[A]s far as vessels in sight of one another at night, the method of communication is red-over-red task lights."). Captain Hight agreed. RT (Hight) 521:8-18:

> Q. So when JOHN S. MCCAIN illuminated her red-over-red lights . . . it would have been essentially saying, through the COLREGS way of doing it, I, MCCAIN, am unable to maneuver as required by these rules. That's what I am saying.
> A. Yes.
> Q. And I would be telling other vessels, such as ALNIC, and I'm therefore unable to keep out of the way of you, you ALNIC. Correct?
> A. Correct.

46. MCCAIN displayed not-under-commands lights at 5:21:25, over 2.5 minutes before the collision. Exh. 3050 (D. Walker) 221:7-10 ("Do you recall that announcement on the 1MC, whether it happened before, after, or at the same time as the click on the light switch? A. Almost -- almost simultaneously."); RT (Putty) 322:8-10; *id.* (Fields) 114:11-13 (estimating that 17 seconds passed from loss-of-steering to verification of lights); Exh. 116 (MCCAIN Log).

47. The COLREGS required no other communication than the not-under-command lights. RT (Putty) 416:12-22 ("Q. Do the COLREGS require any other means of communication made by a vessel not under command? A. No."). By displaying his not-under-command lights,

---

[9] Convention on the International Regulations for Preventing Collisions at Sea, 1972.

CDR Sanchez discharged his duty to communicate his inability to keep out of the way of ALNIC.[10] RT (Sanchez) 218:18-25 ("If I had taken the time to call the vessels [on radio] then it's time that I am not trying to regain control.").

48.     On ALNIC, Nolasco knew that red-over-red lights signified that a vessel "has lost control," making navigation "difficult, if not impossible."  Exh. 3047 (Nolasco) 278:7-279:7.  Since he could not tell whether the vessel was suffering from steering or propulsion problems, he had to assume it could be either.  *Id.* at 279:23-280:3.

49.     Soon after the collision, Nolasco told Singapore investigators that he "noticed that JSM had displayed some **red lights on her mast**."  Exh. 3047 (Nolasco) 264:8-15 (emphasis added).  And further, according to Nolasco, "except for the red-over-red lights, he did not recall seeing any other lights or hearing sound signals made by JSM."  *Id.* at 264:19-24.

50.     But during his deposition, at which he perjured himself numerous times, Nolasco denied making these statements to Singapore investigators.  He claimed he meant:  "I see the red lights but not really red over red.  No, sir.  I only see the red lights, which means the sidelights, you know.  That's what I was talking."  *Id.* at 266:23-267:5.  His testimony is not credible.

51.     Nolasco's story, that he saw a red sidelight rather than red-over-red task lights, was parroted by Ordinary Seaman Secang during his flag-state interview.  Exh. 3038 (Chelios) at 105:2-106:3 ("Q. What does [Secang] tell them then?  A. Starboard quarter and parallel.  Q. And then after -- A. 'Any lights?' 'Side light red.'").  This is significant because Secang was never on

---

[10] Petitioner suggest from CDR Sanchez's Standing Order No. 9 that MCCAIN was obliged to call ALNIC over VHF radio to supplement the not-under-command signal.  This is unpersuasive.  The CO's Standing Orders were for his crew in his absence.  RT (Sanchez) 217:8-13 ("[T]he standing orders . . . are designed, built, written for the conduct of the ship when the captain is not on the bridge.").  Since he was present, he had the prerogative for how best to triage the steering casualty after discharging his absolute duty under the COLREGS to communicate his not-under-command status.  In any event, neither vessels attempted to hail the other over VHF radio prior to the collision.  Exh. 3012 (Resp. to Req. for Admis. 64).

the bridge. He obviously had gotten his 'story straight' with the captain before being interviewed. In deposition, the quartermaster also repeated the sidelight-only story, very much calling into question that veracity of his testimony as well. RT (Jandayan) 624:3-6 ("But I only see the light for the warship on the starboard quarter, the side light.").

52.     The Court finds Nolasco and Jandayan saw MCCAIN with red-over-red energized. *See also* RT (Hight) 525:19-526:3 (agreeing lights were there to be seen by anyone on ALNIC looking out the window); RT (Putty) 324:4-8 ("When the red-over-red lights went up and should have been observed by ALNIC, the immediate thought that should have gone through Captain Nolasco's mind is that the vessel that has overtaken him has had some sort of casualty . . . .").

53.     On MCCAIN, LT Hanna, ENS Coley, and QMC Fields went to the bridge wing and personally verified the lights were on with their own eyes. RT (Hanna) 434:6-10:

> And after that, I remember going out to the bridge wing to verify it. I actually tripped over the door frame. Kind of embarrassing, but I did trip over it. And looked up out there -- it was actually me and Chief Fields were out there at the same time -- verified that the red-over-red was there.

*Id.* (Coley) 443:21-24 ("I went out with him on the bridge wing, verified that they were illuminated."); *id.* (Fields) 112:17-113:8:

> Q. So what did you do next?
> A. I went to the starboard bridge wing and looked up at both lights.
> Q. When you say the starboard bridge wing, you actually went out on the wing itself outside of the pilot house?
> A. Yes, sir.
> Q. And when you – what did you do? Tell us in detail.
> A. I went all the way to the very end. You had to kind of lean over and look up, and I verified both the top and lower red-over-red lights were on.
> Q. And did you see any other lights on?
> A. No, not to my knowledge.
> Q. And was anybody with you out on the wing, the bridge wing, when you saw the two red lights?
> A. Yes, Lieutenant Hanna.
> Q. And how do you know it was Lieutenant Hanna?
> A. I spoke to him because he tripped.

54.     In addition to those three Navy sailors seeing energized red-over-red lights from the starboard wing, the Officer of the Deck (LTJG Ahsanov) saw them burning from the port side. Exh. 3030 (Ahsanov) 216:6-13 ("Q. Did you ever go out on the bridge wing and look up to see whether or not red-over-red was energized? A. Yes, at – at some point I did see the red-over-red energized."), *id.* at 227:8-10 ("Do you recall which bridge wing you were on when you observed the lights? A. The port bridge wing.").

55.     Petitioner suggests that perhaps MCCAIN sailors left the white range lights burning when they energizing the red-over-red task lights. This suggestion is debunked by watchstanders from *both* ships. From ALNIC, the percipient witnesses claimed to see only a single red sidelight. Petitioner cannot change their story now to say they saw red-over-red lights *and* range lights. From MCCAIN, four eyewitness testified that they personally saw that red-over-red lights were properly energized. Petitioner chose to ask only one of them whether he saw other lights, to which he answered in the negative. RT (Fields) 112:17-113:8.

56.     There is no MCCAIN deck log entry about the not-under-command lights until 0534, when the log says "red over red lighted."[11] Exh. 116 (MCCAIN Log). QM3 Woolson, who maintained the deck log during the loss of steering, could not log "energize red-over-red" because he did not hear it. Exh. 3053 (Woolson) 69:3-11 ("[MR. WEIGEL] And we have the quartermaster chief and the navigator both saying they went out on the bridge wing, starboard bridge wing, prior to the collision and looked up and saw red-over-red energized before the collision. So somebody

---

[11] Petitioner notes that two of six task lights were not burning in one of the red lanterns on MCCAIN. ECF 328 (Pet'r's FOF 146(c)). Claimants' expert conducted operational testing on the waters of the Chesapeake Bay to verify that with two of six bulbs out, the light met the COLREGS standard. Further, Capt. Murphy tested that with one lantern having two of six bulbs out, when displayed vertically with another red lantern having all six bulbs burning, the luminous intensity of the lanterns was indistinguishable. *See generally* RT (Murphy) 294:22-297:18. Petitioner apparently did no testing of its own.

did it.  **Somebody ordered it, and somebody did it prior to the collision.  But you didn't hear that order; correct?  A.  Correct.**") (emphasis added).  QM1 Joseph, who relieved Woolson for General Quarters following the collision, testified that he made the 0534 entry, and that the lights were already on when he got to the bridge.  RT (Joseph) 444:6-9, 445:15-21, 446:12-17 ("[D]o you recall hearing at 05:34 someone saying 'energize red-over-red,' giving the order to energize red-over-red?  A. To energize? . . . . No.  It was already on.").

57.     Woolson never added a "late entry" to the log about energizing red-over-red lights at 0521.  That is because, unlike the altered ALNIC deck log, the MCCAIN team locked up their log to protect its integrity.  *See, e.g.*, RT (Fields) 115:6-24 ("I locked it up in a two-drawer filing cabinet.  Q. Why did you do that?  A. To preserve it."); *id.* (Hanna) 436:2-22 ("I didn't want anybody to correct the deck logs or do anything to them, because I wanted . . . to maintain that integrity for the investigation.").[12]

58.     At about the time that CDR Sanchez ordered energizing red-over-red, the Officer of the Deck ordered that "Loss of Steering" be called away on the ship's "1MC" network, which consists of megaphones located outside and inside MCCAIN.  Exh. 3042 (Gillilan) 115:6-12.

59.     Beginning at exactly 5:21:23, Boatswain's Mate of the Watch Gillilan called away over the 1MC megaphones:  "*Loss of steering in the pilot house, loss of steering in the pilot house! Man aft steering!*"  He repeated this announcement twice.  Exh. 4021 (Stip. Tr.); RT (Gillilan) 662:18-24 ("Q. And then you actually did that on the 1MC?  A. Yes.").  This was audible from ALNIC's starboard bridge wing.  Exh. 4021 (Stip. Tr.).

---

[12] *See also* RT (Hanna) 442:10-25 ("Q. Okay. Well, if you had gotten to the end of August and you had reviewed the log entry for August 21, and you had seen an entry for the red-over-red energized after the collision, is there something you could have done to correct the entry? . . . . The Witness: If this wasn't a situation that involved a legal investigation, then, yes, we would have. . . . I did not want to touch anything that happened during that deck log there because there was an open investigation.  I did not want any type of perception that anybody was going in to change anything that was written.").

60.     On ALNIC, down their dedicated lookout, Nolasco did not post a lookout to the bridge wing as required.  Exh. 28 (Standing Orders) ("[A]ny lookout posted shall also maintain good all round watch both aurally and visually.  He shall . . . move from wing to wing.  During bad and cold weather the lookout may keep the watch in the wheel house but he must check outside at reasonably frequent intervals."); RT (Putty) 420:21-421:13 ("[W]hat do you understand [to be] the purpose of Captain Nolasco's specific requirement to post a lookout to the bridge wing?  A. To comply with Rule 5.").  A proper lookout on ALNIC's bridge wing would have heard the distinct sound of MCCAIN's PA announcement, if not the actual words spoken.

61.     A proper lookout on ALNIC's bridge wing would have seen MCCAIN energize red-over-red lights at 5:21:25.  RT (Hight) 547:20-23 ("A. I have no reason to doubt anybody on that bridge didn't see those lights. They all – I don't know if they all – it's basically understood that they saw the lights.  I mean, the lights were lit; they were watching MCCAIN . . . .").

62.     The Court imputes knowledge to Capt. Nolasco that MCCAIN energized red-over-red lights at 5:21:25, during the overtaking.  At that time ALNIC should have known that MCCAIN had an "exceptional circumstance" that prevented her from maneuvering as required by the COLREGS, and therefore made her unable to keep out of the way of ALNIC.  Rule 3(f).

63.     Rules 5 and 7 obliged Nolasco to maintain a proper lookout, and to use all available means (including by looking out the window and using the radar) to determine that a risk of collision existed.  RT (Putty) at 327:18-20.  Once MCCAIN's red-over-red lights were energized, Nolasco "should have started to assess the situation" and "should have been immediately formulating options that he had under Rule 17(a)(2), which allows the stand-on vessel to maneuver."  RT (Putty) 324:9-11; *id.* at 426:14-18; RT (Hight) 533:18:22 ("So if they saw those

red-over-red lights at [5:21:25] . . . it would be prudent, at the very least, to begin their assessment process at that time, would it not?  A. Absolutely prudent.").

64.     At 5:21:52, less than 30 seconds after the 1MC announcement, the first MCCAIN sailor can be seen responding to aft steering, a compartment over the rudders that was accessible only by vertical ladder.  Exh. 97 (Aft Steering Video).  *See also* RT (Sanchez) 195:15-21 ("As soon as the lost steering was passed, aft steering was manned in less – I will say, seemed like an eternity at the time, but it was less than a minute.  And we knew aft steering was manned because, as I stated yesterday, we heard the voices of aft, people in aft steering.").

### E.  ALNIC's Radar Shows MCCAIN Veering to Port (5:21:52)

65.     Shortly after the loss of steering, because of wind and current, MCCAIN's heading began to fall off to port.  By 5:21:52, MCCAIN's veer to port could be seen on ALNIC's X-band radar.  ALNIC's Marine Superintendent, Capt. Chelios, admitted this in his deposition:

> Q. . . . So what you've written there, '21:21:52,' would be slightly more than two
>     minutes prior to the collision; correct?
> A. Yes.
> Q. And you say 'Altering course to port abeam ALNIC.'  There you're describing
>     who's altering course to port?  The MCCAIN?
> A. MCCAIN, the MCCAIN. . . .
> Q. How did you determine that at 21 minutes and 52 seconds after 5:00 a.m. – how
>     did you determine that MCCAIN was altering course to port?
> A. From the VDR data.
> Q. . . . [W]ere you looking at the radar images recorded to the VDR data?
> A. Yes, correct.
>               *                          *                          *
> Q. . . . [I]f either the captain or the mate or anybody aboard ALNIC had been
>     looking at their radar at that time, that is, 20 minutes and 52 seconds after 5
>     o'clock in the morning, if they had looked at the radar, . . . they could have seen
>     the MCCAIN was altering course to port; correct?
> A. Yes.

Exh. 3038 (Chelios) 91:18-92:17, 92:23-93:11.  *See also* Exh. 592 (Radar Screenshots); RT (Hight) 528:3-8 ("I think we established that, yes, you could see, that's where you could begin to see an aspect change.").

66. But that X-band radar was unmanned and had been unused since 5:14.  RT (Putty) 328:2-12 ("[T]he cursor . . . doesn't move. . . . There was no active tracking or acquiring of new targets going on during that period of time."); *id.* at 413:18-414:7 (noting that no one even touched the track ball on the radar since 5:14 a.m.).[13]

67. Nolasco falsely testified that while he used the S-band radar, the chief mate was using the X-band radar.  *See, e.g.*, Exh. 3047 (Nolasco) 164:5-14 ("In the roughly, let's say, ten minutes before the collision, up and to the collision, did you occasionally look at one of the vessel's radars?  A. Yes, sir. . . . I was on the S band radar.  The chief officer was on the X band."); *id.* at 169:17-20 ("Q. And it's your testimony today that the chief officer, the chief mate, he was on the X band; correct?  A. Correct, sir.").

68. It is not known what Nolasco saw on the S-band radar.  RT (Putty) 411:25-412:3 ("Q. What trails were showing on ALNIC's S band radar?  A. No idea.  Q. What trail length was set on ALNIC's S band radar?  A. We have no recording because it's not recorded to the VDR.").

69. The trails showing on the X-band would have provided the quickest indication that MCCAIN was turning.  RT (Putty) 360:2-13; 413:8-14 ("Q. Captain Putty, what story were those trails behind the MCCAIN on the X band radar telling anyone who might have been looking at that radar?  A. That the MCCAIN was getting closer and she was turning to port; and the

---

[13] Petitioner suggests that the X-band radar may have been used because it "was tracking" certain surrounding vessels.  RT (Pet'r's Closing) 754:12-19 ("someone on ALNIC's bridge must have done it manually").  But those other vessels had been tracked since well before the chief mate went to the chart room.  RT (Putty) 328:2-12; Exh. 592.  MCCAIN was never plotted on this radar.

visualization out of the window without even a pair of binoculars would show that she's a vessel not under command and she was making a turn towards you.").

70.     Had ALNIC's Anti-Collision Officer been on watch, as required in BML III, he would have seen MCCAIN veering to port by 5:21:52, which he would have reported to Nolasco.

71.     A reasonably prudent master in Nolasco's position would have had anticipated the worst-case scenario:  MCCAIN veering toward him.  Exh. 3038 (Chelios) 158:5-18, 159:5-14 ("I – I would consider the worst-case scenario, yes."); 163:8-11 (same); RT (Putty) 325:15-22.  A reasonably prudent master would have had time to consider the information, to take action, and to avoid this collision.  RT (Putty) 428:10-14.

72.     Capt. Hight suggests that "at no time in anything I've looked at is it ever apparent until it's too late, until it's too late, for ALNIC to do anything."  RT (Hight) 542:7-18.  The Court finds this unpersuasive, and Hight not credible.[14]  At 5:21:52, MCCAIN was displaying the lights for a vessel Not Under Command, and at just three cables, was veering to port and closing on ALNIC.  It was manifestly apparent "that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules."  Rule 17(a)(ii).

73.     Two seconds later (at 5:21:54), Nolasco was standing at the S-band radar and selected MCCAIN as an ARPA target on the radar.  RT (Hight) 527:18-21 ("That's when somebody aboard ALNIC apparently designated MCCAIN as a target on one of the two radars.

---

[14] Hight wrote in his CV, submitted for this Navy case, that he was a "retired" naval officer.  RT (Hight) 505:5-8.  The truth is that he never served a day in uniform, resigned, and never retired.  RT (Hight) 472:4-5 ("Q. Did you ever actually do any reserve service?  A. No, sir."); 472:20-473:1 ("Q. Now, do you remember during your deposition an issue was raised about your CV because you wrote that you retired from the reserves?  A. Yes, sir.  **Q. Did you retire?  A. No, apparently I didn't.**" (emphasis added)).  Also, during this case Hight has been in litigation against the United States based on an earlier Coast Guard denial of his licensing request.  RT 477:10-13 ("I sued them."); *Hight v. U.S. Dept. of Homeland Security et al.*, ECF No. 78, 1:19-cv-02094-APM (D.D.C.).  While Claimants' expert, Capt. Putty, has over two decades as a captain, Capt. Hight has only 3.5 years of sea time as a master.  RT (Hight) 506:20-24.

Agreed? A. Agreed."). By this late point, Nolasco should have been looking out the window and preparing to take action to avoid collision. RT (Putty) 330:19-24 ("[G]et a pair of binoculars and look out the window"); *id.* at 426:11-13 ("Q. Where should Captain Nolasco have been looking when the two ships were coming into extremis? A. He should have been looking out the window.")

74.     Nolasco's selecting MCCAIN as a target on the S-band radar only *began* the ARPA plotting. *See* RT (Hight) 481:1-4 ("[W]hen you make a plot, you know you kind of have to wait, let the computer crunch the numbers."); RT (Putty) 371:19-20 ("You don't plot a target at three cables and expect to get a good CPA solution in three minutes or one minute."). The season for compliance with Rule 7(b), which requires radar scanning to obtain *early* warning, had already passed. RT (Putty) 329:22-25 ("I think he should have begun his radar plotting long before that."); ECF 32 (Simon Claim) ¶ 10(f) ("ALNIC failed to use its ARPA to timely acquire the MCCAIN as a tracked target.").

75.     At 5:21:59, the ALNIC bridge crew can be heard joking and laughing. Exh. 4021.

76.     At 5:22:00, the ALNIC deck logbook contains a false entry that the ship went to a Stop bell. Exh 13B. Had Nolasco stopped engine at 5:22:00, or as late as 5:22:30, collision would have been avoided. RT (Putty) 332:3-11. But Nolasco did nothing and remained in a Full Ahead bell at 92 RPM. RT (Putty) 332:12-13 ("Did he fulfill that obligation? A. No."). This violation of Rule 8(e) caused the collision. *See* Exh. 3038 (Chelios) 167:14-24 (agreeing that ALNIC stopping engine would have been consistent with Rule 8(e)).

77.     At 5:22:07, the port throttle on MCCAIN slowed. This followed CDR Sanchez's direction to the OOD to slow the ship, and the OOD's order to slow to 10 knots. RT (Sanchez) 141:8-9 ("I gave the order to slow down to the O[O]D. The order was to slow down to ten knots."); Exh. 3030 (Ahsanov) 209:23-210 ("[T]he captain told me right after we had a loss of steering to

slow down.").  CDR Sanchez did this to "slow down the vessel in order to give [him]self and the ship more time to assess the situation and correct – and take corrective action."  RT (Sanchez) 141:11-13.  The Lee Helmsman reduced the throttle to comply, not realizing in the confusion of the loss-of-steering event that his touchscreen throttles were not "ganged."  As a result, his input to slow to 10 knots only took effect at the port shaft.  Exh. 94 (Port: 44 RPM, Starboard: 87 RPM).

78.     Petitioner suggests that the mismatch occurred at 5:22:20, two seconds *after* their simulation found that Nolasco could have avoided collision by stopping his engine.  Their basis is a MCCAIN engineering log that records only periodic snapshots of engine speeds.  Exh. 94 (TCU Log).  (The exact periodicity is under seal, and can be seen in the exhibit.)  They claim that at that time MCCAIN began a "hard left turn."  RT 30:9-17 (Pet'r's Opening).

79.     Petitioner arbitrarily uses the latest possible time within the log's window.  In fact, the port shaft slowed 13 seconds earlier, at 5:22:07.  Exh. 136 (Court-martial Stip.) at ¶ 28.  ALNIC still had 23 seconds to avoid collision by a Stop Engine order.  The drop of the port throttle position can also be seen in the aft steering camera footage that Petitioner moved into evidence.  Exh. 97 (Aft Steering Video).  For orientation, the following enhanced screen shots are provided:



*Aft Steering Video at 5:22:06*

22

80.     In any event, Petitioner's reconstruction of MCCAIN's track belies the hyperbole that asymmetric thrust caused a "hard left turn."  *See, e.g.*, RT (Pet'r's Opening) 30:25-31:1 ("That had the effect of driving the ship *very hard to port*, making a *hard left turn*." (emphasis added)); *id.* (Hight) 496:15-16 ("radical turn"); *id.* at 530:10 ("wild left turn"); *id.* at 540:17-18 ("turn wildly at me like a missile").[15]  The asymmetric thrust began **111 seconds** before collision.  While the path of MCCAIN certainly should have been a concern to Nolasco, it was obviously an arcing turn that played out over several minutes.  The timing or occurrence of the mismatch of thrust is not even discernible from the vessel's track.  *See also* RT (Putty) 426:5-8 ("Would you characterize that as a hard turn?  A. No.").  The following image, from Exh. 4028 (Wilske Tool), shows 5:22:50, which is 30 seconds after Petitioner's time, and 43 second after the real time, of asymmetric thrust.



*Time 5:22:50:  No "Hard Turn" Has Occurred*

---

[15] Hight's opinion of asymmetric thrust on an Arleigh Burke class destroyer is unpersuasive.  He has no Navy experience, and the destroyer's maneuvering tables are classified.  The Court credits CDR Sanchez's explanation of its effect:  "And the reason it is slight is because even though it is two propellers, my propellers are fairly close to each other.  We are very narrow in the back, and the propellers are fairly big.  So they are very narrow.  So yes, they are asymmetric, but they don't have that big of a lever arm . . . .  It doesn't generate a rapid change of course.  It's very gradual."  RT (Sanchez) 211:25-212:7.

81.     At 5:22:24, according to Petitioner's experts, correcting for known error (*see infra* para. 115 (and accompanying note)), ALNIC could have avoided collision by stopping engine.

82.     At 5:22:30, a Stop Engine order on ALNIC still would have avoided collision. Exh. 3001E; RT (Putty) 332:14-18. Nolasco was required to take action before this time. RT (Putty) 334:16-18. Had ALNIC come to a stop bell by this time, she would have coasted and decelerated by about 1.5 knots over the next 90 seconds. RT (Putty) 427:14-17.[16] Ordering a stop engine involved simply pulling the engine order telegraph back a few inches. *Id.* at 428:4-9.    It would have been a "free maneuver" for Nolasco that would not have introduced any risk with any other vessels. *Id.* at 427:14-428:3.

### F.  ALNIC's "Collision Alarm" Blares (5:22:42)

83.     At 5:22:43, a collision alarm sounded from the S-band radar on the ALNIC bridge. RT (Putty) 334:21-335:1 ("[W]hat you heard was an alarm, that was initiated from the s-band radar and it is referred to in the Furuno manual as the TT, as in tracked target, **collision alarm**." (emphasis added)).[17] This sounded once the ARPA had run a solution on MCCAIN for 50 seconds. By then, MCCAIN already met the "danger criteria" on the radar. *Id.* at 328:20-23, 329:1-8. Had Nolasco, the chief mate, or the missing Anti-Collision Officer acquired MCCAIN earlier, this alarm would have sounded earlier.

---

[16] Hight suggests that when considering whether to stop at 5:22:01, "in the back of [his] mind, [he's] very well aware that [he] stop[s], there is a ship behind [him] that is making approximately the same speed . . . ." RT (Hight) 494:15-17. The Court finds more credible Capt. Putty's observation that ALNIC would only have bled off 1.5 knots, and that LONG HU SAN was steaming slower in the first place, so there would not have been any new risk of collision caused by stopping. RT (Putty) 427:18-25.

[17] Petitioner attempted to refute that this alarm was called the "collision alarm" by confronting Capt. Putty with a Furuno **ECDIS** manual. But they had the wrong manual. RT (Putty) 391:18 *et seq*. "When you look at the Furuno **radar** manual and you look under the track target section, you will see that it is designated as the TT Collision Alarm." *Id.* at 394:3-7. Putty was personally familiar with the collision alarm sound heard on the ALNIC's bridge VDR. *Id.* at 394:8-12, 411:3-15. In any event, Petitioner seems to come around: "We were talking before about the collision alarm. And if you look on the screen, you could see the ECDIS. This is at the moment when that alarm sounded." RT (Pet'r's Closing) 755:2-4.

84.     At this time, with MCCAIN's not-under-command lights on and hearing the anti-collision alarm, Nolasco was strictly required by Rule 17(b) to maneuver.  RT (Putty) 335:20-336:2.  Nolasco would have been obliged to maneuver even had MCCAIN never energized red-over-red lights.  *Id.* at 336:13-20 ("At this point, it is regardless that the red lights are up.  We are in a collision situation.").  Rule 17(b) does not contain the word "apparent."

85.     Instead, at 5:22:58, a watchstander aboard ALNIC silenced the collision alarm.  By taking no action, Nolasco violated his obligation to take action to avoid collision.  RT (Putty) 337:12-16 ("She was obliged to take some sort of action before this.  But at this point in time, there is no doubt that she must do something.").

86.     At 5:23:02, someone uttered a comment in Tagalog that has been translated as follows:  "he pass so good in the middle ??.  I guess he can pass that one."  Exh. 4021 (Stip. Tr.).  Petitioner argues, without evidence, that the voice was Nolasco's.  RT (Pet'r's Closing) 757:7-11.  The Court refuses to speculate as to the source of the voice, or the meaning of these cryptic words.  Whatever the case, the speaker did not competently articulate the severity of the situation.

87.     By 5:23:05, ALNIC still could have avoided collision by turning hard to starboard.  That is according to Claimants' simulation *and* Petitioner's simulation once corrected for known errors.  *See infra* para. 116 (and accompanying note); RT (Putty) 337:19-23; Exh. 3001O.  Captain Nolasco should have taken action long before this time.  RT (Putty) 338:10-12.

88.     A turn to starboard at this time would not have created subsequent risk of collision.  RT (Putty) 425:14-24, 423:8-22 ("Well, in this case, it's not necessarily a right turn. . . .  It's an evasive maneuver that any master has probably taken on more than a few occasions.  On a ship that's 600 to 800 feet long, the first thing you do is move your bow away.  The second thing you do is move your stern away.  So an evasive maneuver in this situation . . . the maneuver [you]

would take would be hard right.  And once you've seen you have cleared the obstacle that you are trying to avoid, you'd back and shift your rudder . . . .").

89.     Before 5:23:06, MCCAIN's port engine slowed further to make good 5 knots.  Exh. 94 at 4; Exh. 116 (MCCAIN Log); Exh. 3053 (Woolson) (explaining the 0522 entry is for 5 knots). RT (Sanchez) 142:11-143:12 ("[W]hat created the most -- at least the most confusion for me was that I am turning. I am not slowing down at the rate that I am expecting to slow down. . . . [S]o that's when I order to the O[O]D to come down to one-third bell to translate into five knots, with the notion that I needed more time.").

90.     For MCCAIN, 5 knots was approaching bare steerageway.  RT (Sanchez) 219:2-5 ("When we come to slow to bare steerageway, bare steerageway for us is roughly depends on seas, depends on winds, anywhere between three to five knots is bare steerageway for us.").  Perhaps immediately after the order to slow to 5 knots, but no later than 5:23:21, the lee helmsman ganged the throttles and set both to make good 5 knots.  Exh. 94 (TCU Log) at 4.

91.     CDR Sanchez chose to slow to bare steerageway rather than All Stop, because he did not want to lose control, and knew he had a ship (GUANG ZHOU WAN) shadowing behind him.  Exh. 4028 (Wilske Tool) (*see supra* at page 23); RT (Sanchez) 219:7-12 ("[T]hen we order again to slow down to a one-third [bell], because . . . I am slowing down trying to give myself more time, I'm trading speed for time.  I'm not coming to -- I don't want to come to an all-stop because, once again, I got other ships behind me, I had one ship behind me.").

92.     With no naval expert testimony, Petitioner suggests that during the emergency, MCCAIN should have maneuver through the loss of steering by using engines.  CDR Sanchez explained his doubt as to the location of the rudder at the time, and his certainty that his engines

across a port rudder would overpower even asymmetric thrust. RT (Sanchez) 219:12-220:3 ("I am not going to overpower the rudders using my engines. And that's why that was not used.").

93.     Last, at 5:23:14, according to Petitioner's experts, correcting for known error (*see infra* paras. 117), ALNIC still could have avoided collision by turning hard to port. RT (Wilske) 615:24-616:2 ("Q. But you agree with me it appears likely here that the ALNIC is going to clear the MCCAIN by this hard port maneuver; correct? A. Yeah, it might go clear.").

94.     At no time did Nolasco sound the "doubt" signal (Rule 34(d)) at MCCAIN. Exh. 4021 (Stip. Tr.); Exh. 3030 (Ahsanov) 226:20-25.

95.     At 5:23:17, someone on ALNIC said "Doing wrong maneuver." The speaker of these words is not known. But by this time, Petitioner admits that "Nolasco recognized that the MCCAIN was doing something that it shouldn't have done." RT (Pet'r's Opening) 37:2-3.

96.     The speaker's poor appreciation of the situation at this late time epitomizes the total breakdown of bridge resource management on the ALNIC bridge. "The primary goal of bridge team management is the elimination of one-person errors." Exh. 9B (GMS Vol. M4) ¶ 2.1.2; RT (Torculas) 99:23-100:1. But Nolasco worked as a one-man watch team with no Anti-Collision Officer and no dedicated lookout. "The Master of the ALNIC failed to have full support on the bridge of the ALNIC and did not utilize his team effectively."[18] ECF 32 (Simon Claim) ¶ 10(l).

97.     At 5:23:19, by turning to port, Nolasco could have avoided penetrating MCCAIN's hull with the bulbous bow, if not avoided collision entirely. *See infra ¶* 121.

98.     By 5:23:27, Navy sailors in aft steering had regained control of steering and put the rudders to Right 15°, where they remained until the collision. Exh. 136 (Court-martial Stip.) at 5 (¶ 32) (noting that while the rudder first swung to port when aft steering took control, the "left

_____

[18] Nolasco admitted that leading up to the collision, he had a heavy workload, primarily, keeping a "near-constant watch" on the S-band radar. Exh. 3047 (Nolasco) at 256:25-257:25, 259:3-6.

rudder only lasted for 3 seconds before the rudder passed amidships, landing at right 15 degrees . . . approximately 20 seconds before the collision.")  This stopped MCCAIN's veer to port by 5:23:44, after which time she started turning away from ALNIC.  Exh. 4013 (CCRS Log).

99.     CDR Sanchez ordered right rudder because, recognizing that he was *in extremis*, he was trying "to reduce that angle . . . . [I]nstead of making it basically a T-bone, if you want to call it, I'm trying to ease that angle.  I'm trying to put as much -- distribute that impact point through my plating across the ship."  RT (Sanchez) 146:17-147:7.

100.     At 5:23:44, just 14 seconds before collision, with MCCAIN dead ahead of ALNIC, Nolasco pulled back the Engine Order Telegraph to reduce engine speed from 92 to 73 RPM.  Exh. 3012 (Resp. to Req. for Admis.) ( "the vessel's VDR indicates that the engine went to half ahead at or about 05:23:44").  This did not reduce ALNIC's speed by even one tenth of a knot before collision.  RT (Putty) 317:5-8 ("He did not effectively reduce his speed at all.").  According to Petitioner's expert, it was only at this late time that it became apparent to Nolasco that MCCAIN was not taking appropriate action to avoid collision.  RT (Hight) 555:4-14.



*5:23:44:  The First Time Hight Admits a Problem Was "Apparent"*

101.     At some point, Jandayan moved to the helm to await an order that never came.[19]

**G. The Collision (5:23:58)**

102.     At 5:23:58, ALNIC's bulbous bow collided into the side of MCCAIN while ALNIC was in a steady Autopilot heading with engine turning ahead at 73 RPM.   Exh.  4021 (Stip. Tr.).

103.     Stealth consultant Capt. Jon Walker, who was listed as a Stealth witness but did not come to trial, attended ALNIC in Singapore immediately following the collision.  Reviewing the ECDIS playback video from ALNIC, while being recorded, he uttered:  "**If this gets out, I can see the headlines now:  'There was nobody driving the car.'**"  Exh. 3004 (Resp. to Interrog. 12).  Torculas, who was with Walker when this video was made, *id.*, admitted that the ECDIS playback make it look like there was no one driving the car, RT (Torculas) 90:3-91:18.   He explained the obvious:  "[i]t's because it was in autopilot . . . "  RT (Torculas) 92:17.

104.     ALNIC's heading and speed remained unchanged all the way to the collision.  Exh. 4028 (Wilske Tool) (using hover-over feature to see vessel heading and speed).  ALNIC remained in Autopilot as she collided into MCCAIN.  Exh. 3047 (Nolasco) 163:14-22 ("[D]id you either yourself switch the vessel from autopilot to hand steering or order any other person on your bridge to change the vessel's engine or steering from autopilot to manual steering?  A. No, sir.").

105.     "This collision happened because the crew and Captain Nolasco was in an undermanned watch condition without an anti-collision officer and a dedicated lookout.  He did

---

[19] RT (Jandayan) 631:9-25; 634:18-635:2 ("I am waiting for him to give instruction to manual steering, sir. Q. Because you could see the two ships were about to collide, right?  A. Yes, sir.  Q. And you didn't think it would be right, did you, to have the ships get into a collision with the ALNIC still on autopilot, right?  A. Yes, sir.").  But he could not switch to hand steering without an officer overseeing the switch-over.  *Id.* at 639:5-13 ("[E]ven if you think, I want to switch to hand steering -- A. Yes, sir.  Q. – because I think we're about to hit a ship, you can't do it until one of – A. I cannot touch, sir.  Q. – you can't do it until one of the officers gives you the order to do it?  A. Yes, sir.").  The chief mate came over to the helm console with him, waiting for an order to go to hand steering.  *Id.* at 632:14-23.  No order came.  *Id.* at 636:2-8 ("The time they collided, sir, and did the steering, it's still autopilot, sir.").

not use proper bridge resource management techniques, communication. There was no prior discussion of what his options were . . . . And in the end, he collided with MCCAIN in autopilot with his engine still going ahead." RT (Putty) 341:8-15.

## II. ALNIC COULD HAVE AVOIDED COLLISION, BUT DID NOTHING

### A. The Collision Was Avoidable

106.    The parties stipulated to the admissibility of each other's collision-avoidance simulations. But they reserved rights to challenge the "accuracy, reliability, and weight of the evidence to be given at trial. . . ." ECF 316. After hearing the evidence, the Court credits the times concluded by the Claimants' simulation expert, Capt. Murphy.

107.    Capt. Murphy performed his research at the training facility of the International Organization of the Masters, Mates, and Pilots union. RT (Murphy) 291:21-25. He has extensive simulation and shiphandling experience, including having handled an estimated 400-500 tankers of ALNIC's size while serving as a San Juan harbor pilot. *Id.* at 292:6-9. He followed the same methodology and quality control procedures in this case as used for other operational projects. *Id.* at 293:20-294:8. Because Petitioner did not critique the substance and methodology of the United States' simulation, the Court accepts its results.[20]

108.    Petitioner's simulation expert, Mr. Wilske of SSPA Sweden, made a visualization tool that was helpful for reviewing the historic collision sequence, Exh. 4028, but his simulation of the possible avoidance maneuvers had significant methodological flaws.

---

[20] Petitioner claims that various visual aspects of Claimants' video (Exh. 3001P) were inaccurate, *e.g.*, that it shows stars whereas the sky was cloudy; or that MCCAIN's hull should not be visible at all. Clearly, the simulation was not offered to show celestial events, and an overcast sky would only make MCCAIN's red-over-red task lights more apparent. As for MCCAIN's hull, it was Petitioner's percipient witnesses who *saw* the warship on their starboard quarter. *See, e.g.*, Exh. 4028 (Stip. Tr.) ("Warship, I see a warship."). Also, Hight agreed that if it were darker than shown in Exh. 3001P, one "could still be able to see the red-over-red lights if somebody was looking for them." RT (Hight) 524:2-9.

109.     The witness was retained by, and given assumptions from, another of Petitioner's experts, Mr. Mangriotis of London Offshore Consulting. RT (Wilske) 566:24-25. But Mangriotis, also listed in the Joint Pretrial Order, was not called to explain his assumptions. Wilske and Mangriotis previously testified together in a collision case about their simulation work, leading the U.S. District Court for the Southern District of Texas to conclude that the work was not persuasive, and fit for only limited use. *Chembulk Houston v. Monte Alegre*, 4:15-cv-714, 2018 WL 2731402, fn. 8 ("The Court was not persuaded by the overall conclusion of the SSPA simulation.").

110.     Mangriotis fed Wilske the wrong vessel drafts for ALNIC: 8.72 meters fore-and-aft. RT (Wilske) 578:2-7. ALNIC's actual drafts at the time of collision were 7.55 meters forward and 8.95 meters aft. These drafts are shown in the pilot card that Torculas prepared while working in the chart room before collision. Exh. 338 (Pilot Card), RT (Torculas) 87:5-15 ("When you were back in the chart room after being relieved at 0400, did you prepare the pilot board card for arrival to Singapore? A. Yes, I did. Q. Did you update the pilot boarding card after the collision? A. After the collision, it's the same, sir. I don't change anything."). Murphy used these correct drafts. RT (Murphy) 305:18-306:25 (also explaining other corroborating evidence considered).

111.     Mangriotis asked Wilske to "estimate" how his conclusions would change if he had modeled an alternate draft of 7.55 meters forward and 8.55 meters aft. RT (Wilske) 591:19-592:3. Wilske *estimated*, without any modeling, that this would have given Nolasco another 5 seconds to avoid collision by stopping his engine. *Id.* at 593:14-22; 596:23-597:4 ("Q. Right. That was an estimate. That was never run in your simulator; correct? A. That's correct."). In other words, by that estimate, Nolasco could have stopped engine at T-95 rather than T-100 seconds. RT (Wilske) 598:4-7. Wilske did not estimate how the wrong drafts affected his simulations of ALNIC turning.

112.     Wilske's simulation also used the wrong rudder rate for ALNIC.  He conceded that he used a rudder rate assuming ALNIC had only one steering motor on at the time of collision. RT (Wilske) 606:21-24.  But Stealth required, and ALNIC crew logged, that two steering motors were on.  *Id.* at 607:4-609:10.  Wilske agreed that with the correct rudder rate, ALNIC's rudder would have reached hard-over 6.5 seconds faster than in his simulation.  *Id.* at 609:11-611:5.  He *estimated* that this would have given Nolasco up to six more seconds to avoid collision by turning. RT (Wilske) 617:10-20 (testifying that "as a maximum, it could gain some six seconds").

113.     Wilske's "visualization tool" does not simulate hull interaction between vessels, a topic with which he is familiar from previous testimony before a U.S. District Court.  RT (Wilske) 595:4-7, 595:15-596:5.  He did not model, and could not quantify, what difference hull interaction might have had on his results.  *Id.* at 605:21-606:6.

114.     There is another problem.  Exh. 4028 shows a "miss" with a Stop engine at T-99 seconds, whereas Wilske testified that the last time to miss by stopping was T-100 seconds.  RT (Wilske) 588:3-11; Exh. 4028 (*see infra* Appendix).  The visualization tool also shows a "miss" with a Hard Starboard turn at T-59 seconds, whereas Wilske testified that this maneuver had to be done at T-60 seconds.  RT (Wilske) 591:13-18; Exh. 4028 (*see infra* Appendix).  These results are seen by simply zooming in a little further than what counsel showed the Court.

115.     ALNIC could have avoided collision by stopping engine as late as 5:22:30.  Exh. 3001E.  Murphy's result compares well to Wilske's, once corrected for known errors.[21]

---

[21] Wilske's original conclusion was that ALNIC could have avoided collision by stopping at 5:22:18.  This was off by one second in the first instance because a Stop at T-99 seconds yields a miss in his own model. Adjusting further based on Wilske's estimated five-second error caused by having the wrong vessel drafts, his conclusion is an *estimate* of 5:22:24.  This result, which does not account for the lack of hull interaction in Wilske's modelling, is a modest six seconds apart from the United States' figure.

116.    ALNIC could have avoided collision by turning hard to starboard as late as 5:23:05. Exh. 3001O.  Murphy's result is identical to Wilske's, once corrected for known errors.[22]

117.    ALNIC could have avoided collision by turning hard to port as late as 5:23:14.  This is based on Wilske's agreement that the vessels appear to miss if ALNIC turns to port at T-50 seconds (*i.e.*, 5:23:08), adjusting six seconds for the incorrect rudder rate, and considering that the model does not account for hull interaction between the ships as they approach at a fine angle. Exh. 4028.  MITAGS did not simulate a hard turn to port this late because Captain Putty "would have maneuvered long before this."  RT (Putty) 339:2-8.

118.    No party has modelled what evasive action could have been taken by MCCAIN, or at what time.  Petitioner presented no naval expert to testify regarding what alternate actions by MCCAIN would have allowed for collision avoidance.  Therefore, the Court is unable to reach any conclusions as to avoidability from the perspective of MCCAIN.

### B.  Having Failed to Avoid Collision, Nolasco Took No Action to Mitigate Damage

119.    The collision rules of the road never allow a vessel to stand on and take no action and have a collision.  *Id.* at 337:6-8; RT (Hight) 500:4-7 ("If you know there is going to be a collision, absolutely not, you are bound by the rules to do something, something.").  In other words, Nolasco never enjoyed a right of way through MCCAIN.  RT (Putty) 337:9-11.

120.    Even after collision seemed inevitable, Nolasco still had an obligation of prudent seamanship to take action in order to mitigate the damages.  RT (Putty) 339:9-13 ("[Y]ou have to take action to prevent extreme damage to both vessels and potential loss of life.").  He had an obligation to "[m]inimize damage to both vessels and prevent loss of life."  *Id.* at 339:14-18.

---

[22] Wilske's original conclusion was that ALNIC could have avoided collision by turning hard starboard at 5:22:58.  This was off by one second in the first instance because a turn at T-59 seconds yields a miss in his own model.  Adjusting further based on Wilske's estimated six-second error from the wrong rudder rate, his conclusion is an estimate of 5:23:05.  This is the same as the United States' figure.

121.    As late as 5:23:19,[23] just 39 seconds before collision, Petitioner's expert agreed that Nolasco could have avoided penetration by the bulbous bow, if not collision altogether, by turning hard to port.  RT (Wilske) 600:19-23, 611:6-8; Exh. 4028 (Wilske Tool).  This conclusion is conservative as it does not account for hull interaction as the vessels approached at a relatively fine angle and similar speed.[24]  So a later turn also likely would have avoided hull penetration.

### C.  Nolasco's Post-Collision Actions Aggravated the Damage

122.    At the moment of impact, ALNIC was heading 226.9 degrees, and MCCAIN was heading 178.4.  RT (Wilske) 612:18-22.  This made for an angle of convergence of 48.5 degrees. *Id.* at 612:23-25.

123.    ALNIC was fitted with a "V" shape reinforced steel bulbous bow.  This penetrated into MCCAIN at a height spanning three decks:  Berthing 3, Berthing 5, which was entirely below the waterline and where all ten decedents were located, and a fuel tank below Berthing No. 5.

124.    After colliding, Nolasco negligently left his engine ordered ahead for 43 seconds. RT (Putty) 341:2-6 ("I am extremely critical of Captain Nolasco to not only sail into this collision on autopilot, but turning 73 r.p.m. at the moment of impact and not stopping the engine for additional 43 seconds and not coming out of auto pilot for over an additional minute after that.").

---

[23] This corrected by six seconds due to the known error in Wilske's rudder rate.  *See supra* ¶¶ 110-117.

[24] Petitioner argues that "there has been no evidence in this case, no analysis by anybody about whether a different collision that might have occurred would be a better or a worse collision than the one that actually happened."  RT (Pet'r's Closing) 749:23-750:4.  This is incorrect.  Petitioner's expert is a naval architect, RT (Wilske) 617:12-13, who testified that based on his own simulation, ALNIC's bulbous bow would not have penetrated MCCAIN.  There is no doubt that the predominant cause of death and destruction in this case was the bulbous bow penetrating berthing compartments and then laterally sweeping through them. *See* RT (Sanchez) 238:16-20 ("I see the bulbous nose . . . .  I'm like now you know how -- how not only that I got stabbed, but I know how deep the stab is.").  In any event, under the causative potency analysis, which allows apportionment to be made based on a qualitative and commonsensical analysis of faults, no further expert testimony is needed.

125.    Nolasco negligently remained in Autopilot as well, and did not go to hand steering until 5:25:12, that is, one and a quarter minutes after the collision.  RT (Hight) 543:3-10.

126.    The force of the collision into the moving MCCAIN pulled ALNIC's bow to port. Because ALNIC was still in Autopilot, the computer mindlessly tried to compensate.  It ordered the rudder to its limit of Right 15° Rudder.  RT (Putty) 341:16-25 ("With the autopilot still engaged, there is an autopilot limit setting on the Yokogawa, and it was set at 15 degrees.  So what happens is, as the bow swings to port, the rudder will go to hard–to 15 right and stay there . . . .").

127.    The force of propeller wash across the right rudder pushed ALNIC's stern to port. RT (Putty) 342:1-6 ("Q. [I]f you look at it from kind of a tugboat view, he is going to turn his stern more a perpendicular to MCCAIN's hull, with 15 degrees right rudder and still maintaining 73 r.p.m.s ahead.").   As a consequence, ALNIC's bulbous bow pivoted inside MCCAIN, sweeping through the berthing compartments from forward to aft.  RT (Ryan) 450:2-20:

> Q. When you wrote this, what did you mean by the words 'sweeping movement'?
> A. The penetration in the side of the hull was known to be made by the bulbous bow of the ALNIC.  The bulbous bow of the ALNIC is in a V-shaped form. But the damage located within that space extended in a direction which was swept down towards aft, which implied that it wasn't just a straight penetration and then a reverse out.  There was relative movement between both vessels and . . . the slowest of the movements had caused that effectual sweeping motion of the bulbous bow within the space of the JOHN MCCAIN . . . ."

128.    Eventually, ALNIC's bulbous bow swept through an arc of over 45 degrees while pushing inside the MCCAIN's berthing.  RT (Wilske) 613:16-19.  66 seconds after the collision, the angle between the two ships' keels was 94.6 degrees.  *Id.* at 613:3-12.

129.    This forensic evidence comports with witness testimony from within MCCAIN. Berthing 5 (3-310-2-L in the below image), where all ten sailors died, sat entirely below the waterline.  Exh. 912; RT (Ling) 261:25-262:2.  Despite that, the compartment did not flood for approximately the first 30 seconds following the collision.  RT (Ling) 254:18-19; 255:6-21

(testifying about the flood sensor triggering). During that time, ALNIC's bulbous bow must have plugged the massive hole it made. This gave at least one sailor time to escape. RT (Patat) 280:21-281:2. But as the bulbous bow swept aft within MCCAIN, the waters rose rapidly.



*A 28-foot Hole with Damage Pushed Aftward (Exh. 912)*

130. This conclusion is supported by the testimony of two percipient witnesses. Warrant Officer Patat was in his stateroom (1-322-2-L in the above image) when it was struck by ALNIC's stem. He donned coveralls and headed straight down to Berthing 3 and 5, from where he felt vibrations. RT (Patat) 267:24-268:12, 270:11-13. As Patat approached the main scuttle for Berthing 5, the water level was still near the base of the ladder. *Id.* at 277:20-22, 278:2-3 (estimating 2-3 feet of water). This must have been shortly after the flood sensor triggered (T+30 seconds). He immediately descended the ladder, but did not even reach the bottom before rising

waters flushed him back up.  *Id.* at 276:7-17; 278:21-279:5 ("I reached a step where it was at thigh level. . . . I never was able to get off of the ladder well.").

131.    LCDR Ling, the Chief Engineer, had also been in his main-deck stateroom when MCCAIN was struck.  RT (Ling) 244:22-245:11.  He laced his boots, then proceeded to the head before going to take charge of damage control efforts.  RT (Ling) 248:11-14; 250:4-7; 251:7-13.  Throughout that time, he heard "crunching, screeching, and then a rhythmic – not quite rhythmic, but a cadenced pounding of metal on metal."  *Id.* at 250:10-19.  This cadenced pounding, caused by ALNIC powering into MCCAIN, stopped just after Ling left the head.  *Id.* at 250:15-19.  As he passed the hatch for Berth 3, he looked below one deck and saw that the scuttle for Berthing 5 was overflowing with a green foamy fuel-seawater mixture.  CWO Patat was trying to dog (close) the scuttle to prevent flooding inside MCCAIN.  *Id.* at 251:16-25; 253:11-16.

132.    Besides unplugging his bow from the hole it had created, Nolasco's negligence in powering into MCCAIN under Autopilot had further tragic effects.  After pivoting to the right, the bulbous bow pushed Berthing 3 furnishing aftward and over an escape scuttle from Berthing 5.  RT (Ling) 256:19-257:9, 258:6-259:10.  Two decedents were later found under that scuttle, ET1 Kevin S. Bushell, U.S. Navy, and ICC Abraham Lopez, U.S. Navy.  RT (Sanchez) 147:13-24.  Ling later investigated and found the scuttle had been undogged.  RT (Ling) 260:5-7.  It is probable that those sailors would have survived if ALNIC had not pushed the furniture over the scuttle.

133.    Last, as seen in Exh. 912 (shown above), ALNIC worked and pushed aftward along MCCAIN's hull, penetrating aft of the watertight bulkhead at Frame 338.  This caused entirely new and extensive flooding and damage to MCCAIN.  RT (Ling) 260:13-23.

### III. ALNIC AND HER OWNERS LIED AND CONSPIRED TO COVER THE TRUTH

#### A. Crew Lies at Commencement of Litigation

134.    After the collision, ALNIC's crew set about on a fraudulent scheme to gundeck[25] or destroy evidence in order to cover up at least these damning facts: (1) ALNIC did not Stop Engine until after collision; (2) ALNIC did not come off Autopilot until after collision; and (3) the ALNIC bridge team was missing the required dedicated lookout at the time of collision.[26]

135.    Lies about when ALNIC stopped the engine were pervasive.  The chief mate falsely wrote in the deck log, squeezed between two regular lines, that the bridge team had stopped the main engine at 5:22:00.  Exh. 13B.  He was never made available for deposition or trial testimony.  The Court notes that the deck log, in particular, is critical for documenting the activities of the bridge.  Exh. 3047 (Nolasco) 49:23-50:4.  The ALNIC officers knew that it would be relied upon by the courts.  RT (Torculas) 74:23-75:3.

136.    Nolasco falsely stated in his official post-collision report that "Before the collision at 0522 [local time] we stopped the engine."  Exh. 5.  Capt. Nolasco submitted this form by email on the evening of August 22, 2017, two full business days after the collision and one full day after the VDR had been reviewed in the presence of Stealth's investigative consultant, Capt. Jon Walker.

137.    The engineers repeated the lie in the engine log.  Exh. 3005 (Resp. to Interrog. 15).

138.    The ALNIC crew caused the engine order telegraph ("EOT") log to disappear after the collision.   This record would have shown, to the second, when Nolasco changed bells.

---

[25] "[G]undecking is falsifying log entries for the purpose of obscuring information from outside bodies, whether they be flag state, Coast Guard.  In other words, you are fictiously drawing a picture that doesn't really exist."  RT (Putty) 347:19-23.

[26] There were numerous other lies as well.  For example, the crew lied about having completed pre-arrival tests, and about the captain having reported to the bridge at 0300 instead of 0405 as is currently alleged.  *See, e.g.*, RT (Torculas) 50:12-51:1 (admitting it was lie to log Nolasco on the bridge at 0300).

Petitioner claims that the EOT logger was disused between August 11-21, 2017. Exh. 3005 (Resp. to Interrog. 19). But Torculas confessed, after having been confronted with a checklist he signed, that a now-missing log roll was in use after August 11. Because each roll lasts about 30 days, and considering all the evidence, the Court finds that Nolasco and his co-conspirators purposefully destroyed the EOT log to hide the fact that ALNIC did not stop engine at 5:22:00.

139.     The crew also lied repeatedly to obscure the truth that ALNIC was in Autopilot. The second mate falsely logged that ALNIC was in hand steering. Exh. 13B; RT (Torculas) 51:16-25 (admitting this was a "lie"). He repeated the lie in the bell book. Exh. 15B; RT (Torculas) at 56:18-20. In the first overnight after the collision, and in the presence of Stealth consultant Jon Walker, Nolasco lied to Liberian investigators and claimed that the ship had been in hand steering since 0300. Exh. 3051 (J. Walker) 118:7-119:3. Jandayan told them a variation of the false story, claiming they had switched to hand steering *just before* the collision. *Id.* at 122:14-22.

140.     Perhaps most striking is the scope of the conspiracy to hide that Nolasco did not have a dedicated lookout on watch when he had a collision. Through discovery, Claimants learned that alleged lookout Secang was *never* on ALNIC's bridge on the morning of the collision. RT (Torculas) 54:14-17; Exh. 3038 (Chelios) 50:24-51:5 ("Q. Are you – are you aware that that, in fact, is a lie? A. Yes. I am aware, yes.").

141.     Secang sat for interviews with state investigators from Liberia, Singapore, and the United States, testifying about a watch he never stood. Exh. 3038 (Chelios) 80:23-25. Likewise, Secang wrote a fraudulent handwritten statement describing his experience as lookout, including his having seen and reported the warship to the chief mate. Exh. 543.

142.    The ALNIC crew also fabricated STCW rest logs to make it appear that Secang had been on watch from 0400 to 0800 on the morning of the collision.  Exh. 305 (Secang Rest Log) (singed by captain and chief mate); Exh. 3007 (Supp. Resp. to Interrog. 16).

143.    Things fell apart for Petitioner when Torculas admitted that he falsely logged Secang as the "Lookout" in the deck log, Exh. 13B.  RT (Torculas) 53:6-54:3 ("Yes, it's a lie."). *See also* Exh. 3038 (Chelios) 203:2-6 ("Q. We know that the logs falsely stated that the OS who was supposed to serve as the lookout was present when he, in fact, was not present; right?  A. Right."); Exh. 3005 (Resp. to Interrog. 15) ("With respect to the Deck Log, Petitioner also now believes that the entries reflecting that O/S Secang was on watch . . . are incorrect.").

144.    But before Torculas's confession, Nolasco had been deposed, and had perjured himself *repeatedly* about Secang being the lookout.  Exh. 3047 (Nolasco) 132:3-21 (falsely testifying that when he took the conn, he "had an ordinary seaman on watch" making for a "total of four" crew on watch); *id.* at 134:11-17 ("As I could remember, he went down due to some stomach pain and all this for a while with that.  But he come back immediately also."); *id.* at 134:21-135:9 (similar); *id.* at 140:23-141:13; *id.* at 142:23-144:3; *id.* at 220:24-225:7; *id.* at 228:18-229:5.  *See also* Exh. 3038 (Chelios) 83:14-18 ("Q. So all three of those people lied, the captain, the chief mate, and the ordinary seaman, about the ordinary seaman being on the bridge originally; correct?  A. Correct, yes.").

## B.  Petitioner Covered-up the Cover-up

145.    Five days after the collision, after ALNIC's VDR had been probed and numerous lawyers (including Petitioner's trial counsel) had arrived in Singapore, Nolasco signed an "Addendum" to the deck log dated August 21, 2017.  This was stapled to the deck log page for August 21, 2017, as if the officers had made contemporaneous corrections to their own false log

entries. Exh. 3047 (Nolasco) 153:2-24 ("You crossed out 5:22, didn't you? A. Correct, sir. Q. Because that was not a truthful entry, was it? A. Correct, sir.").

146. Nolasco falsely testified that he created the "Addendum" to the deck log, using the ship's computer, one or two days after the collision. Exh. 3047 (Nolasco) 148:3-14 ("And you typed [the Addendum] out on the ship's computer. A. Correct, sir. Q. And printed it out and signed it. A. Correct, sir. Q. . . . . The ship's computer that used to type out, is that in your state room? Is it on the bridge? Where it is? A. It's on the bridge, sir."); *id.* at 123:5-19 ("Q. Was it one day after collision? Two days? . . . Your best estimate. A. After -- I think after collision, just after the collision, sir, after – the day after the collision itself. . . . I think that was [Aug.] 22."); *id.* at 126:17-127:2 ("Do you know if [the Addenda] were done on the ship's [type]writers? A. On the ship's computer. Q. On the ship's computer? Did you type in the corrections, or did somebody else type in - - A. I typed myself.").

147. In reality, the "Addendum" was created by Mr. Weigel, Petitioner's counsel on August 26, 2017, on a Blank Rome LLC laptop. Exh. 3010 (Resp. to Req. for Admis. 47).

148. When Nolasco committed perjury about the origins of the "Addendum," the real author was sitting feet away. Exh. 3047 (Nolasco) 13:4-7. The video of this deposition was played at trial pursuant to Fed. R. Civ. P. 32 and is part of the record. The deposition opened with the videographer's warning that his microphones captured whispering. *Id.* at 11:2-5. After a question quoted above, *id.* at 148:3-14, which began at 11:53:22 a.m. of the deposition, Petitioner's counsel had the following exchange with each other about the perjury: "Do we need to correct this?," and, "You don't want to . . ." *Cf.* RT (Hight) 517:23-24 ("So Captain Nolasco, I'm not going to defend him. I'm not going to defend his perjury."). No correction was ever made. Instead, Claimants identified the true origins of the Addendum through discovery and metadata review.

## IV. ALNIC'S MASTER AND OWNERS KNEW ALNIC SAILED THE SINGAPORE STRAIT WITH AN UNDERMANNED BRIDGE

149.    "Stealth" sent their marine superintendent, Capt. Dretakis Zisimos aboard ALNIC for 28 days in May and June 2017.  Exh. 549 (joined May 27, 2017); Exh. 550 (disembarked Jun. 24, 2017).  Zisimos flew from Stealth's offices in Athens, and met the ship underway in Singapore. Exh. 3045 (Zisimos) 18:16-24.

150.    His mission was to inspect the ship, audit her crew, and identify any training needs. Exh. 3045 (Zisimos) 145:20-146:4.  While aboard, he slept in the "owner's stateroom."  *Id.* at 19:24-20:5.  By August 21, 2017, Zisimos had been physically aboard the ship for about 25% of Stealth's time in management.  Exh. 3045 (Zisimos) at 13:4-12; Exh. 3003 (Resp. to Interrog. 9).

### A. Stealth Knew ALNIC Was Undermanning the Bridge in the Singapore Strait

151.    Zisimos joined ALNIC via launch while the ship was underway, "westbound in the [Singapore] TSS going to the anchorage at Tanjung Pelepas" in Malaysia.  RT (Putty) 343:7-13, 345:25-346:2; Exh. 3045 (Zisimos) 37:18-23. At that time, ALNIC was using Bridge Manning Level I, the lowest possible manning condition.  Exh. 10B.

152.    Zisimos went "straight up to the bridge" from his boat, saw the crew "not standing the correct bridge manning level," and according to his testimony, "address[ed] that issue immediately with Captain Nolasco."  Exh. 3045 (Zisimos) 159:9-19.

153.    But after he claims to have trained ALNIC to use BML III, *id.* at 74:8-76:4,[27] the ship proceeded through the Singapore Strait *still* using BML II (*i.e.*, no Anti-Collision Officer). RT (Putty) 344:8-19.

---

[27] "A. They were using the wrong [level] at that time.  Q. What level did you observe them using at that time in the Singapore Strait?  A. I think it was Level II. . . . Q. And then when you trained them, what did you tell them they should have been doing?  A. They should be using Level III."

154.    Following operations in Malaysia, ALNIC returned back through the length of the Singapore Strait to an anchorage area east of the Singapore TSS.  *Id.* at 344:20-25.  Once again, with Zisimos aboard, Nolasco set BML II in the Singapore Strait.  *Id.* at 345:1-6.

155.    That transit of the Singapore Strait, with Stealth's marine superintendent aboard and under the wrong BML, was ALNIC's last before the collision.  RT (Putty) 345:18-24.  *See also* Exh. 3010 (Resps. to Reqs. for Admis. 51, 52).  When ALNIC returned on August 21, 2017, nothing had changed:  Nolasco set BML II.  Exh. 13B.

156.    In addition to his percipient observations of ALNIC using the wrong BML, Zisimos had reviewed logs and voyage plans showing three previous Singapore transits at the wrong BML.  Exh. 3010 (Resp. to Req. for Admis. 49-50); Exh. 3045 (Zisimos) at 107:5-11 (Q. "Does this indicate that you actually did look at the passage plan?  A. Yes."); Exh. 3047 (Nolasco) 73:17-19 ("He was on the bridge with me, and I showed him all of the logs."); *id.* at 195:24-196:3 ("Q. Do you remember [Zisimos] actually examining the vessel's deck logs or providing them to them?  A. Yes, sir.").  He also saw the ship's Singapore Strait chart, which called for "BML II."  Exh. 3010 (Resp. to Req. for Admis. 48); Exh. 3038 (Chelios) at 128:8-15 ("Q. And are you aware that his audit of ALNIC indicated that he examined the ship's deck logs and its charts?  A. . . . He - - he examined, yes. . . . [I]t's a part of his job.").

157.    After his month aboard, Zisimos reported back to Stealth's home office in Greece, where he told the Safety Manager and the Crewing Manager that ALNIC had used the wrong bridge manning level in the Singapore Strait.  Exh. 3045 (Zisimos) 104:16-20.  He specifically recommended that Stealth send someone back to provide ALNIC's officers with remedial training on the company's SMS.  *Id.* at 49:21-50:2.  This meeting happened over two months before the collision, yet Stealth sent no one back to ALNIC before then.  Exh. 3003 (Resp. to Interrog. 1).

158.     Capt. Zisimos testified falsely that he trained the ALNIC officers to set BML III in the Singapore Strait.  *See* Exh. 3045 (Zisimos) 74:8-76:4 (trained them); 103:18-25 ("the rest of the time that I stayed on board, yes, he stick with this one, he complied with the GMS requirements"); 77:17-24 (testifying that after he told Nolasco to use BML III, Nolasco said, "'I understand,' and he was feeling pity that he didn't follow at that time.").

159.     In truth, nothing changed on ALNIC after Zisimos testified that he corrected the officers.  The ship never once transited the Singapore Strait in BML III.  When Zisimos flew home, both charts for the Singapore Strait remained conspicuously annotated:  "**BML II**."  Exh. 6 (BA 2403), Exh. 7 (BA 3831), Exh. 327 (Photo of Chart).  Moreover, the two ALNIC officers to be deposed flatly contradicted Zisimos's testimony.

160.     Nolasco denied ever having been taught to use BML III in the Singapore Strait. Exh. 3047 (Nolasco) 340:16-341:9 ("Q. . . . [A]t the time of this collision, you believed that you were following the procedure manual set forth in the GMS?  A. That's correct, sir.  Q. And if anyone with the ALNIC had seen any of the other prior records and said, 'You know what . . . that's violating this procedure?'  If they had told you, would you have fixed it?  A. Yes, sir.  Q. That just didn't happen; correct?  A. That just didn't happen.  Yes, sir.").  With all the post-collision cover-up, Nolasco never altered the chart or other records to turn "BML II" into "III."  Exh. 327. He even remained in BML II after the collision.  Exh. 3047 (Nolasco) 186:15-19.

161.     Torculas also denied ever having been taught to use BML III in the Singapore Strait. He testified that if Zisimos had told him to plan voyages for BML III, then that's what he would have done.  RT (Torculas) 75:15-76:25, 77:23-78:4:

> Q . . . I'm not talking about after the collision.  Just before the collision, had anyone from your company or had Captain Nolasco told you that you should have been in bridge watch condition III during these transits?
> A. No.

Q. If someone had told you that, would you have made voyage plans that put you in bridge watch condition III?

A. Yes, I will.

Q. So if you knew the company policy from the GMS about standing bridge watch condition III when in the Singapore Strait, you would have complied with that rule in your passage planning, right?

A. Yes, I mislooked with this III anyway, so forget it. I just put II.

    *                    *                    *

Q. And on this day too, if someone from your company had told you you should have been in watch condition III to transit the Singapore Strait, this voyage plan would have been prepared anticipating watch condition III; correct?

A. Correct, sir.

Q. But that didn't happen, did it?

A. It didn't happen.

**B. Zisimos Falsified Outward-facing Safety Records**

162.     After observing the crew using BML I in the Singapore Strait, Zisimos conducted an ISM Audit. In his official audit checklist, he falsely logged that he had "ensure[d] adequacy of bridge manning levels against actual navigational conditions." Exh. 19 (Audit Checklist), Exh. 3045 (Zisimos) 94:10-12, 99:3-7.

163.     In deposition, Zisimos explained why he did not tell the truth in the Audit form:

The only reason that I didn't mark it as 'no' was because this internal audit is a document that also third parties can see it, and if I write an observation like the manning level was not proper, that means that it would have been an issue by – during a SIRE inspection[28] or a vetting inspection or another third-party inspection.

Exh. 3045 (Zisimos) 101:4-11. That is, he wanted the paperwork to look good for outside parties, so they would not see the ship's history of operating unsafely and in violation of the ISM Code.

164.     Zisimos also failed to document serious safety violations ("major nonconform-ities"), including that ALNIC sailed the Singapore Strait at the wrong BML.[29] Exh. 3045 (Zisimos)

---

[28] Ship Inspection Report Program.

[29] SMS Vol. M1 defines a "major nonconformity" as "An identifiable deviation which **poses a serious threat** to personnel or ship safety" that requires **immediate** corrective action. Exh. 555 at 11 (emphasis added). *See also* Exh. 3045 (Zisimos) at 140:22-141:9. The SMS required him to make his report immediately using Stealth Form Q 104. *Id.* at 148:19-149:8. He did neither.

141:10-142:11 ("Q. How about the fact that the ship was standing in Bridge Manning Level I or II when in the Singapore Strait? Would that be a major nonconformity? A. Yes, it is.").

165. Zisimos shared his true observations upon his return to the Stealth home office in Greece. Stealth officers tacitly approved Zisimos's cover-up of ALNIC's deficient BML in the Singapore Strait by not having him document it as a "major nonconformity," and not having him correct his false audit form. They furthered his plan to deceive outside auditors and international safety inspectors, including inspectors from the United States government.

## C. Zisimos Knew ALNIC Was Incompetent in Stealth's Safety Management System

166. After interviewing the officers while onboard ALNIC, Zisimos had significant safety concerns which he documented in confidential Stealth appraisals.[30] He graded Nolasco a 2 out of 5 for both his knowledge of, and compatibility with, Stealth's SMS. Exh. 3045 (Zisimos) 34:9-19, 82:12-17, 85:2-8 ("That means that he was not good on the GMS. He was not able to perform well on the GMS."). He could not, and would not, confirm to Stealth that Nolasco had an adequate knowledge in Stealth's SMS. *Id.* at 85:11-15.

167. He graded Chief Mate Gracia and Second Mate Torculas the same way. Exh. 3045 (Zisimos) 41:5-12, 82:17-19. He even said of Torculas, *the navigator*, that "as for navigation, consider him as a danger at some times." Exh. 3045 (Zisimos) 91:19-23. But Torculas did not receive any extra training from Stealth after this appraisal. *Id.* at 82:22-25; 83:10-13.

168. Following his onboard interviews, Zisimos returned to Greece and told the Safety Manager and Crewing Manager that the master, chief mate, and second mate needed SMS training. *Id.* at 45:11-14; 46:7-47:7. They said back to Zisimos that "we will provide the relevant training

---

[30] Zisimos testified that of the 70 or more Stealth ships he had audited, ALNIC was the worst ship he had audited. *Id.* at 178:23-180:3 ("This is the worst evaluation that I did."). He agreed he told Stealth's safety manager that he had "serious concerns about what [he] saw on board the ALNIC MC." *Id.* at 182:18-23.

and that a superintendent will shortly visit again to check if there is any improvement on this one." *Id.* at 47:8-12; 50:3-7 ("I said in close future.").  That never happened.

169.    About these problems, Capt. Hight testified that ALNIC's crew needed six months to become familiar with the system.  RT (Hight) 512:11-25 (claiming "industry standard" to sail around the world with an incompetent crew while learning SMS).  *Cf.* Exh. 3045 (Zisimos) 52:2-6 ("Nolasco and his deck officers need – May, June, July – they need time to get familiar with the management system right?  A. Correct, yes.").  This is not credibletestimony.  As noted above, the ISM Code requires vessels to implement *and comply with* their Safety Management System.

## V. DAMAGES

170.    The United States suffered $185,000,000 in damages as a result of the collision. Further, MCCAIN's repair period was stipulated to be 450 days.  ECF 310-1 (Trial Stipulation).

171.    Energetic Tank suffered $442,445 in damages as a result of the collision.  *Id.*

172.    The vessel-owning parties claim a right to pre- and post-judgment interest.

## PROPOSED CONCLUSIONS OF LAW

## I.  ALNIC WILL NOT BE EXONERATED

### A.  Singapore Law on Collisions

1.    The Court has chosen to apply Singapore law.  ECF 247.  Singapore courts follow the doctrine of *stare decisis*, and accord weight to admiralty cases from common law countries. Decisions of the United States' courts sitting in admiralty and applying the general maritime law are persuasive authority.  ECF 323-2 (Kuek) ¶¶ 11, 39.

2.    The elements of negligence under Singapore law are: (i) duty, (ii) breach, and (iii) "damage caused by the breach of duty which is not too remote a loss."  Reginald G. Marsden and Simon Gault, Marsden on Collisions at Sea 92, para. 4-022 (Simon Gault et al. eds., 14th ed.

2016).  *Cf.* 1 Schoenbaum, *Admiralty and Maritime Law* § 5:4 (6th ed.) (*prima facie* elements of negligence under U.S. admiralty law are duty, breach, causation, and damages).

3.      In collision cases, the standard of care may be evidenced by international safety conventions.  MARSDEN, *id.* at 88, para. 4-009, 92, para. 4-022.  Most relevant are the Convention on the International Regulations for Preventing Collisions at Sea 1972 (COLREGS) and the International Safety Management (ISM) Code.  *Id.*

### B. ALNIC's Violations of the COLREGS Caused the Collision

   *i.    During the Overtaking, MCCAIN Became "Not Under Command"*

4.      Prior to MCCAIN's loss of steering, the vessels were in an overtaking situation governed by Rule 13.  MCCAIN was required, "*so far as possible*," to "keep well clear."  Rule 16.  ALNIC was required to maintain course and speed.  Rule 17(a)(i).  The parties agree that MCCAIN and ALNIC formally remained in an overtaking relationship all the way until collision.  They disagree with respect to whether ALNIC had to take action before colliding.

5.      The United States has never sought to invoke the hierarchical privileges accorded by Rule 18 to a vessel Not Under Command.  Rather, throughout the overtaking, MCCAIN was obliged "so far as possible" to "keep well clear."  Rule 16.   The Court rejects the suggestion that MCCAIN was ever claiming a right to "go steaming on through the fleet, and everyone's got to get out of my way."  RT (Pet'r's Opening) 28:1-2.

6.      When steering control unexpectedly left the wheel of MCCAIN, and the orders of the conn could not be executed, that was an "exceptional circumstance" described in Rule 3(f):

> The term "vessel not under command" means a vessel which through some exceptional circumstance is unable to manoeuvre as required by these Rules and is therefore unable to keep out of the way of another vessel.

7.     In determining whether a vessel is Not Under Command, the question is whether it is able to maneuver as another vessel would reasonably expect. *The Mendip Range* [1921] 1 AC 556, 571 ("If a vessel is in such a condition owing to an accident that she can only get out of the way of another after great and unusual delay, I think she must be considered as 'not under command' . . . . She is not able to behave as those on board other vessels meeting her would reasonably expect.").[31]

8.     A loss of steering control is a textbook example of being Not Under Command. *See* MARSDEN at 177, para. 5-153 ("In the ordinary course of navigation a ship is sometimes not under command; [*e.g.*,] a ship which has suffered an engine or steering breakdown . . . .").

9.     When MCCAIN's helm stopped responding to the helmsman's order, MCCAIN was not "able to behave as those on board other vessels meeting her would reasonably expect." *The Mendip Range*, 1 AC at 571. That is, she faced an "exceptional circumstance" and was Not Under Command. Rule 3(f). *See Complaint of Flota Mercante Grancolombiana, S.A.*, 440 F. Supp. 704 (S.D.N.Y. 1977) (vessel Not Under Command even though alternate steering available).

10.     At that moment, CDR Sanchez properly determined that MCCAIN was a vessel Not Under Command. *See* RT (Putty) 323:17-18 (officer of the watch determines when a vessel is not under command); *id.* at 418:23-419:1 ("Q. When the wheel becomes unresponsive and the orders of the conning officer cannot be carried out, would you consider that to be an exceptional circumstance as used in Rule 3(f)? A. Yes."); RT (Sanchez) 223:19-20 ("If the helmsman gives input, the rudder doesn't move, it's a loss of steering."). Given the circumstance of overtaking at 3 cables in the Singapore Strait, CDR Sanchez was not obliged to, nor should he have, waited to troubleshoot before communicating his Not Under Command status to surrounding vessels.

---

[31] While prior rules defined Not Under Command by reference to some "accident," the 1972 COLREGS changed the wording to the more expansive term "exceptional circumstances."

11.     Responding to the loss of steering, MCCAIN timely and properly displayed the lights for a vessel Not Under Command.  Rule 27(a).  These communicated to all surrounding vessels, that MCCAIN was "unable to manoeuvre as required by these Rules and is therefore unable to keep out of the way of another vessel."  COLREGS Rule 3(f).

*ii.  ALNIC Failed to Appraise the Situation (Rule 5) or to Determine the Risk of Collision (Rule 7)*

12.     Rule 5 ("Look-out") states:

Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

13.     "Steamers navigating in the thoroughfares of commerce must have constant and vigilant look-outs stationed in proper places on the vessel, and charged with the duty for which look-outs are required . . . ."  *Chamberlain v. Ward*, 62 U.S. 548, 570 (1858).  *See also Delaware, L. & W.R. Co. v. Cent. R. Co. of New Jersey*, 238 F. 560, 562 (2d Cir. 1916) ("The fundamental rule of the admiralty is that a vigilant lookout must be kept on all vessels, so that collision may be prevented even with those which are violating the rules.").

14.     A vessel's failure to see what is to be seen, or to hear what is to be heard, is conclusive evidence of standing a deficient lookout.  *The New York*, 175 U.S. 187, 204 (1899) ("Her officers failed conspicuously to see what they ought to have seen or to hear what they ought to have heard.  This, unexplained, is conclusive evidence of a defective lookout.").  "The failure of officers whose duties are to keep a lookout to see what they ought to have seen, or to hear what they ought to have heard, where casualty results, is a grievous fault, for which the vessel will be rendered liable."  *Union S.S. Co. v. Latz*, 223 F. 402, 411 (9th Cir. 1915).

15.     ALNIC failed to maintain a proper visual lookout of MCCAIN.  Given their close proximity, ALNIC was obliged to maintain a constant watch on MCCAIN during the overtaking.

*See* Exh. 3047 (Nolasco) 283:3-17 (admitting it was "absolutely imperative" to keep a "constant watch" on MCCAIN); *Chamberlain v. Ward*, 62 U.S. at 570 (requiring "constant and vigilant look-outs stationed in proper places . . ."); *Delaware, L. & W.R. Co.* 238 F. at 562; *The Iran Torab & Tan* [1988] 2 Lloyd's Rep 38 ("A very careful look-out should have been maintained in the wheelhouse of *Tan* while *Iran Torab* was passing her. If such a look-out had been kept it would soon have become apparent that the distance between the two ships was being reduced."); *In re Ocean Foods Boat Co.*, 692 F. Supp. 1253, 1263 (D. Or. 1988) (vessel failed to see other's "lights, in part, because neither the mate nor the lookout went out on the bridge wing to scan with their binoculars."); *The Samco Europe* [2011] 2 Ll. R. 579 ("The extensive navigational aids now available to mariners are capable of providing much information, but safe navigation also requires . . . a good visual lookout.").

16.     ALNIC failed to maintain a proper aural lookout, because it did not post a lookout to the starboard bridge wing, from where MCCAIN could be heard. *See The Colorado*, 91 U.S. 692, 699 (1875) ("Lookouts are valueless unless they are properly stationed . . . ."); *The Sagamore*, 247 F. 743 (1st Cir. 1917) (describing lookout as "[t]he eyes and ears of the ship."); *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 161 (4th Cir. 1984) ("Approximately two minutes before the collision, the . . . lookout on the starboard bridge wing of the Hellenic heard two whistles from an approaching vessel."); *Granholm v. TFL Exp.*, 576 F. Supp. 435, 448-49 (S.D.N.Y. 1983) (approving of posting lookout on the wing *in lieu of* the bow).

17.     At 5:21:25, Nolasco failed to appraise from the situation that MCCAIN's obligation **to** *keep out of the way "so far as possible"* was constrained by the fact that MCCAIN was **"unable to** *keep out of the way***."** *See* RT (Putty) 406:2-22; Rules 3(f), 5, 13, 16.

18.    Rule 7 ("Risk of Collision") adds that:

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.
(b)  Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observations of detected objects.

      *                      *                      *

(d) In determining if risk of collision exists the following considerations shall be among those taken into account:

      *                      *                      *

    (ii) such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

19.    A merchant ship with operational radars must make proper use of those radars, including through ARPA plotting, in order to maintain a proper lookout and to determine the risk of collision.  Rules 5, 7; *The Oden* [1989] 1 Ll. Rep. 280 (finding fault in "failing to maintain a proper look-out by radar, in breach of r. 5, and in breach of r. 7(b) . . . ."); *Potomac Transp., Inc. v. Ogden Marine, Inc.*, 909 F.2d 42, 45 (2d Cir. 1990) (faulting officer for failing to complete rapid radar plot, and then failing to slacken speed as required by Rule 8(e)); *Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 826 (9th Cir. 1988) ("Failure to effectively use radar is an unambiguous statutory violation for the purposes of *The Pennsylvania* rule."); *Complaint of G & G Shipping Co., Ltd. of Anguilla*, 767 F. Supp. 398, 409 (D.P.R. 1991) ("Nieuwkoop also failed to use the Van Noort's sophisticated radar and ARPA to plot the relative course and speed of the Wishing Star, in violation of Rule 7(b)."); *In re Nat'l Shipping Co. of Saudi Arabia*, 147 F. Supp. 2d 425, 438 (E.D. Va. 2000) (faulting navigator, although he began ARPA plotting on time, for failing to use other safety features of radar).

20.    It was negligence for Nolasco not to make timely use of radar equipment, including through his failure to post the required "anti-collision officer" whose sole duty would have been

to conduct radar plotting of MCCAIN. *See* Rule 7(b); *The Oden* [1989] 1 Ll. R. 280. The missing anti-collision officer would have timely acquired MCCAIN as an ARPA target, and would have noticed MCCAIN's veer to port by 5:21:52.

21.     ALNIC's failure to see what ought to have been seen (not-under-command lights and visibly veering on radar), and to hear what ought to have heard (*"Loss of Steering in the Pilot House!"*) is conclusive evidence of a defective lookout. *The New York*, 175 U.S. at 204. This failure violated the "fundamental rule of the admiralty." *Delaware, L. & W.R. Co.,* 238 F. at 562.

22.     MCCAIN was not broadcasting over the Automatic Identification System (AIS). But Petitioner presents no expert evidence that this violated a standard of care, or contributed to the collision. AIS actively transmits a vessel's name and position. RT (Sanchez) 163:8-14, 163:15-20; RT (Putty) 414:11-18 (AIS is a "post-9/11 tracking method for . . . port states, for checking you as you're passing through their waters."); RT (Hight) 519:5-19 (agreeing malign persons with the internet could have found MCCAIN if transmitting on AIS). Military vessels have discretion whether to actively transmit over AIS. RT (Sanchez) 165:24-166:1. Merchant captains know this. RT (Putty) 415:21-25 ("I can say with certain that between the Germans, the French, the English, UK, I have never seen the AIS broadcast on a military ship."). CDR Sanchez made the operational decision not to actively broadcast AIS. *Id.* at 166:17-22.

*iii. ALNIC Failed to Take Action to Avoid the Collision (Rules 2, 8, and 17)*

23.     Rule 2 (Responsibility) states:

(a) Nothing in these Rules shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precautions which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

(b) In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the

limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

24.     Rule 8(e) ("Action to Avoid Collision") states:

If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

25.     Rule 17 ("Action by Stand-on Vessel") states:

(a) (i) Where one of two vessels is to keep out of the way, the other shall keep her course and speed.
(ii) The latter vessel may, however, take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

(b) When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision.

26.     The COLREGS never allow a vessel to stand on and take no action and have a collision. *See Crowley Marine Servs. Inc. v. Maritrans Inc.*, 447 F.3d 719, 727 (9th Cir. 2006) ("[Overtaken vessel's] theory is akin to standing on principle and insisting on the right of way even in the face of an imminent collision."); RT (Hight) 542:7-15 ("[H]e is bound by the rules, not to plow into him, not to stand into a collision, we all agree that that's not what the rules say.").

27.     Rule 8(e), which applies to both give-way and stand-on vessels, was added to the 1972 COLREGS.  All pre-1977 collisions must be analyzed in light of this significant change.

28.     Rule 8(e) expressly requires that "[i]f necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion."  *See Complaint of Potomac Transp. Inc.*, 741 F. Supp. 395, 403 (S.D.N.Y. 1989) ("The moment Kampmann recognized a problem with his radar plotting, Rule 8(e) required him to 'slacken' POTOMAC's speed to afford 'more time to assess the

situation.' His failure to immediately do so constituted a violation of the Rules of the Road . . . ."), *aff'd in relevant part*, 909 F.2d 42 (2d Cir. 1990); *Moore v. Matthews*, 445 F. Supp. 2d 516, 527 (D. Md. 2006) ("Rule 8 is violated if the vessel had safe means of avoiding the accident available and failed to use them. . . . Among the reasonable actions available to the navigator or driver is the ability to slacken speed or stop vessel and a substantial and timely alteration of course.").

29.     Rule 17(a)(ii) was added to the 1972 COLREGS, which entered into force on July 15, 1977. It was one of the most significant changes to the COLREGS. Winford W. Barrow, *Consideration of the New International Rules for Preventing Collisions at Sea*, 51 Tul. L. Rev. 1182, 1189 (1977) (describing the sequence of Rules 17(a)(i), 17(a)(ii), and 17(b) as "one of the most significant and difficult changes" to the COLREGS). Under the prior rules, the "stand-on vessel was staying in and holding course and speed for too long a period of time, not feeling that they had the option to make a maneuver." RT (Putty) 405:1-14. All pre-1977 collisions must be analyzed in light of this significant change.[32]

---

[32] *The Fogo* [1967] 2 Ll. R. 208, and *The Frosta* [1973] 2 Ll. R. 348, are two prime examples of anachronistic cases decided under the pre-1972 COLREGS. (*Frosta* was decided in 1973, but the 1972 COLREGS did not come into force until 1977.) Both involved steering failures by an overtaking vessel and were analyzed before the addition of Rules 3(f), 8(e), and 17(a)(ii) to the 1972 COLREGS, all three of which are critical to the present analysis. Other distinctions abound:

In *The Fogo*, the overtaking vessel never communicated her Not Under Command status; she had no lookout; the watch officer let the autopilot overtake at two cables in open ocean, while he did work in the chart room; and his autopilot inexplicably applied a hard rudder toward the overtaken vessel just 90 seconds before collision; as such, the overtaken vessel's effort at avoiding with her own hard rudder could not avoid collision.

*The Frosta* also was an overtaking at two cables in the open sea with a steering failure that applied a hard rudder toward the overtaken vessel. The overtaking vessel displayed not-under-command lights *100 seconds* after the steering casualty, and just five seconds before the overtaken vessel attempted avoiding with her own hard rudder. The court found that had the overtaken vessel attempted avoidance five seconds earlier, it would not "have made any material difference," and that it would have been correct to take action immediately upon seeing not-under-command lights from the overtaking vessel.

30.     Rule 17(a)(ii), although phrased in permissive language, may have a compulsory effect when in conjunction with others rules.  *See The Topaz and Irapua* [2003] 2 Ll. R. 19 (noting that good seamanship may require the stand-on vessel to take action before Rule 17(b) applies); *The Koscierzyna & Hanjin Singapore* [1996] 2 Ll. R. 124 (faulting overtaken vessel for not acting according to the "overwhelming dictates of common sense" and altering course even when not expressly obliged by Rule 17(a)(ii)); Harry Hirst, *Collisions:  What the Courts Say - Part II*, North of England P&I Club (Feb. 2, 2018) ("The stand-on vessel may of course, take avoiding action earlier under Rule 17(a)(ii), and will often be required to do so as a matter of good seamanship.").

31.     By 5:21:52, Rule 17(a)(ii) relieved Nolasco from any obligation under Rule 17(a)(i) to maintain course and speed.  Once so relieved, under Rule 8(e), Nolasco was required to slacken his speed "to avoid collision or allow more time to assess the situation."  That rule was compulsory. Even assuming some delay to react to the information provided by the radar, it was negligence for Nolasco not to stop his engine by 5:22:00.  *See* Exh. 3047 (Nolasco) 162:4-14 ("Q. And so when the vessel's deck log, as originally written, and before it was corrected, stated at 5:22 a.m. . . . when it says 'vessel stopped engines,' you felt that that would be an appropriate maneuver to try to avoid the collision and that that maneuver would be in accordance with both Rule 7 and Rule 8 of the COLREGS; correct?  A. Correct, sir.").  "The Master of the ALNIC was negligent in not stopping or reversing the engines of the ALNIC prior to collision."  ECF 32 (Simon Claim) ¶ 10(g).

32.     If no action is taken under the circumstances of Rule 17(a)(ii), as the vessels draw closer, the strict mandate of Rule 17(b) will apply.  Once the stand-on vessel finds herself "so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision."  Rule 17(b).  *See Crowley Marine Servs., Inc. v. Maritrans, Inc.*, 530 F.3d 1169, 1177 (9th Cir. 2008) ("Like the other rules of the COLREGS that

employ the word 'shall,' Rule 17(b) is mandatory.") (finding overtaken vessel 70% at fault).  At this point, the vessels are often considered to be *in extremis*.

33.     Petitioner cites *The Jaladhir*, [1961] 2 Ll. R. 13 at 17, to note that "English courts fully recognize the practical difficulty for a stand-on vessel in determining when it has to take action under Rule 17(b) and consequently have allowed some latitude to stand-on vessels in this situation."  ECF 328-1.[33]  This analysis is entirely anachronistic since *The Jaladhir* was decided under the 1960 COLREGS.  The court was analyzing an earlier stand-on rule, under which there was no equivalent to Rule 17(a)(ii).  Even under that old rule, and without involvement of a give-way vessel that was Not Under Command, the court apportioned 25% fault to the stand-on vessel.  2 Ll. R. at 13, 15.[34]

34.     Petitioner also cites, for the same purpose, *The Otranto* [1930] 38 Ll. R. 204.  That case was seminal for interpreting the old stand-on rule, which "was designed to secure that the stand-on vessel **shall maintain her course until the last safe moment**."  *Id.* at 208 (emphasis added).  That is the old rule, completely abrogated (indeed, rejected) by the 1972 COLREGS Convention when it added Rule 17(a)(ii).[35]  Even then, the House of Lords faulted the stand-on

---

[33] In closing argument, the Petitioner quoted that case's shibboleth that courts "must not be too wise after the event."  But counsel did not read the very next sentence, in which the English court reached its conclusion about the stand-on vessel: "But, having said that and having those matters in mind, I have come to the conclusion that the boatswain of the *Loch Melfort* left avoiding action much too late in the case."

[34] The stand-on vessel admitted fault at the outset of the case, "*called no evidence*," and "was seriously to blame for the collision, in that she kept a shocking look-out, if in fact she kept a lookout at all, and in that she failed to keep clear of the stand-on ship under Rule 19 [of the 1960 COLREGS]."  *Id.* at 15.

[35] The *travaux preparatoires* to the 1972 COLREGS Convention, available publicly at the IMO library, make clear that the old rule was deeply unpopular with shipmasters precisely because of the difficulty it imposed on the master to identify "the last safe moment."  *The Otranto* at 201.  *See* CR/CONF.2/SR.9:

> Captain MANSON (UK) said that Rule [17] was a revision of Rule 21 of the current Regulations.  The answers to questionnaires sent to masters of ships had made it quite clear that the most important change wanted by most of them was a relaxation of the injunction

vessel not for acting too early, but for turning rather than timely stopping its engine. *Id.* at 209

("First, and before all things, he ought to have stopped and reversed his engines. Upon this point

the nautical assessors by whom we have been advised are in agreement. This, by itself, might have

saved an accident.") In any event, in *The Otranto* both vessels were held to blame. *Id.* at 206.

35. Petitioner's reading of the rule for stand-on vessels is not only anachronistic but

incorrect by 1930 standards. Petitioner defends Nolasco's taking **no action** by claiming he had a

"legal obligation to maintain [his] course and speed. And why is that? It's to be predictable." RT

(Pet'r's Opening) 28:6-8.[36] Petitioner perhaps got this notion of predictability from the old rule –

before the 1972 COLREGS – which prohibited the stand-on vessel from taking action "at a

moment when there is ample time for the ship that is bound to give way to discharge her duty, for

that ship is entitled to rely upon obedience to the rule by the ship that has to keep her course." *The

Otranto.* But, the old rule still required the stand-on vessel to take action once "it was, **or ought

to a master of reasonable skill and prudence to have been**, obvious that to keep his course

would involve immediate danger . . . ." *The Otranto*, at 208 (quoting from *Tasmania*, 155 App.

Cas. 223, 226) (emphasis added).

---

in existing Rule 21 to stand on into a situation and not to take action until they were satisfied
that action by the other vessel alone would not avert a collision.
. . . .
Rear-Admiral MORRISON (USA) said that he had listened with great interest to the
comments made, and especially to those by the representative of the United Kingdom. The
United States had likewise sent out questionnaires on the existing Rules and had found that
one of the Rules most adversely commented on was the existing Rule 21; there was in fact
a strong desire on the part of United States mariners to have some relaxation of that Rule.

[36] Similarly, Petitioner's expert Hight claimed that even after MCCAIN energized red-over-red lights,
ALNIC remained under the "curse of being that stand-on vessel." RT (Hight) 490:11-12. *See also id.* at
490:12-14 (claiming that being a stand-on vessel "supersedes, it's more – it rises above the level of whatever
the not under command lights are intending to show."). There is no authority, before or after the 1972
COLREGS Convention, that remotely supports Hight's claim of a **radical stand-on duty** that supersedes
the meaning of a red-over-red signal from another vessel, *i.e.*, that it "is unable to maneuver as required by
these Rules and is therefore unable to keep out of the way . . . ."

36.     Even having failed to stop by 5:22:00 (or 5:22:30 for that matter), Rule 17(b) attached no later than 5:22:43, when the Collision Alarm blared and MCCAIN closed on ALNIC's bow.  In breach of the COLREGS, Nolasco negligently took no action while steaming ahead at 73 RPM into a collision.  *See* Craig Allen, *Admiralty's In Extremis Doctrine*, 43 J. Mar. L. & Com. 155, 177 (2012) ("While no specific maneuver is prescribed in the Collision Regulations for vessels *in extremis* (even under Rule 17(b)), fault will almost surely be found if the vessel failed to take any action at all.").  Nolasco was negligent for not making a hard turn at this time.  He still had 22 seconds to turn hard to starboard, and 30 seconds to turn hard to port.

37.     The Court rejects Petitioner's argument that by the time ALNIC's Rule 17(b) obligations arose, "we were past the time when any action by the ALNIC could have prevented this collision."  RT (Pet'r's Opening) 29:1-4.[37]  With an Anti-Collision Officer and dedicated lookout, Nolasco would have assessed MCCAIN's red-over-red lights, veer to port, and approach toward his bow.  He is not excused by claiming the situation developed too suddenly.  *See* Allen, *Admiralty's In Extremis Doctrine*, 43 J. Mar. L. & Com. at 174 ("[W]here a vessel fails to maintain a proper look-out, or to detect and evaluate risk of collision, it should not be heard to say that it later 'suddenly' found itself in an *in extremis* situation solely of another's making.").

38.     Rule 34(d) states:

> When vessels in sight of one another are approaching each other and from any cause either vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle.

---

[37] "THE COURT:  The ALNIC had to stay on its course and speed until collision was inevitable?  MR. BELKNAP:  No, no, no. That's not how it works, your Honor. . . . At some point, when it becomes clear that the collision cannot be avoided by the actions of the keep-clear vessel alone, then the ALNIC has the obligation to attempt to avoid the collision.  But as we are going to get to, by the time we got to those points, we were past the time when any action by the ALNIC could have prevented this collision."

39.     But the "Master of the ALNIC failed to give warning signals in accordance with the COLREGs."  ECF 32 (Simon Claim) ¶ 10(e).  It was negligence for Nolasco not to issue the signal required by Rule 34(d).  The Court faults Nolasco for failing to sound this signal, which would have alerted MCCAIN to ALNIC's proximity and approach.  At a minimum, this act might have prompted MCCAIN crew to sound the collision alarm sooner.

### iv. ALNIC Failed to Act to Mitigate Damage once Collision Was Inevitable, and then Aggravated Damage Post-Collision

40.     Even after collision appears to be inevitable, a prudent mariner is obliged to take action to mitigate damage.  Rule 2(b); *Matter of Hellenic Lines, Ltd.*, 1984 AMC 57 (E.D. Va. 1982) (exonerating turn to port in final minute, where collision ensued, because alternative was to strike "hard at a right angle" (citing Rule 2(b)); RT (Hight) 500:4-7 ("If you know there is going to be a collision, absolutely not, you are bound by the rules to do something, something.").

41.     After this collision was inevitable, by negligently taking no action to mitigate its severity, Nolasco breached his duty to MCCAIN and her sailors.   Rule 2(b).  At 5:23:19, while Nolasco might have avoided collision altogether by turning hard to port, he certainly would have avoided penetrating MCCAIN below the waterline with his bulbous bow.  It was his duty to try.

42.     Having collided, a prudent seaman has a duty to avoid exacerbating damage.  Rule 2(b).  *See Complaint of Seiriki Kisen Kaisha*, 629 F. Supp. 1374, 1383 (S.D.N.Y. 1986) ("As one court has noted, '[t]here is authority for the proposition that plain and inexcusable failure, on the part of those in charge of a vessel stricken in a collision, to take available steps to prevent further damage, may, under some circumstances, exonerate another vessel, originally at fault, from liability for the additional damage.' (citations omitted)).

43.     Nolasco, as the conning officer responsible at all times for the position of ALNIC's engine and rudder, negligently failed to stop or take the ship out of Autopilot after the collision.

His actions led to ALNIC making a powered turn into MCCAIN while sweeping through manned berthing compartments. This was an unconscionable and egregiously unseamanlike action. Relative to damages, the effects were significantly causally potent in that they led to major crushing of racks (beds) inside berthing compartments; a blocked escape scuttle below which two drowned men were found; and an obviously widened and elongated opening in MCCAIN that allowed flooding aft of the watertight bulkhead at From 338.

### C. Absent Witnesses and Fraudulent Conduct

#### i.    *Inferences from Missing Witnesses*

44.    "When 'a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction' and fails to produce such witnesses, the jury may infer that 'the testimony, if produced, would be unfavorable' to that party." *United States v. Torres,* 845 F.2d 1165, 1169 (2d Cir.1988) (quoting *Graves v. United States,* 150 U.S. 118, 121 (1893)). *See also S.E.C. v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 614 (S.D.N.Y. 1993), *aff'd sub nom. S.E.C. v. Posner*, 16 F.3d 520 (2d Cir. 1994) ("The Court can and does infer from the Posners' declining to testify . . . that their truthful testimony would have been unfavorable to them."); *Jett v. Texas Co.*, 73 F. Supp. 699, 704 (D. Del. 1947) ("The only explanation of the failure to call Captain Walker as a witness was that his anticipated testimony in this case would be in violent conflict with his former testimony before the Coast Guard and so subject him to the charge of having formally given false testimony.").

45.    No members of the ALNIC crew, and no shoreside directors or employees of either Stealth or Energetic testified at trial. Chief Mate Gracia and Ordinary Seaman Secang were also not made available for deposition, although noticed.

46.     The Court can and does infer from Petitioner failing to produce even one single witness from ALNIC, Stealth, or Energetic to testify at trial that their truthful testimony would have been unfavorable to Petitioner.  This is particularly significant with respect to Chief Mate Gracia, who could have testified regarding the actions of Nolasco, Jandayan, and himself.  He also could have testified about the observation of MCCAIN's not-under-command lights, and about his own observations (*vel non*) of what was depicted on ALNIC's radars.

ii.     *The Effects of Falsifying Logbooks and Testifying Falsely*

47.     "If possible, it ought never to happen that a case sought to be supported by a fabricated log-book should succeed; and while charges of this kind are not to be listened to unless based upon strong evidence, if they are supported by testimony and remain unanswered on the evidence, they compel an adverse decree."  *The Tillie*, 23 F. Cas. 1266, 1267 (E.D.N.Y. 1874).

48.     "Courts many times have inveighed against parties who fabricate documents and then perjure themselves to support them.  It would serve very little purpose to add more to what has already been written.  Suffice it to say that under the law of the sea, when a party comes into court with log entries which will not stand the test of credibility, that party's chance of success in the litigation is little short of nonexistent."  *Capehorn S. S. Corp. v. Texas Co.*, 152 F. Supp. 33, 36 (E.D. La. 1957) (refusing to accept mariner-prevaricator's "eyewitness account of the alleged collisions and the fabricated log entries.").

49.     "The authorities are legion to the effect that intentional falsification of material records presumptively destroys the weight of the offender's evidence as to the entire case."  *Skibs Aktieselskapet Orenor v. The Audrey*, 181 F. Supp. 697, 701 (E.D. Va. 1960) (cited in *Freedman & Slater, Inc. v. M. V. Tofevo*, 222 F. Supp. 964, 969 (S.D.N.Y. 1963)).  *See also Gratsos v. The Moisie Bay*, 287 F.2d 706, 707 (4th Cir. 1961) ("strongly favor[ing] the invocation of the principle

'that intentional falsification of material records presumptively destroys the weight of the offender's evidence-as to the entire case.'"); *Gung You v. Nagle*, 34 F.2d 848, 850 (9th Cir. 1929) ("The fabrication of testimony is always a badge of weakness in a case, and when clearly established justifies a conclusion of fraud in the entire case.").

50.     "'When a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable, conclusion is that he has something to conceal, and is conscious of guilt.'" *Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha*, 102 F.2d 450 (2d Cir. 1939) (Hand, J.). *See also Old Colony Ins. Co. v. S. S. S. Star*, 280 F. Supp. 189, 191 (D. Or. 1967) (drawing inference that truth that was attempted to be hidden by changed logbook "would establish carrier's liability"); *United States v. Parness*, 503 F.2d 430, 438 (2d Cir. 1974) ("It is axiomatic that exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force.").

51.     The Supreme Court has long noted "the principle that the fabrication of testimony raises a presumption against the party guilty of such practice." *Allen v. United States*, 164 U.S. 492, 499–500 (1896). The general maritime law simply reflects the cardinal legal principle: *Omnia praesumuntur contra spoliatorem* ["All things are presumed against the wrongdoer"]. *United States v. Graham*, 102 F.2d 436, 442 (2d Cir. 1939).

52.     "The manufacture, destruction, or suppression of evidence in defense of a criminal charge is in the nature of an admission of guilt and, though not conclusive, is to be given consideration as such [*i.e.*, as an admission of guilt] by the jury." *United States v. Graham*, 102 F.2d 436, 442 (2d Cir. 1939). *See also United States v. Waldman*, 240 F.2d 449, 451–52 (2d Cir. 1957) ("Evidence that defendant fled in the course of an investigation by local authorities into this same theft is clearly admissible to show consciousness of guilt."); *United States v. Katz*, 78 F.

Supp. 435, 438 (M.D. Pa. 1948), *aff'd*, 173 F.2d 116 (3d Cir. 1949) ("Evidence of the misconduct of a party in connection with the trial of his case is admissible as tending to show that the party guilty of the misconduct is unwilling to rely on the truth of his cause.").

53.       "In the end, the one thing that should remain unsullied is the integrity of the judicial process." *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 571 (S.D.N.Y. 2008). Mere exclusion of the falsified evidence would be an inadequate deterrent to future litigants. *See Jung v. Neschis*, No. 01CIV6993, 2009 WL 762835, at *20 (S.D.N.Y. Mar. 23, 2009) ("[P]laintiffs have been either intentionally dishonest or recklessly indifferent to the truth in dealing with Defendants and the Court. . . . In the face of this misconduct, the mere exclusion of the fabricated evidence amounts to no sanction at all."); *Pope v. Federal Express Corp.,* 138 F.R.D. 675, 683 (W.D. Mo. 1990), *aff'd in part, vacated on other grounds,* 974 F.2d 982 (8th Cir. 1992) ("Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues."); *Oniha v. Delta Air Lines, Inc.*, No. 1:19-cv-5272, 2021 WL 3493163, at *10 (N.D. Ga. Apr. 13, 2021) ("[E]xclusion of the fabricated [evidence] would not be an adequate sanction, because Plaintiff would be allowed to continue pursuing the very claim that he intended to bolster with his fabricated evidence.").

54.       "It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction. This adverse inference rule is supported by evidentiary, prophylactic, punitive, and remedial rationales. . . . [T]he drawing of an adverse inference against parties who destroy evidence will deter such destruction, and will properly place the risk of an erroneous judgment on the party that wrongfully

created the risk." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (internal quotations and citations omitted).

55.     The Court draws an adverse inference from the destruction of the EOT log, and concludes that it is positive evidence of a far-reaching conspiracy by ALNIC interests to cover the ship's failure to Stop Engines before collision, of which they were consciously guilty.

56.     The Court, as trier of fact, considers most seriously Nolasco's perjurious testimony in assessing his credibility. *Rybner v. Cannon Design, Inc.,* No. 95-cv-0279, 1996 WL 470668, at *6 (S.D.N.Y. Aug. 20, 1996) ("[D]efendants will be permitted to inform the jury of the dishonesty and a jury charge will be given that any falsehood under oath should be considered seriously by jurors in assessing [plaintiff's] credibility.").

57.     Based on the falsification of the ship's deck logbook, numerous other logs and records, the destruction of the EOT log, the *post hoc* attempt to explain away the proven-false logbook entries through a backdated sham "Addendum" generated by counsel, about which Capt. Nolasco perjured himself, and which false testimony trial counsel suborned, the Court reaches the following conclusions of law:

58.     First, there is fraud in the entirety of Petitioner's case. *Gung You v. Nagle*, 34 F.2d 848, 850 (9th Cir. 1929).

59.     Second, the weight of Petitioner's evidence as to their entire case is presumptively destroyed.  This includes Petitioner's contention that, based on the information apparent to Nolasco, he did not have time to react to MCCAIN before collision was inevitable. *See Freedman & Slater, Inc. v. M. V. Tofevo*, 222 F. Supp. 964, 969 (S.D.N.Y. 1963) (citing *Skibs Aktieselskapet Orenor v. The Audrey*, 181 F. Supp. 697, 701 (E.D. Va. 1960)).

60.     Third, each and every false logbook entry raises a "strong presumption" by Petitioner and its officers that the truth was adverse to the vessel's contention.  *The Silver Palm*, 94 F.2d 754, 761–62 (9th Cir. 1937).  *See also Allen v. United States*, 164 U.S. 492, 499-500 (1896) (expressing principle that the fabrication of testimony raises a presumption against the party guilty of such practice).

61.     Fourth, Nolasco and his conspiratorial crew were conscious of guilt for not stopping the engine before collision, for allowing the Autopilot to drive the ship into collision, and for not having a dedicated lookout on watch.  *See Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha*, 102 F.2d 450 (2d Cir. 1939) (Hand, J.).

62.     Fifth, when Capt. Zisimos testified falsely about having instructed ALNIC officers to use BML III in the Singapore Strait, he was conscious of guilt for not doing so.  *Id.*

63.     Sixth, ALNIC's falsification of evidence constitutes an admission of guilt, and is considered as such by the finder of fact.  *United States v. Graham*, 102 F.2d 436, 442 (2d Cir. 1939); *Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha*, 102 F.2d 450 (2d Cir. 1939).

64.     Seventh, Energetic Tank is unable to overcome the presumption, "strong" or otherwise, that the failures about which its officers lied were causative.  *See The Silver Palm*, 94 F.2d 754, 761–62 (9th Cir. 1937).

65.     Eighth, and finally, the admitted falsifications compel an adverse decree against Energetic's petition for exoneration from or limitation of liability.  *The Tillie*, 23 F. Cas. 1266, 1267 (E.D.N.Y. 1874).

*iii. Claimants' Exposing the Truth Does Not Excuse the Wrongdoer*

66.     In an effort to make the party's lies and false records immaterial, Petitioner contends that "Notwithstanding the false entries on ALNIC's paper logs, the ship's VDR

**automatically logged and preserved all relevant data concerning ALNIC's operations** on the day of the collision." ECF 328 (Pet'r's Prop. FOF 278) (emphasis added).

67. This is not true. The VDR captured certain pieces of information, but other significant matters, about which Petitioner later lied, were not recorded.

68. First, the VDR did not automatically log when Nolasco, Gracia, or Jandayan saw red-over-red lights on MCCAIN. RT (Putty) 350:7-9 ("Q. Does the VDR show the Court when Captain Nolasco saw red-over-red lights? A. No, it doesn't.").

69. Second, the VDR did not automatically log what Nolasco saw or did on the S-band radar. The one radar recorded to the VDR, the X-band, certainly contains relevant information, *e.g.*, that it was not in use for ten minutes prior to the collision.

70. Third, the VDR did not automatically log whether Secang was on watch on the morning of the collision. *See* RT (Putty) 349:14-350:6.

71. Fourth, the VDR did not automatically log and preserve anything related to Zisimos's audit of the ship in May 2017, including his claim that he instructed the crew to set BML III in the Singapore Strait, which has been proven false.

72. In each of these areas, the Court has to rely on witness testimony and documentary evidence to establish the "relevant data concerning ALNIC's operations . . . ." *Contra* ECF 328 (Pet'r's Prop. FOF 278). For example, the Court has only Nolasco's testimony from which to learn what he saw in the radar, but his testimony is known (indeed admitted) to have been perjurious. *See* RT (Hight) 517:23-24 ("So Captain Nolasco, I'm not going to defend him. I'm not going to defend his perjury.").

73. Even assuming that all of the lies have been unpacked – a tenuous assumption – the argument that this exculpates the wrongdoing party is refuted by compelling caselaw. In *The Silver*

*Palm*, 94 F.2d 754, 761–62 (9th Cir. 1937), a warship was caught engaged in conduct remarkably similar to ALNIC's. The officers falsely logged "what would have been the proper order 'all engines were ordered stopped'" in place of a truthful entry that the ship had merely slowed its engine. But the truth was "clearly shown in the bell books contemporaneously recording the orders from the captain to the several turbines driving the ship . . . ." *Id.* This is directly analogous to the VDR recordings kept on ALNIC. The court concluded:

> The importance of the logbook entries in determining marine causes has always been recognized by courts of admiralty. The alternation of logbooks by erasure and substitution (here, as later shown, in 9 pertinent entries of the maneuvers to the collision) has long been condemned in courts of admiralty. It not only casts suspicion on the whole case of the vessel, but creates a strong presumption that the erased matter was adverse to her contention. *Id.* (citations omitted).

74. Petitioner goes further and claims that while it condemns its crew, it has always come clean with the Court. RT (Pet'r's Closing) 763:14-18 ("Now, you heard *ad nauseum* about ALNIC's false log entries and false statements to the investigative authorities after the collision. I think we have addressed that enough; but just to be clear, petitioner has never condoned such conduct and has been straight with this court.").

75. Petitioner did not come clean about the conspiracy to make Secang appear to be the dedicated lookout; it simply got caught. By its own position, it learned "at or about" the time that counsel for the United States elicited a confession about Secang from a percipient witness. Exh. 3005 (Resp. to Req. for Admis. 17).

76. Petitioner did not come clean about Nolasco's numerous lies during his deposition, including about the created of the "Addendum" to the deck log; it simply got caught. Counsel for the United States had to obtain discovery on document *metadata* to ferret out the truth. Even then, it never corrected the record during, or after, Nolasco's deposition.

77.     Petitioner did not come clean and correct Zisimos's obviously false claim that he trained the crew to use BML III after the collision, a yarn it could have used to show a lack of privity or knowledge in order to obtain limitation under the U.S. Limitation of Liability Act, 46 U.S.C. Ch. 305.  Once again, Petitioner got caught by a thorough canvassing of the evidence.

78.     Petitioner asks the Court to reach conclusions that it cannot reach without making conclusions of what Nolasco or Jandayan saw or did.  *See, e.g.*, RT (Petitioner's Closing) 756:25-757:6 ("Claimants try to suggest that Captain Nolasco actually did see MCCAIN's not-under-command lights, but that is not consistent with the evidence. **He denied it in his deposition**, but you don't have to take his word for it. **The AB also denied that** they saw anything other than MCCAIN's red side light.").  Both men have been shown to have given untruthful testimony in this case.  The Court refuses to credit their testimony, and instead presumes against these witnesses that what they actually did or saw would only have been detrimental to Petitioner's case.

## II.  APPORTIONMENT OF 70% FAULT TO ALNIC

79.     Singapore's Maritime Conventions Act 1911 (Cap. IA3, 2004 Rev. Ed)  states the rule in Singapore that "liability to make good the damage or loss shall be in proportion to the degree in which each ship was in fault, except that if, having regard to all the circumstances of the case, it is not possible to establish different degrees of fault, the liability shall be apportioned equally."   MCA, sec. 1(1).  *See* ECF 323-2 (Kuek) ¶¶ 9(b), 28, 46.

80.     "In most cases involving a collision between two moving vessels, 'there is some degree of fault on the part of all the vessels involved in a collision [and] a court may apportion liability between the vessels according to the degree to which each vessel was at fault.'[38]  *Id.* ¶ 47.

---

[38] Section 1(1) Maritime Convention Act 1911 (Cap. IA3); *The Dream Star* at para. 50; *The Mount Apo and Hanjin Ras Laffan* at para. 95; Sir Henry Brandon, *Apportionment of Liability under the Maritime Conventions Act of 1911*, 51 Tulane Law Review 1025 (1976 - 1977).

81.    In *Complaint of Seiriki Kisen Kaisha*, 629 F.Supp. 1374, 1381 fn. 2 (S.D.N.Y. 1986), the court determined that "both culpability and causative potency of faults are to be regarded in apportioning liability" under cases subject to the Brussels Collision Convention of 1910 and Britain's Maritime Conventions Act.  Singapore law also assess "causative potency."  *The Dream Star,* [2017] SGHC 220.  Though not expressly stated as such, the concept can be understood as an attempt to apply justice in a Solomonic and holistic sense.

82.    "**There are 'no universal rules with regard to the assessment of culpability or causative potency'**[39] and the Court will have to rely on 'practical experience of apportionment in numerous cases over many years'[40] when apportioning liability upon '**a broad, commonsensical and qualitative assessment of the culpability and causative potency** of [the faults of] both vessels.'"  *Id.* ¶ 48 (emphasis added).

83.    In *The Dream Star,* [2017] SGHC 220, the Singapore court agreed that "Causative potency has two aspects. The first is the extent to which the fault contributed to the fact that the collision occurred. **The second is the extent to which the fault contributed to the damage resulting from the casualty.**"  (quotation omitted) (emphasis added).

84.    "Admiralty judges often consider, where one ship is more to blame than the other, how many more times to blame one vessel is than the other."  *The Samco Europe and MSC Prestige* [2011] 2 Ll. R. 579.

85.    As noted, the rule in the MCA for apportioning fault contains the significant caveat: "[I]f, having regard to all the circumstances of the case, it is not possible to establish different

---

[39] *The Dream Star* at para. 126 (citing *The Samco Europe and MSC Prestige* [2011] 2 Ll. R. 579 with approval; *The Mount Apo and Hanjin Ras Laffan* at para. 95).

[40] Brandon, 51 Tul. L. Rev. 1025.

degrees of fault, the liability shall be apportioned equally." Maritime Conventions Act 1911 (Cap. IA3), section 1(1). *See also Evergreen Marine v. Nautical Challenge*, 2021 UKSC 6; *The Oden*, [1989] 1 Ll. Rep. 280; *The Sabine* [1974] 1 Ll. R 465.

86.    Cases where a stand-on vessel takes no action are rare, and have been decided strictly against the vessel that failed to take any action.  In *Crowley Marine Servs. v. Maritrans Inc.*, 530 F.3d 1169, 1173 (9th Cir. 2008), where the overtaken vessel took no action, the court upheld a finding that the overtaken vessel [ALNIC in this case] was 70% at fault.[41]

87.    In cases where the overtaken vessel did take action (unlike ALNIC), but too little to avoid collision, the overtaken vessel has still consistently been held at fault.  The court in *Complaint of Seiriki Kisen Kaisha*, 629 F. Supp. 1374 (S.D.N.Y. 1986), allocated 40% fault against the stand-on vessel even though the give-way vessel took an "inexplicable last minute course alteration . . . . that guaranteed that the two vessels would collide in the manner they did with the attendant consequences."

88.    In *Complaint of Flota Mercante Grancolombiana, S.A.*, 440 F. Supp. 704 (S.D.N.Y. 1977), the court applied the 1960 collision rules and held the overtaken vessel at fault even before Rules 8(e) and 17(a)(ii) were put into effect through the 1977 implementation of the 1972 COLREGS.  The case involved a collision following a loss of steering by the overtaking vessel.  The court specifically noted that, even with loss of steering at the wheel, the overtaking vessel had redundant modes of steering available.  *Id.* at 161 ("Thus, failure of the electrical steering mechanism did not necessarily deprive the vessel of the ability to steer.").  Still, the court's

---

[41] "Crowley effectively asks us to abandon the comparative fault rule in situations where an overtaking vessel has violated Rule 13(a) and that violation is a cause of the collision, and instead adopt a rule that the overtaking vessel in such a situation is always responsible for the majority of fault as a matter of law. Crowley's proposed rule, however, would mandate that a vessel charged with violating Rule 13(a) would bear the majority of the burden for a collision even if the balance of factors showed that the other vessel was more blameworthy[] because of . . . its own statutory violations . . . ." *Crowley,* 530 F.3d at 1174.

principal critique was the ship's failure to signal that it was Not Under Command: "Rodriguez's first priority as soon as he became aware of the loss of steering from the bridge should have been to warn the *Transhawaii* that the *Colombia* was out of command. Instead he set out to determine the scope of the problem . . . ." *Id.* at 169.[42] That stands in stark contrast to CDR Sanchez: as soon as he became aware of the loss of steering from the bridge, he fulfilled his "first priority" to warn ALNIC that the MCCAIN was out of command. In *Grancolombiana*, despite the ship's principal failure to communicate her not-under-command status, and despite that there was no Rule 8(e) or Rule 17(a)(ii) to guide the overtaken vessel to earlier action, the court still found the overtaken vessel 17.5% at fault.

89.    In the remarkable case of *The Koscierzyna* [1996] 2 Ll. R. 124, 129, an overtaking vessel literally rear-ended the "overtaken" ship, apparently without even seeing it at any time before the collision. The overtaking vessel, unlike MCCAIN in this case, was *in command*. The overtaken vessel noticed that it was about to be run-down, causing its mate to sound a series of rapid blasts of the whistle and to attempt a hard rudder maneuver (actions ALNIC never took). Despite these rather incredible facts, under the modern COLREGS, the court held the overtaken vessel 15% at fault for "not watch[ing] the overtaking vessel continuously."

90.    In *The Dream Star,* [2017] SGHC 220, which assessed 30% fault to the stand-on vessel and 70% on the give-way vessel (a vessel *in command*), the court adopted the reasoning of *The "Nordlake"* [2016] 1 Ll. R. 656, providing the principles of comparative fault and causative potency as follows:

> (i) The number of faults on one side or the other is not decisive. It the nature and quality of a ship's faults, rather than their number, that matter.

---

[42] That collision occurred in daylight. The court does not address if the mate could have hoisted not-under-command dayshapes, Rule 27(a)(ii), which is doubtful under the exigencies of the moment, so comments on radio usage instead. CDR Sanchez had crew on hand to energize the proper lights. Rule 27(a)(i), (iii).

(ii) Breaches of the obligations imposed on ships in certain defined Regulations will usually be regarded as seriously culpable…

(iii) Causative potency has two aspects. The first is the extent to which the fault contributed to the fact that the collision occurred. The second is the extent to which the fault contributed to the damage resulting from the casualty.

(iv) In most cases though not all it will be right to treat the fault of a ship that creates a situation of difficulty or danger as greater than that of the ship that fails to react properly to such situation after it has been created.

(v) The fact that a fault consists of a deliberate act or omission may in certain circumstances justify the court in treating it as more culpable than a fault which consists of omission only.

91.     Applying these factors here, the first factor (the nature and quality of the faults), weighs most heavily against Petitioner.  The causative faults aboard MCCAIN were unintentional errors.  Put simply, failures in training to use an extremely complex computerized system (the "IBNS") led to an unnecessarily slow response to a loss of steering, which in turn led to the collision.  By comparison, fault also lies with Petitioner for causative lack of training.

92.     The second factor (breaches of the obligations under the COLREGS) apply to both vessels, but not equally.  As the give-way vessel, MCCAIN remained obligated under COLREGS Rules 13 and 16 to keep out of the way of ALNIC "so far as possible."  But her not-under-command status specifically warned Nolasco that she was "unable to keep out of the way."  Even then, MCCAIN was still attempting to avoid collision, and in fact regained steering control and applied right rudder before Nolasco took any action.  ALNIC violation Rule 2 ("Responsibility"), Rule 5 ("Look-out"), Rule 7 ("Risk of Collision"), Rule 8 ("Action to Avoid Collision"), and Rule 17 ("Action by Stand-on Vessel").  This factor suggests that ALNIC's faults were three to five times greater than MCCAIN's.

93.     The third factor (the extent to which the fault contributed to the fact that the collision occurred and to which the fault contributed to the damage) might have been roughly

equal given that MCCAIN lost steering while overtaking, but then ALNIC took no action at all to avoid collision. However, the factor also weighs the extent to which the fault contributed to the extent of damage. Thus, this factor also weighs heavily against ALNIC given the facts concerning ALNIC's failure to mitigate injuries, deaths, and hull damage once collision was believed inevitable, and then its gross misconduct concerning post-collision "engine ahead" and failure to disengage the Autopilot (for which additional damages ALNIC is solely at fault).

94. The fourth factor (who initiated the navigational situation that led to the collision) goes against MCCAIN, though the factor itself is qualified by the *caveat*, "In most cases though not all . . . ." The occasion of a loss of steering is highly sympathetic toward MCCAIN, and a hazard of overtaking about which the Stealth SMS specifically warned Nolasco.

95. The fifth factor (whether a fault consists of a deliberate act or omission may lead to greater culpability than a fault which consists of omission only) applies *solely* to Petitioner/Stealth and ALNIC. Petitioner intentionally refused to stand BML III as required by the ISM Code, and Liberian law, through the ship's certified SMS. It goes without saying that ALNIC's having a *collision* while missing the *anti-collision* officer, is noteworthy for this analysis.

96. Based on all of the foregoing, the Court apportions 70% fault to Petitioner and 30% fault to the United States.

## III. LIMITATION OF LIABILITY IS DENIED

97. As discussed above, ALNIC was obliged by law to comply with Stealth's SMS. In the Singapore Strait, that meant posting five watchstanders to the bridge, including the Anti-Collision Officer. Nolasco failed to do this on the day of this collision. *See* paras. 11-13, 15-20.

98. Even though the Court has ruled that Singapore law applies to the substantive law regarding liability, the U.S. Limitation of Liability Act ("LLA"), 46 U.S.C. § 30501 *et seq.*, is

considered "procedural" and applies to limitation. Indeed, Petitioner's action is brought under the LLA. As the Court has found that Petitioner's vessel is liable, the shipowner has the burden of proving that it lacked "privity or knowledge" of the conditions or acts that brought about the casualty. *Coryell v. Phipps*, 317 U.S. 406, 409 (1943); Schoenbaum, *Admiralty and Maritime Law* § 5:8 ("Privity or Knowledge") ("If negligence or unseaworthiness involving the vessel that was the proximate cause of the loss, the vessel owner must prove it had no privity or knowledge of the unseaworthy condition or the negligent acts to obtain limitation.").

99. "The Second Circuit has stated that privity or knowledge may be 'actual or constructive,' but in either case must involve 'some degree of culpable participation or neglect of duty on the shipowner's part.'" Schoenbaum, *Admiralty and Maritime Law* § 5:8 (citing *Otal Investments, Ltd. v. M/V Clary*, 673 F.3d 108, 115 (2d Cir. 2012)).

100. "[A] shipowner is presumed to know what the company's managing officers knew or should have known with regard to actions or conditions that caused the loss. Privity or knowledge is deemed to exist 'where the owners had the means of knowledge or . . . where knowledge would have been obtained by reasonable inspection.'" Schoenbaum, *Admiralty and Maritime Law* § 5:8 (citations omitted).

101. As Prof. Schoenbaum explains, "[a] principal reason for denying limitation is because management failed to provide proper procedures for . . . the training of the crew, or adequate checks to ensure the implementation of established maintenance and safety procedures." Schoenbaum, *Admiralty and Maritime Law* § 5:8 (citations omitted).

102. An example of the foregoing well-settled law of limitation of liability is the Eleventh Circuit's decision in *Hercules Carriers, Inc. v. Florida*, 768 F.2d 1558, 1576-77 (11th Cir. 1985) (emphasis added):

Because of the petitioner's privity and knowledge as to the crew's negligence and unseaworthiness . . . it cannot claim that it is entitled to a limitation of liability because the accident was purely the result of an erroneous navigational judgment. As stated in *In re Ta Chi Navigation (Panama) Corp., S.A.,* 513 F.Supp. 148, 158 (E.D.La.1981), *aff'd,* 728 F.2d 699 (5th Cir.1984):

> The actual conduct of such an incompetent crew which is the cause of the damage may involve the navigation or management of the vessel; nonetheless if incompetence results in a navigational error which causes the collision, it is crew incompetence, and therefore the unseaworthiness of the vessel, which has caused the . . . damage. The fact that the unseaworthiness can be labeled as an error in navigation does not magically protect the shipowner from liability. At some point along a spectrum of performance competency, an error in navigation is attributable to incompetence on the part of the crew.

*The negligent navigation by Lerro became the responsibility of the owner when it failed to train its crew and authorized crew members to ignore the IMCO regulation and its own manual* with respect to the officers' right to take command of the vessel from Lerro. [43]

103.    As regards claims for personal injury and death, the Limitation Act expressly provides:  "In a claim for personal injury or death, the privity or knowledge of the master or the owner's superintendent or managing agent, at or before the beginning of each voyage, is imputed to the owner."  46 U.S.C. § 30506 (emphasis added).  This means that Capt. Nolasco's acts at the

---

[43] *See also, e.g.*, *Trico Marine Assets, Inc. v. Diamond B Marine Svcs. Inc.*, 332 F3d 779, 790 (5th Cir. 2003) ("In short, the facts found in this case go far beyond mere navigational errors.  Diamond B knew, or should have known, that the MISS BERNICE was unseaworthy and that its captain was improperly trained."); *Verrett v. McDonough Marine Services*, 705 F.2d 1437, 1444 (5th Cir. 1983) (privity or knowledge existed in collision case when vessel owner failed to ensure its captain was competent) (citing *Tug OCEAN PRINCE, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978)); *Limon v. Berryco Barge Lines, L.L.C.*, 787 F. Supp. 2d 580, 589 (S.D. Tex. 2011) ("Berryco made no effort-either through training or through manuals-to ensure that Captain Turrentine was trained in the safe operation of Berryco's vessels."); *Complaint of Cameron Boat Rentals, Inc.*, 683 F. Supp. 577, 585 (W.D. La. 1988) ("The fact that navigational errors figured heavily in the incident does not negate privity or knowledge [when owner did not properly train its crew]."); *See also Gautreaux v. Scurlock Marine, Inc.*, 84 F.3d 776, 783-84 (5th Cir. 1996) (privity or knowledge existed based on negligent training), *vacated in part on other grounds*, 107 F.3d 331 (5th Cir. 1997); *Hodgen v. Forest Oil Corp.*, 862 F. Supp. 1567, 1575 (W.D. La. 1994) (privity or knowledge existed where company "provided no training to its captains on how to properly accomplish a swing rope transfer operation."); *Matter of Complaint of Theriot Crew Boats, Inc.*, 1996 WL 495154 at *2 (E.D. La. Aug. 29, 1994) ("[f]ailing to properly train the crew or educate the crew about company policies specifically defeats the right to limit.").

beginning of the voyage, which commenced only days before the collision, are sufficient to deny limitation as to the personal injury and death claimants.

104. As concluded above, this collision was caused, and its potency was aggravated, by ALNIC's failure to operate the bridge at BML III as required by international law and the Stealth Safety Management System. ALNIC had a *collision* while missing the required "*anti-collision* officer." ALNIC also did not have a dedicated lookout to see MCCAIN energize her red-over-red lights while overtaking. Finally, the ship was in Autopilot through and beyond the collision. None of these conditions, each of which caused or contributed to the collision, and its potency, would have existed had the crew been properly trained to use BML III in the Singapore Strait.

105. Because Nolasco adopted the Voyage Plan submitted by his navigator, Second Officer Torculas, prior to commencement of the voyage from Taiwan, and because that plan called for sailing the Singapore Strait at BML II rather than BML III as required, Nolasco had actual privity or knowledge before the commencement of the collision voyage. Exh. 11; Exh. 3047 (Nolasco) at 112:14-113:2 (agreeing that the voyage plan for the accident voyage was completed "[j]ust before departure from Taiwan"); *id.* at 114:5-21 (agreeing that he approved passage plan to enter Singapore with BML II); *id.* at 308:13-21 ("That was done when you were departing Taiwan? A. That's correct. Before departure Taiwan.").

106. Both through Zisimos as Petitioner's marine superintendent, and through the Stealth Safety Manager and Crewing Manager, Stealth had actual privity and actual knowledge of ALNIC's undermanning defects. They had two months to implement Zisimos's specific recommendation – to send someone to the ship to conduct remedial training – but failed to take any action prior to the collision voyage.

107.    In this respect the case is similar to *The Lady Gwendolen* [1965] P. 294,[44] in which owners employed a marine superintendent who, while aboard, did not correct the master's habit of sailing too fast in fog:

> The result was that when [marine superintendent] Robbie failed, as he clearly did fail, to exercise proper supervision over the manner in which The Lady Gwendolen was being navigated, his failure went undetected, for the reason that there was nobody whose business it was to take any interest in the matter. This seems to me to be the negation of good management, and I do not see how it is possible to say that it occurred without actual fault on the part of the company.

For that reason, owners in *The Lady Gwendolyn* were denied limitation. The same holds in the present case, given Zisimos's failure to correct known bridge manning deficiencies, which were his duty to correct, plus the company's participation in Zisimos's cover-up to deceive outside international auditors and inspectors regarding ALNIC's undermanning faults.

108.    Petitioner did not put on a limitation case, but called only two retained witnesses at trial (Wilske and Hight), neither of whom testified to privity or knowledge. Petitioner has failed to carry its burden of proving lack of privity or knowledge.

## IV.  PETITIONER'S CLAIM FOR CONTRIBUTION IS NOT ALLOWED

109.    Petitioner claims a right to contribution against the United States for payments they will make to U.S. Navy sailor claimants and Gold Star Families. But Singapore law does not allow contribution in this scenario. *See* Kuek Rep. ¶ 178 *et seq.* "Under the 1911 Act and under s.189 owners of vessels partly to blame are given a right of contribution *inter se* only when neither had a defence to the original action for damages."[45] MARSDEN, para. 16-043. MARSDEN provides as an example a direct analogy to ALNIC's argument against the United States' warship:

---

[44] This UK case was decided under the 1957 Limitation Convention which, like its U.S. counterpart, broke limitation upon showing of "privity of owners" of the defect that caused or contributed to the collision.

[45] As Claimants' Singapore counsel explains in his report: "The 1911 Act referred to in MARSDEN is the act enacting the 1910 Brussels Convention. The House of Commons expressly intended to extend this 1911

Where, for example, a seaman who could not recover against the owners of the ship on which he is serving by reason of a defence such as existed under the Crown Proceeding Act 1947 s.10, relating to the armed forces, successfully sues the owners of the other ship partly to blame for his injuries, the owners of the other ship cannot obtain contribution from the owners of the ship on which he is serving.

110.     Of course, as was the case with Royal Navy sailors under the Crown Proceeding Act of 1947, U.S. Navy sailors cannot recover against the owner of USS JOHN S MCCAIN because such claims are strictly barred by the *Feres* doctrine.  *Feres v. United States*, 340 U.S. 135 (1950).  In *Feres,* the Supreme Court held that Congress had not waived the United States' sovereign immunity for claims by service members that arise out of service-related activity.  The Supreme Court later extended the *Feres* doctrine to bar third-party claims against the United States that have as their genesis a service member's service-related activity.  *See Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666 (1977).

111.     Petitioners have argued that *Feres* was wrongly decided or should be changed.  ECF 327 (Trial Brief) at 31-33.  However, the Court has consistently reaffirmed *Feres* over the sixty-seven years since its promulgation.[46]  Likewise, the Court has repeatedly denied petitions for *certiorari* urging that *Feres* be over-ruled or reexamined,[47] most recently in a Navy case.  *Jones,*

---

Act to the colonies.   The Singapore Parliament passed the Application of English Law Act (Cap. 7A) (the 'AELA') in November 1993 to provide an exhaustive list of statutes which Singapore will continue to inherit and apply.   The Maritime Conventions Act 1911 (the 'MCA') is one of them . . . ."

[46] *See United States v. Johnson*, 481 U.S. 681 (1987); *United States v. Stanley*, 483 U.S. 669 (1987); *United States v. Shearer*, 473 U.S. 52 (1985); *Chappell v. Wallace*, 462 U.S. 296 (1983); *Stencel Aero Engineering, supra,* 431 U.S. 666 (1977); *United States v. Muniz*, 374 U.S. 150 (1963).

[47] *See, e.g.*, *Ritchie v. United States,* 134 S. Ct. 2135 (2014) (No. 13-893); *Lanus v. United States,* 133 S. Ct. 2731 (2013) (No. 12-862); *Witt v. United States,* 131 S. Ct. 3058 (2011) (No. 10-885); *Matthew v. Department of the Army,* 558 U.S. 821 (2009) (No. 081451); *McConnell v. United States,* 552 U.S. 1038 (2007) (No. 07-240); *Costo v. United States,* 534 U.S. 1078 (2002) (No. 01-526); *O'Neill v. United States,* 525 U.S. 962 (1998) (No. 98-194); *George v. United States,* 522 U.S. 1116 (1998) ( No. 97-1084); *Bisel v. United States,* 522 U.S. 1049 (1998) (No. 97-793); *Hayes* v. *United States,* 516 U.S. 814 (1995) (No. 94-1957); *Schoemer v. United States,* 516 U.S. 989 (1995) (No. 95-528); *Forgette v. United States,* 513 U.S. 1113 (1995) (No. 94-985); *Sonnenberg v. United States,* 498 U.S. 1067 (1991) (No. 90-539).

*et al. v. United States*, 2016 WL 3033859 (S.D. Cal. 2016), *aff'd*, 733 Fed. Appx. 903 (9th Cir. 2018), *cert. denied*, 139 S.Ct. 2615 (2019).

112.    Under Singapore law, Petitioner can do no more than "step into the shoes" of claimant sailors when asserting its contribution claim against the United States.  Because claimants cannot assert a claim against the United States, Petitioner's claim for contribution is denied.

## V. DAMAGES

113.    As noted, the parties have stipulated to their quanta of damages, excluding pre- and post-judgment interest.  *See supra* paras. 170-171; ECF 310-1.

114.    Because the rule regarding prejudgment interest presents a question of substantive law, it will be determined by Singapore law.  *See Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999) ("The awarding of prejudgment interest is considered a question of substantive law."); *Patch v. Stanley Works (Stanley Chem. Co. Div.)*, 448 F.2d 483, 494 (2d Cir. 1971) ("This conclusion would also be reached under a consistent line of decisions in the courts of New York and in this court applying New York conflicts law, which hold that the allowance of pre-judgment interest is controlled by the rule of the jurisdiction whose law determines liability . . . ."); *In re Exxon Valdez*, 484 F.3d 1098, 1101 (9th Cir. 2007) ("It is well settled that prejudgment interest is a substantive aspect of a plaintiff's claim, rather than a merely procedural mechanism.").

115.    Under Singapore law, while an award of interest is discretionary, it is usual for Singapore courts to order prejudgment interest.  The usual practice is for the court to order simple interest at the rate of 5.33% per annum, accruing on the judgment-debt from the date losses are incurred or the commencement of proceedings.[48]  *See* Chief Justice of Singapore, Practice Dir. No.

_____

[48] In *Friis v Casetech Trading Pte Ltd* [2000] 2 SLR(R) 511, the Singapore Court of Appeal acknowledged that interest should be awarded from the date of accrual of a loss, especially where the defendant is enriched by the claimant's loss and has the benefit of using enrichment or sums for further profit.  However, Singapore Courts are likely to award interest only from the date of the commencement of proceedings

1 (2007); *Lalwani Ashok Bherumal v. Lalwani Shalini Gobind* [2019] 4SLR 1304; ECF 323 (Kuek Rep.) ¶¶ 165-168.[49]

116.    Running interest from the date losses were incurred to the date of trial on November 1, 2021, the United States' claim for prejudgment interest is $35,362,725.  RT (Overbaugh) 456:11-14.  Running interest from the commencement of proceedings on February 15, 2018, to the date of trial on November 1, 2021, the United States' claim for prejudgment interest is $36,632,433.  RT (Overbaugh) 456:15-19.

117.    Petitioner did not cross-examine Mr. Overbaugh at trial despite the Court's offer to delay his cross-examination for three days.  His testimony therefore is uncontroverted.  Moreover, Petitioner presented no case on prejudgment interest and did not call any witnesses in support of its own claim for damages to ALNIC.  Finally, Petitioner stipulated to the 450-day repair period for the USS JOHN S MCCAIN and presented no evidence at trial to establish alternative dates on which the U.S. Navy incurred costs to repair its warship.

## CONCLUSION

1.    Any Finding of Fact that properly should be a Conclusion of Law, and any Conclusion of Law that should be a Finding of Fact, are so deemed.

2.    The Court **DENIES** Energetic Tank's petition for exoneration, and apportions ___% fault to Petitioner and ___% fault to the United States.  Accordingly, the Court finds Petitioner liable to the United States in the amount of ___% of the stipulated damages amount of

---

where the claimant has unwarrantably or inexplicably delayed the commencement of proceedings.

[49] By comparison, U.S. maritime law awards prejudgment interest unless there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest. *Noritake Co., Inc. v. M/V Hellenic Champion et al*., 627 F.2d 724 (5th Cir. 1980). Generally, exceptional circumstances exist only when the district court concludes that the party requesting interest has (1) unreasonably delayed in prosecuting its claim, (2) made a bad faith estimate of its damages that precluded settlement, or (3) not sustained any actual damages.  *Id.*  None of those conditions apply here.

$185 million, less ___% of ALNIC's stipulated damages amount of $442,445, plus pre-judgment interest.[50]  Net payment on principal damages is to be made by Petitioner to the United States for $_____.

3.      Interest on the United States' stipulated principal damages ($185 million) from the mid-point of repair until an assumed judgment date of December 22, 2021 is $36,740,493; ___% of this amount is $_____.  The date of ALNIC's repair was not put into evidence. Interest on Petitioner's stipulated principal damages ($442,445) from the date of writ (February 15, 2018) until an assumed judgment date of December 22, 2021 is $90,905; ___% of this amount is _____.   Net payment on pre-judgement interest is to be made by Petitioner to the United States for $_____.

4.      The Court **DENIES** Energetic Tank's petition for limitation of liability.

5.      The Court **ORDERS** that Energetic Tank shall pay to the United States the sum of the net totals for principal damages and pre-judgment interest, $_____, plus post-judgment interest.

6.      The Court further **ORDERS** that Judgment in favor of the United States and against Energetic Tank shall be entered in the foregoing amounts, plus costs.

7.      Trial shall proceed to Phase 2 damages of the personal injury and wrongful death claimants in accordance with further orders to be issued by the Court.

---

[50] The United States respectfully submits that apportionment should be made in line with the United States' Post-trial Brief, *i.e.*, that the Court should apportion 70% fault to Petitioner and 30% fault to the United States, but alternatively that equal apportionment allowed by Singapore's Maritime Conventions Act would be a floor under the facts of this case.  The stipulated damages and pre-judgment interest of each party would then be multiplied accordingly.  For example, on a 70/30 apportionment, for principal damages, the United States would be entitled to recover 70% of its stipulated damages of $185,000,000 less 30% of Petitioner's stipulated damages of $442,445, and likewise with the pre-judgment interest amounts.

Dated: November 22, 2021          Respectfully submitted,


BRIAN M. BOYNTON
Acting Assistant Attorney General

R. MICHAEL UNDERHILL
Attorney in Charge
West Coast and Pacific Rim Office
Aviation, Space & Admiralty Litigation
Torts Branch, Civil Division
U.S. Department of Justice

*/s/ Thomas M. Brown*
DOUGLAS HOTTLE, Senior Trial Counsel
JESSICA SULLIVAN, Trial Attorney
THOMAS M. BROWN, Trial Attorney
THOMAS BRIGHT, Trial Attorney
Aviation, Space & Admiralty Litigation
Torts Branch, Civil Division
U.S. Department of Justice

Attorneys for the United States of America

*Images from Exh. 4028 Showing One-Second Error in Wilske Testimony*



**CERTIFICATE OF SERVICE**

I certify that on November 22, 2021, a copy of the foregoing was filed electronically with the Clerk of the Court by operation of the Court's electronic filing system, which will serve an electronic copy to all counsel of record.

*s/ Thomas M. Brown*
THOMAS M. BROWN
U.S. Department of Justice