CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Complaint<br><br>of<br><br>ENERGETIC TANK, INC.,<br>as Owner of the M/V ALNIC MC,<br>for Exoneration from or Limitation of Liability | Docket No. 1:18-cv-1359 (PAC)(RWL) |

## PETITIONER ENERGETIC TANK INC'S POST-TRIAL BRIEF

**BLANK ROME LLP**
Thomas H. Belknap, Jr.
Alan Weigel
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000
tbelknap@blankrome.com
aweigel@blankrome.com

*Attorneys for Petitioner Energetic Tank Inc.*

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ..............................................................................................................1

1.    USS JOHN S. MCCAIN Caused The Collision By Its Own Gross Negligence ................1

     A.    MCCAIN's Negligent Training Of Helm and Lee Helm Operators and Supervisors................................................................................................3

     B.    MCCAIN's Unseaworthiness/Negligent Navigation/Operation............................8

2.    MCCAIN Was Not Not-Under-Command During Time Leading Up To The Collision................................................................................................13

3.    Claimants Failed To Meet Their Burden To Prove MCCAIN Correctly Showed Not-Under Command By Also Deenergizing Her White Masthead Lights .....................17

4.    Even If MCCAIN Were Not Under Command, She Never Had Right Of Way Over ALNIC ................................................................................................21

5.    ALNIC's Crew Took Proper Measures To Monitor MCCAIN In The Moments Leading Up To The Collision And Could Not Reasonably Be Expected To Have Avoided The Collision ................................................................................24

6.    Petitioner's Model of ALNIC's Maneuvering Capabilities Is Accurate And Reliable ................................................................................................32

7.    Claimants' 3-D Model Does Not Accurately Reflect What ALNIC's Crew Would Have Seen ................................................................................................37

8.    By The Time It Became Apparent That MCCAIN Was Not Properly Keeping Clear, It Was Too Late For ALNIC To Avoid The Collision................................40

9.    Claimants Present No Evidence To Indicate Any Different Collision Scenario Would Have Been "Better"................................................................................50

10.    Post Collision False Log Entries Did Not Cause The Casualty Nor Impede The Claimants From Litigating This Case ................................................................52

11.    Petitioner Is Entitled To Recover All of its Claimed Damages, Plus Pre-Judgment Interest................................................................................................53

12.    Alternatively, ALNIC Is Entitled To Limit Its Liability................................56

13.    If Petitioner Is Partially At Fault For The Collision, It Is Nevertheless Entitled To Contribution From The United States For Any Liability It May Have To The Injury And Death Claimants ................................................................64

CONCLUSION................................................................................................66

## TABLE OF AUTHORITIES

Page(s)

**U.S. CASE LAW**

*Ameejee Valleejee and Sons v. M/V Victoria U.*,
  661 F.2d 310 (4th Cir. 1981) ...................................................................................54

*Aronson v. Celebrity Cruises, Inc.*,
  30 F. Supp. 3d 1379 (S.D. Fla. 2014) .....................................................................26

*Carr v. PMS Fishing Corp.*,
  191 F.3d 1 (1st Cir. 1999)........................................................................................56

*Cent. R. Co. v. Tug Marie J. Turecamo*,
  238 F. Supp. 145 (E.D.N.Y. 1965) ....................................................................47, 48

*Cliffs-Nedrill Turnkey Int'l Oranjestad v. M/T Rich Duke*,
  947 F.2d 83 (3d Cir. 1991)......................................................................................17

*Coryell v. Phipps*,
  317 U.S. 406 (1943)................................................................................................57

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)................................................................................................33

*Empresa Lineas Maritimas Argentinas S.A. v. United States*,
  730 F.2d 153 (4th Cir. 1984) ..................................................................................57

*Farrell Lines, Inc. v. Jones*,
  530 F.2d 7 (5th Cir. 1976) ...........................................................................56, 57, 58

*Feres v. United States*,
  340 U.S. 135 (1950)..........................................................................................64, 65

*General Trading Co. v. S.S. Hellenic Carrier*,
  1982 U.S. Dist. LEXIS 9462 (S.D.N.Y. April 14, 1982) .......................................53

*Great Lakes Business Trust v. M/T ORANGE SUN*,
  855 F. Supp. 2d 131 (S.D.N.Y. 2012).....................................................................55

*Great Lakes Dredge & Dock Co. v. City of Chicago*,
  3 F.3d 225 (7th Cir. 1993) ......................................................................................57

*In re Harris*,
  216 F. Supp. 176 (E.D. La. 1963) ..........................................................................47

*Hellenic Lines, Ltd. v. Prudential Lines, Inc.*,
    813 F.2d 634 (4th Cir. 1987) ........................................................................58

*Hercules Carriers, Inc. v. Florida*,
    768 F.2d 1558 (11th Cir. 1985) ..................................................................58

*Horton v. Maersk Line, Ltd.*,
    603 F. App'x 791 (11th Cir. 2015) ..............................................................26

*Ill. Constructors Corp. v. Logan Transp.*,
    715 F. Supp. 872 (N.D. Ill. 1989) ...........................................................25, 60

*In re M.V. Atl. Hope*,
    493 F. Supp. 192 (S.D.N.Y. 1979)...............................................................26

*In re Messina*,
    574 F.3d 119 (2d Cir. 2009)..........................................................................57

*In re Molai Shipping Corp.*,
    569 F. Supp. 523 (S.D.N.Y. 1983)...............................................................56

*In re Moran Towing Corp.*,
    166 F. Supp. 2d 773 (E.D.N.Y. 2001) .........................................................56

*In re Nat'l Shipping Co. of Saudi Arabia*,
    147 F. Supp. 2d 425 (E.D. Va. 2000) ..........................................................59

*Ingersoll Milling Mach. Co. v. M/V Bodena*,
    829 F.2d 293 (2d Cir. 1987), *cert. denied*, 484 U.S. 1042 (1988).........................................54

*Johnson v. Horizon Lines, LLC*,
    520 F. Supp. 2d 524 (S.D.N.Y. 2007)..........................................................26

*Kristie Leigh Enters. v. Am. Commercial Lines*,
    72 F.3d 479 (5th Cir. 1996) .........................................................................58

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    412 F. Supp. 3d 392 (S.D.N.Y. 2019).........................................................32

*Mac Towing, Inc. v. Am. Commercial Lines*,
    670 F.2d 543 (5th Cir. 1982) .......................................................................58

*The Mary T. Tracy*, 298 F. 528 (S.D.N.Y.1920), *rev'd on other grounds*, 8 F.2d
    591 (2d Cir. 1925)........................................................................................46

*Mentor Ins. Co. v. Brannkasse*,
    996 F.2d 506 (2d Cir. 1993)..........................................................................54

*Moore-McCormack Lines, Inc. v. Armco Steel Corp.*,
   272 F.2d 873 (2d Cir. 1959) ............................................................................................. 57

*Nassau Bay Water Sports, Inc. v. McClelland*,
   No. 94-20252, 1995 U.S. App. LEXIS 42653 (5th Cir. July 19, 1995) ........................... 57, 58

*Nissan Fire & Marine Ins. Co. v. M/V Hyundai Explorer*,
   93 F.3d 641 (9th Cir. 1996) ............................................................................................. 58

*Nittetsu Shoji America, Inc. v. M.V. Crystal King*,
   No. 90 Civ.2082, 1992 WL 116430, 1992 U.S. Dist. LEXIS 7615 (S.D.N.Y.
   May 21, 1992) ................................................................................................................... 54

*O'Brien v. NCL (Bah.) Ltd.*,
   No. 16-23284-CIV, 2016 U.S. Dist. LEXIS 195694 (S.D. Fla. Nov. 18, 2016) ................... 26

*Ocean S.S. Co. of Savannah v. U.S. (CITY OF ROME - USS S-51)*,
   24 F.2d 729 (S.D.N.Y. 1928) ........................................................................................... 21

*Ocean S.S. Co. v. United States*,
   38 F.2d 782 (2d Cir. 1930) ............................................................................................... 17

*Otal Invs. Ltd. v. M.V. Clary*,
   494 F.3d 40 (2d Cir. 2007) ........................................................................................38, 52, 53

*Petition of A.C. Dodge*,
   282 F.2d 86 (2d Cir. 1960) ............................................................................................... 59

*Petition of Energetic Tank, Inc.*,
   1:18-cv-1359, Dkt. No. 221 ............................................................................................... 53

*Petition of Marina Mercante Nicaraguense, S.A.*,
   364 F.2d 118 (2d Cir. 1966) ............................................................................................. 59

*Pocomoke Guano Co. v. Eastern Transp. Co.*,
   285 F. 7 (4th Cir. 1922) ................................................................................................... 59

*Spencer Kellogg Co. v. Hicks*,
   285 U.S. 502, 511-12 (1932) ........................................................................................... 57

*Stencel Aero Engineering Corp. v. United States*,
   431 U.S. 666 (1977) ......................................................................................................... 64

*Sunderland Marine Mut. Ins. Co. v. Weeks Marine Constr. Co.*,
   338 F. 3d 1276 (11th Cir. 2003) ....................................................................................... 17

*The Catskill*,
   95 F. 700 (S.D.N.Y. 1899) ............................................................................................... 59

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

*The Chester O. Swain,*
    76 F.2d 890 (2d Cir. 1935)................................................................................18

*Tokio Marine & Fire Ins. Co. v. M/V Flora,*
    1999 WL 14000, 1999 U.S. Dist. LEXIS 267 (E.D. La. Jan. 11, 1999).................................53

*Tug Ocean Prince, Inc. v. United States,*
    584 F.2d 1151 (2d Cir. 1978)................................................................................57

*U.S. v. Shearer,*
    473 U.S. 52 (1985)................................................................................65

*United States v. Cruz,*
    363 F.3d 187 (2d Cir. 2004)................................................................................32

*United States v. Johnson,*
    481 U.S. 681 (1987)................................................................................65

*United States v. Williams,*
    506 F.3d 151 (2d Cir. 2007)................................................................................33

*Virgin Offshore U.S.A., Inc. v. Tex. Crewboats, Inc.,*
    No. 04 CV 740, 2007 U.S. Dist. LEXIS 41484 (W.D. La. May 29, 2007) ............................26

*Walker v. Harris,*
    335 F.2d 185 (5th Cir. 1964) ................................................................................47

**FOREIGN CASE LAW**

*Grains and Industrial Products Trading Pte Ltd v Bank of India*
    [2016]................................................................................55

*HMS Drake* [1919] P 362 ................................................................................13, 14, 18

*The Jaladhir* [1961] 2 Lloyd's Rep 13 ................................................................................42

*Koh Tiam Ting v Soon Li Heng Civil Engineering Pte Ltd*
    [2020]................................................................................54

*Mendip Range v Radcliffe*
    [1921] AC 556 ................................................................................14

*Nautical Challenge Ltd v Evergreen Marine (UK) Ltd*
    [2021]................................................................................22, 42

*P Caland v Glamorgan Steamship Co, Ltd*
    [1893]................................................................................14

*The Albion* [1952] 1 Lloyd's Rep 38, *affirmed* [1953] 1 Lloyd's Rep 239 ................................14

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

*The Aracelio Iglesias* [1968] 2 Lloyd's Rep 7.................................................................43

*The Djerada* [1976] 2 Lloyd's Rep 40.....................................................................13

*The Fogo* [1967] 2 Lloyd's Rep 208........................................................................47

*The Frosta*, [1973] 2 Lloyd's Rep 348 ..................................................11, 17, 43, 48

*The Otranto* [1931] AC 194......................................................................................42

*The Roanoke* [1908] P 231........................................................................................40

**U.S. STATUTES**

33 U.S.C.S. § 1603.....................................................................................................17

28 U.S.C. § 2671........................................................................................................64

46 U.S.C. § 30501 *et seq*..............................................................................*passim*

46 U.S.C. § 31102......................................................................................................64

**FOREIGN STATUTES**

*Civil Law* Section 12.................................................................................................54

Paragraph 6 of the *First Schedule of the Supreme Court of Judicature Act* (Cap
    322, 2007 Rev Ed) ...............................................................................................54

**FEDERAL RULES OF EVIDENCE**

Fed. R. Evid. 702 .................................................................................................32, 33

**INTERNATIONAL REGULATIONS FOR PREVENTING COLLISIONS
AT SEA 1972 (COLREGS)**

COLREGS Rule 3...................................................................................................12, 16

COLREGS Rule 3(f).............................................................................................13, 15

COLREGS Rule 3(k)..................................................................................................38

COLREGS Rule 5..................................................................................................26, 60

COLREGS Rule 6.......................................................................................................23

COLREGS Rule 8.......................................................................................................41

COLREGS Rule 8(a)............................................................................................41, 42

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

COLREGS Rule 8(e) ..........................................................................................23, 41, 42

COLREGS Rule 9 ...............................................................................................21, 22, 24

COLREGS Rule 10 .............................................................................................21, 22, 24

COLREGS Rule 13 .......................................................................................21, 22, 24, 45

COLREGS Rule 13(a) ........................................................................................21, 22, 40

COLREGS Rule 13(d) ..................................................................................................40

COLREGS Rule 15 ........................................................................................................22

COLREGS Rule 16 .............................................................................................23, 40, 41

COLREGS Rule 17 .................................................................................................41, 49

COLREGS Rule 17(a)(i) ........................................................................................ *passim*

COLREGS Rule 17(a)(ii) ............................................................................39, 41, 42, 46

COLREGS Rule 17(b) .............................................................................................41, 42

COLREGS Rule 17(d) ..................................................................................................41

COLREGS Rule 18 ................................................................................................ *passim*

COLREGS Rule 18(a)(i) ........................................................................................21, 22

COLREGS Rule 27(a) ...................................................................................................17

## SECONDARY SOURCES

ALLEN & ALLEN, FARWELL'S RULES OF THE NAUTICAL ROAD 151, n.24 (9th ed.
2020) ...................................................................................................... *passim*

COCKCROFT & LAMEIJER, A GUIDE TO THE COLLISION AVOIDANCE RULES 90 (7th
Ed. 2012)..................................................................................................22

COCKCROFT & LAMEIJER, A GUIDE TO THE COLLISION AVOIDANCE RULES 28 (3rd
ed. 1982) ..................................................................................................13

James A. Barber, *Naval Shiphandling Guide* (2005)...................................................50

MARSDEN & GAULT, COLLISIONS AT SEA ¶ 5-155 (14th ed. 2006)...............................15

*Singapore Court Practice* (LexisNexis Singapore, 2021) ("*Singapore Court
Practice*") at p. 1336 ................................................................................54

**PRELIMINARY STATEMENT**

Petitioner Energetic Tank Inc., owner of ALNIC MC, submits this Post-Trial Brief in support of its Petition for exoneration or, alternatively, limitation of liability pursuant to the Shipowner's Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.*  Accompanying this Brief as Exhibit 1 is the Supplemental Memorandum of Singapore Law dated November 22, 2021, prepared on behalf of Petitioner by Singapore Maritime Law Specialist Leong Kaw Wah.  Petitioner also hereby incorporates by reference its Post-Trial Proposed Findings of Fact and Conclusions of Law, which are being filed simultaneously with this brief.

Petitioner respectfully submits that judgment should be entered in its favor, and against Claimants, exonerating it from liability and awarding it 100% of its collision-related damages plus pre-judgment interest against the United States, or alternatively allocating fault and damages between Petitioner and the United States on the basis of the parties' comparative fault, limiting Petitioner's liability to the value of the Limitation Fund, and granting Petitioner a right of contribution against the United States for its proportionate share of any liability Petitioner may be found to have to the injury and death claimants, and that it be granted such other and further relief as may be just and equitable.

**ARGUMENT**

**1.     USS JOHN S. MCCAIN Caused The Collision By Its Own Gross Negligence**

To use MCCAIN's commanding officer's own words, as sworn to in his Stipulation of Fact signed in connection with his court martial proceedings arising out of the collision between USS JOHN S MCCAIN and ALNIC MC (Trial Ex. 136):

16. I now believe that had I set Sea and Anchor Detail adequately in advance of entering the Singapore Strait TSS, it would have reduced the likelihood that this collision would have occurred.

21. Had the Helm station not been in "backup manual," then it is unlikely that there would have been an inadvertent shift of steering control from the Helm to Lee Helm during the shift of thrust control and, therefore, it is unlikely that a collision would have occurred.

24. My order to shift thrust control to the Lee Helm station and the lack of procedural compliance by the watch team served as the start of a series of mistakes that led to the collision. Had I not ordered the unplanned shift of thrust control from the Helm station to the Lee Helm station, then it is unlikely that this collision would have occurred.

31. There was never a steering casualty. Instead, there was a loss of situational awareness concerning which station was in control of steering primarily due to a lack of knowledge of the proper operation of the SCC. Additionally, there was failure to use EOCC procedures by those watch standers charged with its operation.

And as BMC Jeffery Butler, who had primary responsibility for training sailors to stand watch at the helm and lee helm stations, stated in his Stipulation of Fact signed in connection with his own court martial proceedings (Trial Ex. 99):

g.   In hindsight, I now believe I was derelict in my duties to provide adequate training and properly qualify junior Sailors because the four Sailors mentioned above demonstrated lack of knowledge and failed to follow procedures in the following ways:

i. They did not understand the proper procedures for a perceived Loss of Steering casualty.

ii. They did not understand the function of the Emergency Override to Manual (EOTM) pushbutton, or Big Red Button.

iii. Prior to the collision, steering control was shifted from the Helm to the Lee Helm station at the SCC without an order from a bridge watchstander in a supervisory position.

iv. They failed to follow procedures for transfer of thrust control from the Helm to Lee Helm station at the SCC following the CO's order to split out steering and thrust control.

h.   This dereliction was a negligent act on my part because I failed to exercise due care that a reasonably prudent person would have used under the same or similar circumstances. Additionally, I failed to gain the knowledge necessary regarding IBNS procedures related to the SCC to ensure I was knowledgeable on the transfer of steering control and thrust or operation of the EOTM pushbutton. My failure to gain this knowledge directly resulted in bridge watchstanders lacking a basic level of knowledge on the SCC.

No one fault caused this collision. Rather, as is illustrated by the above, and as was clearly shown at trial, this collision was the culmination of an overwhelming number of negligent decisions made by the officers and crew of MCCAIN which caused her to veer wildly across

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

ALNIC's path in the pre-dawn hours of August 21, 2017.  Because of the reckless manner in which MCCAIN chose to overtake ALNIC, at twice her speed and within three-tenths of a nautical mile, while simultaneously executing unbriefed helm maneuvers with improperly trained and inexperienced crew, MCCAIN created a perilous situation that developed so quickly and unexpectedly that ALNIC found herself in an *in extremis* situation before her crew could even realize what was developing.  This collision was caused solely due to MCCAIN's fault, and MCCAIN should bear 100% of the blame.

The facts and circumstances aboard MCCAIN leading up to the collision are exhaustively addressed in Petitioner's Pre-Trial Brief, (Dkt. No. 327, pp. 2-10), its Pre-Trial Proposed Findings of Fact, (Dkt. No. 328), and also in its Post-Trial Proposed Findings of Fact (referred to herein as "FOF") (*see generally* FOF at ¶¶ 160-264).  Accordingly, this brief will not re-recount all of the events aboard MCCAIN that led to this collision but will instead focus on some of the key areas of causative fault that were established at trial.

### A.   MCCAIN's Negligent Training Of Helm and Lee Helm Operators and Supervisors

Nobody on board MCCAIN fully understood how the Integrated Bridge and Navigation System ("IBNS") helm and thrust control consoles worked.  Not one person.  Two absolutely critical failures of understanding in this respect were direct causes of this collision:  (1) CO Sanchez's lack of understanding that when the helm control was put into "backup manual," that allowed any other steering control station to unilaterally take control of steering without the helmsman's knowledge or assent, and (2) the widespread misconception that when one pressed the "emergency override to manual button" on the helm station, that "sent" control of steering to aft steering rather than bringing control of steering back to the helm station.  (*See, e.g.*, FOF ¶¶ 103(d), 184-187, 258.)

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

As to the first misconception, CO Sanchez may have *believed* he was making the helm control more reliable, because when the steering mode is in backup manual the system bypasses the IBNS computer altogether.  (FOF ¶ 33.)  It is hardly surprising that he might have wanted to do that, considering MCCAIN had ███████████████████████████████████ ██████████████████████████████████████████████████, (Trial Exs. 383, 384, 443-444, 446, 464-465; Trial Tr. at 158:19-22), ████████████████████████████████████ ████████████████, (Trial Ex. 446; Trial Tr. at 285:19-287:25), and had repeatedly experienced hydraulic pump unit major alarms in the past.  (Trial Tr. at 155:11-14, 157:11-23; Trial Ex. 3043, Hanna Dep. Tr. at 93:15-95:19.)  Clearly, the crew had lost confidence in the system (Trial Ex. 385 at US0056598 ("The system is unstable, albeit safe to navigate, and the multiple cascading node crashes are a distraction to the safe operation of the Ship.")), and switching to backup manual had been his "work around" for all of these problems.  But as CO Sanchez fully admitted, he had *no idea* about the risk he was creating by utilizing this "solution."  (Trial Tr. at 191:7-192:4, 194:21-195:12.)  (*See generally, e.g.*, FOF ¶¶ 147-159, 184-187.)

As to the second, it is very difficult to overstate the enormity of the failure, of *all* of the crew members responsible for operating or supervising those operating the helm and lee helm stations that morning, to understand the very fundamental fact that the emergency override to manual button – the "Big Red Button" – was specifically designed to restore steering control to the station where it is pressed.  This one step – ████████████████████████████████ ████████████████████████████████████████ right after calling out loss of steering, which every helmsman was expected to *memorize* (Trial Tr. at 187:6-18) – could have, in a single second, ended MCCAIN's "loss of steering" emergency and averted this catastrophe.  (*See generally, e.g.*, FOF ¶¶ 41, 103-104, 229.)

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

As BMC Butler admitted in his Stipulation of Fact, a major reason why MCCAIN's crew was not competent to operate the helm and steering control was a complete absence of proper training and qualifying watchstanders.  (Trial Ex. 99 at ¶ 3.g.)  This problem existed not just at the operator level, but right up to the qualifiers, supervisors and even the most senior deck officers.  (*See, e.g.*, FOF ¶ 104.)  MCCAIN's watchstanders joining the vessel from other vessels were being qualified without even checking their skills – even when they transferred from a vessel that did not have a touchscreen steering control system.  (Trial Exs. 136 at ¶ 17; 174; 438 at US0033430; 439 at US0033444; 527; 4025 at ¶ 29; 3042, Gillilan Dep. Tr. 22:6-9, 29:2-9, 30:24-32:13; 4043, Taylor Dep. Tr. at 37:10-25, 44:2-45:23. *See also* Trial Tr. at 652:16-654:1.)  And for those being qualified aboard MCCAIN, ███████████████████████████████████ ██████████████████████████████████.  (Trial Ex. 73.)  BMC Butler, who was ultimately responsible for qualifying helmsmen and lee helmsmen, wasn't even qualified himself to stand watch at either station, (Trial Ex. 4035, Butler Dep. Tr. at 73:23-74:18), and there was no training program for operators of the helm/lee helm stations.  (Trial Exs. 299 at ¶ 3; 4034, Becker 30(b)(6) Dep. Tr. at 152:4-9.)  Indeed, even MCCAIN's ██████████████████ ████████████████.  (Trial Ex. 384; Trial Tr. at 157:24-158:22.)  (*See generally, e.g.*, FOF ¶¶ 101-104, 149.)

But the problem was even more fundamental than poor training.  The IBNS steering control system was nothing like traditional helm and thrust controls, which consist of a physical steering wheel and physical throttle levers.  As MCCAIN's Chief Engineer Lt. Jonathan Ling wrote to the court martial judge in connection with BMC Butler's court martial proceedings (Trial Ex. 299 at ¶ 2):

> The SCC itself, at first glance, looks nothing like a traditional steering console. In fact, the SCC is a computer terminal or Human Machine Interface (HMI) that has extensive functions, drop down menus and hosts of configurations. The expectations that traditional ratings of deck seaman to operate this complex HMI from simple Under-Instruction (U/I) watches, essentially On the Job Training (OJT) is un-realistic. Frankly the traditional qualification system for qualifying helmsman is in-sufficient and can only be properly taught in a formal Navy provided course.

Lt. Ling was right: The Navy had implemented a 21st Century helm control system but had failed to update their training and operating procedures at the same time. Consequently, helm and lee helm operators were essentially being set up for failure. The Navy's own Design Review Board

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████. (Trial Ex. 377 at 27, 36.)

(*See generally, e.g.*, FOF ¶¶ 28, 251).

Moreover, the actual instruction manuals were complex and not readily accessible to the helm operators. BMC Butler said this when asked why the helmsmen and their supervising bosun's mates had not seen helm operating instructions contained in the Ship's Information Book (Trial Ex. 82):

> A. … But you show this to a deck seaman, deck seaman is going to get on there -- this is typical deck seaman because I know them.
>
> ████████████████████████████████████████
> ████████████████████████████████████████
> ████████████████████████████████████████
> ████████████████████████████████████████ *After a deck seaman reads that, what does that mean? A deck seaman is looking at you like "I don't know." Even if they would have read that, they probably would have been lost.* People are going to say that they didn't know what the big red button is. That's what y'all fixing to get to right now. They didn't know how to use it.

(Trial Ex. 4035 Butler Dep. Tr. at 104:3-21.)

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

The helm and lee helm watch standers on at the time of the collision lacked even the most basic understanding of the helm and thrust control.  Indeed, the Lee Helmsman had literally never stood a lee helm watch before (Trial Tr. at 682:8-14, 690:19-23; Trial Ex. 3046, Mitchell Dep. Tr. at 34:9-17, 92:20-24.), and testified that he didn't even realize that the lee helm station was capable of controlling the steering.  (Trial Tr. at 691:5-10.)  Those supervising were not much better.  And as a direct result of MCCAIN's crew's lack of training and experience, (1) they inadvertently shifted steering control to the lee helm station while intending to transfer thrust control; (2) they failed to recognize that steering control had been shifted to the lee helm station even though they should have been able to determine this just by looking at the ███████████████████ display on both the helm and lee helm stations (*see* Trial Ex. 86); (3) they failed to follow the proper emergency procedure for loss of steering, which called for ████████████████ ████████████████ (*see* Trial Ex. 88; Trial Tr. at 207:20-25); (4) in transferring thrust control to the lee helm station, they failed to "gang" the throttles so that any thrust change order would affect both shafts equally; (5) when they went to execute a slow engine order they failed to slow both shafts, which precipitated a sharp turn to port; (5) they failed to recognize that they had mismatched thrust, believing instead that their rudder was making an un-commanded port turn (Trial Tr. at 142:14-143:4); (6) when aft steering was finally manned and took control of the helm by pressing the aft steering emergency override to manual button, the helmsman made matters worse by finally pressing the button at the helm station, thinking he was sending control back to aft steering but actually unknowingly taking control; and (7) by the time aft steering took control back from the helm station, they had allowed their wheel to turn all the way to port, with the result that when they regained steering control MCCAIN immediately answered a helm order of left 30+ degrees, directly at ALNIC.  (*See generally, e.g.*, FOF ¶¶ 194-262.)

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

**B.      MCCAIN's Unseaworthiness/Negligent Navigation/Operation**

As CO Sanchez admitted, one of the most fateful decisions he made before transiting Singapore Strait that morning was to ignore the recommendation of his senior officers and set his Sea and Anchor Detail at 06:00 rather than at 05:00 as they had recommended.  (Trial Ex. 136 at ¶ 11.)  In the first place, as a result of this decision, watchstanders on the bridge were undertaking informal chow reliefs after MCCAIN had already entered the busy Singapore Strait traffic separation scheme, which caused general confusion.  (*Id.* at ¶ 14.)  But far more fundamentally, by continuing to sail under the Condition III watch bill at this time, MCCAIN had only a single, inexperienced helmsman responsible for all steering and thrust control functions.  (Trial Ex. 44.)  If they had already transitioned to the Sea and Anchor Detail watch bill, they would have had a "master helmsman," who according to MCCAIN's SORM "holds a higher qualification than the helmsman and is utilized during all restricted maneuvering evolutions" (Trial Ex. 421), as well as a Lee Helmsman, a Helm Safety Officer, an Aft Helmsman and an Aft Helm Safety Officer.  (Trial Ex. 102.)  (*See generally, e.g.*, FOF ¶¶ 170-174.)

CO Sanchez knew from past experience that helmsmen could have difficulty managing both the steering and thrust – particularly when operating in a place where the steering requirements are very demanding.  (Trial Tr. at 204:2-205:10.)  This makes it all the more inexplicable that he never planned for the possibility that it might be necessary to split the controls between the helm and lee helm stations.  Having failed to do so, he found himself in a situation where his helmsman was reaching "task saturation," and so he decided to assign a lee helmsman on the fly and make the shift.  (*See generally, e.g.*, FOF ¶¶ 194-199.)

At the moment they decided to undertake this maneuver, MCCAIN was overtaking both ALNIC and TEAM OSLO at 18 knots, as compared to their 9 or 10 knots.  (FOF ¶ 195.)  This is

the view as seen on ALNIC's radar at 05:20:00 (Trial Ex. 4019), *i.e.*, less than a minute before
MCCAIN initiated the change in thrust control:



As can be clearly seen in this image, once MCCAIN passed ALNIC and TEAM OSLO, there was
a large gap in the traffic ahead.  Besides making it much safer to execute the maneuver in open
water, waiting until MCCAIN had passed clear ahead would have given the crew time to brief the
procedure and ensure they knew and were ready to take the necessary steps to execute it.  Instead,
making the assumption that the helmsman and lee helmsman were qualified at their posts and
therefore fully ready to proceed without further discussion or briefing, CO Sanchez proceeded with
the transfer.  (*Compare* Trial Tr. at 182:9-17 *with* FOF ¶ 203.)

When the procedure went awry and the helmsman called out loss of steering, mass
confusion ensued as they tried to troubleshoot the problem, which caused everyone on the bridge
ordinarily responsible for collision avoidance to lose situational awareness.  This problem was
exacerbated by several other work-arounds that MCCAIN had implemented to deal with
operational and equipment constraints.

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

██████████████████████████████████████████████████████████████. (Trial Tr. at

164:13-22.) ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████. (Trial Ex. 439 at US0033445; 3039, Coley Dep. Tr. at 140:8-20; 4042, Scott

Dep. Tr. at 71:15-25.)  Notably, CO Sanchez also made the decision not to broadcast MCCAIN's

positional information on AIS.  (Trial Tr. at 165:24-166:22.)  Whatever operational reasons might

have justified this decision, it is a fact that this action deprived surrounding vessels of

contemporaneous data concerning MCCAIN's speed and course, which made it more difficult for

them to track MCCAIN's movements.  (Trial Tr. at 166:23-167:15.)  (*See generally, e.g.*, FOF ¶¶

147, 153-156, 167, 180-183.)

Meanwhile, on the bridge, the navigator and the assistant navigator went out on the bridge

wing to visually check whether MCCAIN's red task lights had been energized, leaving nobody to

monitor MCCAIN's course as she veered across the TSS.  As assistant navigator Chief Fields

testified:

> Q.  Okay, so while you and the navigator, the two senior members
> of the modified navigation detail, were out on the bridge wing
> looking at the NAV lights, Petty Officer Woolson was busy making
> deck log entries, *there was no member of the modified navigation
> detail who was monitoring MCCAIN's heading on the VMS as it was
> moving to the left across the traffic separation scheme, correct?*
>
> A.  Yes, sir.  [Emphasis added.]

(Trial Tr. at 122:12-19.)  Indeed, "no member of the crew including [the CO] monitored or even

looked at the ship's position on the Voyage Management System (VMS) with regard to the

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

intended track, even though [MCCAIN was] in a high density traffic area."  (Trial Ex. 136 at ¶ 35).

When MCCAIN could not immediately regain control of steering at this time, CO Sanchez ordered a reduction in speed to two-thirds ahead, or ten knots.  (Trial Tr. at 141:3-13.)  *Ten knots!*  When it became apparent that was not having the desired effect, he ordered a second speed reduction to one-third ahead, or five knots.  (Trial Tr. at 142:2-143:4.)  This was gross negligence.  When MCCAIN's crew could not immediately regain steering control, CO Sanchez should immediately have stopped engines.  Period.  His own standing orders expressly directed the officer of the deck to slow to "bare steerageway" in the event of loss of steering.  (Trial Ex. 61 at US 10848; Trial Ex. 136 at ¶ 36).  *See The Frosta* [1973] 2 Lloyd's Rep 348, 355 ("…it seems to be clear that, as soon as it became apparent that the [defendant's] rudder was jammed to starboard, her engines should have been stopped and thereafter kept stopped, unless and until it was certain that the defect had disappeared and the rudder could be put to port.").

There is no dispute that MCCAIN could have stopped engine at any time. As CO Sanchez testified, ALNIC was a "semi" and MCCAIN was a "Lexus," and if MCCAIN couldn't exactly stop "on a dime," when she stopped engines it was "like opening two parachutes behind the ship." (Trial Tr. at 209:14-210:25.)  *See also* ALLEN & ALLEN, FARWELL'S RULES OF THE NAUTICAL ROAD 151, n.24 (9th ed. 2020) ("FARWELL'S") (noting that an Arleigh Burke's stopping distance at 20 knots is "reportedly, less than two ship lengths")(citing JAMES A. BARBER, NAVAL SHIPHANDLING GUIDE 242 (2005)).

MCCAIN's unganged thrust reduction, ███████████████████████████████ ████████ (Trial Ex. 94 at p. 4), is the event that turned a gentle drift to port into a precipitous turn across ALNIC's path.  Even still, MCCAIN could have prevented a collision by ordering "all

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

stop" on the Lee Helm touch screen panel, but no such order was made. And MCCAIN's crew, meanwhile, had lost all situational awareness, were not tracking surrounding vessels, and had no idea until seconds before that they were crossing directly in front of ALNIC and would collide. With more than a dozen people on the bridge, MCCAIN was essentially steaming blind into the dark. (*See generally, e.g.*, FOF ¶¶ 245-258.)

MCCAIN crew members claim that as the events unfolded, they energized their not-under-command lights to communicate to surrounding vessels that they were not able to control their vessel. As discussed below, the question whether MCCAIN properly energized her not-under-command lights is very much in dispute. What is not in dispute, on the other hand, is that MCCAIN ignored the CO's Standing Order No. 9, which provided that in the event of a loss of steering the officer of the deck shall initiate "BTB" – *i.e.*, bridge to bridge – transmissions "to communicate a loss of steering to ships in our vicinity." (Trial Ex. 61 at US10848). No such transmissions were ever made. (*See* Trial Ex. 136 at ¶ 38; Trial Tr. at 220:18-221:11.) Similarly, at no time before the collision was any danger signal sounded nor any collision alarm sounded. (*Id.*) In other words, apart from (possibly) energizing not-under-command lights, MCCAIN took no action to attempt to notify surrounding vessels that they were experiencing a loss of steering or that such vessels should take evasive maneuvers because MCCAIN's crew could not control the vessel. ( FOF ¶ 266-267.)

Based on the foregoing, and based on MCCAIN's multiple violations of the COLREGS which are discussed more fully below, the evidence is clear that this collision was directly and proximately caused solely by MCCAIN's negligence.

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

2.     **MCCAIN Was Not Not-Under-Command During Time Leading Up To The Collision**

COLREGS Rule 3, the "General Definitions," provides at paragraph (f): "The term 'vessel not under command' means a vessel which through some *exceptional* circumstance is unable to maneuver as required by these Rules and is therefore unable to keep out of the way of another vessel." (Emphasis added).[1]   The rule typically applies to vessels that have suffered actual steering casualties or propulsion problems that render the vessel unable to maintain steerageway. COCKROFT & LAMEIJER, A GUIDE TO THE COLLISION AVOIDANCE RULES 28 (3rd ed. 1982) (breakdown of engines or steering gear, or loss of a propeller or rudder are examples of vessels which are likely to be accepted as being not under command).   The party claiming it was not under command bears the burden to prove that it meets the criteria for not under command under Rule 3(f).   *See H.M.S. DRAKE* [1919] P 362.

The analysis as to whether a vessel is not under command is "an objective one."   In *The Djerada*, [1976] 2 Lloyd's Rep 40, 45, a collision occurred in the Dover Straits between the Ziemia and the Djerada in good visibility, but with a force eight wind blowing. The Djerada, proceeding at 6 1/2 knots, was exhibiting not-under-command lights.   The English Admiralty Court held that the Djerada was not justified in carrying not-under-command lights and that she was not relieved of her duty to give way notwithstanding that she carried such lights. *The Djerada*, [1976] 1 Lloyd's Rep 50 (Adm.).   Mr. Justice Brandon stated that although a vessel "may be under certain difficulties," if a vessel is not "genuinely disabled … they should not claim this special right and privilege ... without proper justification."   *Id.*   The court found the Djerada had the full use of her

---

[1] The cause of a vessel's inability to maneuver due to an "exceptional" circumstance should not be confused with the "special" circumstances in Rule 2.  Allen, *Farwell's Rules of the Nautical Road*, 9th Ed. at 57.

engines and steering and "was well able to keep out of the way of the other ship without great or unusual delay and … had no business to advertise herself as unable to do so." *Id.*

The judgment was upheld on appeal, *The Djerada* [1976] 2 Lloyd's Rep 40, with the court explaining that it could not accept "the contention which makes the test of the right and duty to hoist [the not under command day shapes], not the very truth of the case, but the opinion which the officer in charge of the damaged ship may form … *the rule is express that the condition of hoisting the black shapes is the fact and not the opinion of the fact*." *Id.* at 44 (emphasis added).

The legal question is thus whether, in fact, a vessel was actually "not under command," and not merely whether her crew considered her to be so. In *Mendip Range v Radcliffe* [1921] AC 556; *HMS Drake* [1919] P 362, the English Court of Appeal (whose finding was affirmed by the House of Lords) found that HMS Drake was out of command, taking into account the fact that HMS Drake's condition was such that it could not take the ordinary and prompt action which a vessel of her type might reasonably be expected to take. *Id.* at 367. HMS Drake had, prior to the collision, been torpedoed, could not be navigated at more than very moderate speed, its steering gear had been rendered useless, and the means of communication interfered with. *Id.* The court held

> . . . every case must depend upon its own circumstances, and . . . the answer [to] the question whether a vessel is, or is not, under control must be largely, if not entirely, a matter of seamanship. . . If this Court, or any other Court, was on opinion that the vessel was not in such a condition as to be properly described as not under command, it would not come to the conclusion that those on board were justified in considering that she was in that condition.

*Id.* at 368-369.

In *P Caland v Glamorgan Steamship Co, Ltd* [1893] AC 207, the English court held that a vessel was not under command if she can maneuver only "after great and unusual delay." Furthermore, a vessel was also not under command if breakdown of its machinery was such that

it was "imminent and likely" to be incapable of propelling the vessel.  In that case, a steamship's speed was reduced from 11 knots to between 4 to 5 knots, and it was held that the vessel was "still under command" because it was able to steer and could reverse and go astern, although not as quickly as before.  *See also The Albion* [1952] 1 Lloyd's Rep 38, *affirmed* [1953] 1 Lloyd's Rep 239 (CA)(vessel was considered not under command if it is in such a condition owing to an accident that she can only get out of the way of another after great and unusual delay).

Several well-respected treatises on the collision regulations have offered consistent interpretations of these cases, explaining that "[w]hether or not the use of the 'not under command' signal is justifiable depends upon the vessel's condition and not upon her commander's belief as to that condition. . . ."  MARSDEN & GAULT, COLLISIONS AT SEA ¶ 5-155 (14th ed. 2006) ("MARSDEN"). *See also* FARWELL'S *supra* 57 ("An inadequate or incompetent crew generally does not qualify as an exceptional circumstance that renders the vessel not under command. The focus is on the ability of the vessel to maneuver, not her master and crew.").

MCCAIN was never "not under command" within the meaning of Rule 3(f) of the COLREGS.  As the Navy's own post-collision public report unequivocally states, MCCAIN's "[s]teering was never physically lost.  Rather, it had been shifted to a different control station and watchstanders failed to recognize this configuration."  (Trial Ex. 438 at 48.)  This admission was confirmed by the Navy's Dual-Purpose Investigation ("DPI") which states:

> there was never a loss of steering. Instead, there was a loss of situational awareness concerning which station was in control of steering primarily due to a grossly inadequate lack of knowledge of the proper operation of the SCC, as well as a failure to use EOCC procedures by those watchstanders charged with its operation.

(Trial Ex. 439 at 3.)  Similarly, Commander Sanchez and the United States stipulated to this fact as part of Commander Sanchez's Special Court Martial.  (Trial Ex. 136 at ¶ 31)("There was never a steering casualty. Instead, there was a loss of situational awareness concerning which station was

in control of steering primarily due to a lack of knowledge of the proper operation of the SCC."). These admissions completely refute any claim that MCCAIN was a vessel not under command and entitled to that status under COLREGS Rules 3 and 18.[2]

The evidence clearly establishes that MCCAIN's bridge watchstanders perceived the unintended shift of steering to the lee helm as a loss of steering solely as a result of their incompetence and lack of adequate training. In the first place, the Helmsman should have been able to determine that steering had transferred to the lee helm station just by looking at the available information at the helm station touch screen. (See Trial Ex. 86). A competent Lee Helmsman should have been able to make this same determination from his own helm station and, moreover, actually had full control of steering himself at that time if he had only understood the touchscreen display well enough to recognize it.[3] (Trial Tr. at 207:15-25.) Indeed, any number of other crewmembers on the bridge that morning could have looked at the helm forward station as well. As Captain Piscitelli, the CONN, testified when asked if he should have done anything differently:

> I wish I would have taken one second to step forward, look at the helm forward station, and see where the control of steering was. . . .

(Trial Tr. at 709:18-20.) (*See generally, e.g.*, FOF ¶¶ 216-230.)

In any event, MCCAIN's crew should have known and fully understood the emergency procedures by heart – or at least looked at them in the small red emergency procedures booklet hanging right on the SCC – in which case they would have understood that they needed only to press the "Big Red Button" to restore steering to the helm station. (Trial Tr. at 224:2-9.) And as a last resort, MCCAIN's Commanding Officer clearly did know that he had other ways to control

---

[2] Captain Putty, the United States' navigation expert, never expressed any opinion about whether MCCAIN was or was not actually "not under command." (Trial Tr. at 430:18-21.)

[3] It is evident that one reason the helmsman and lee helmsman did not observe which station was in control of steering was that the brightness of the IBNS screens on the SCC were dimmed so as to not ruin the watchstanders' night vision. (Trial Tr. at 215:6-22.)

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

steering and thrust:  by pressing the "All Stop" button on the console that was controlling thrust (Trial Tr. at 208:21-210:9), or even manually in the engine room, if necessary.  A destroyer is built with redundancy, after all, and crew incompetence is not the kind of exceptional circumstance that the COLREGS intend to justify a vessel's claiming not under command status.

### 3.     Claimants Failed To Meet Their Burden To Prove MCCAIN Correctly Showed Not-Under Command By Also Deenergizing Her White Masthead Lights

At night, a vessel not under command is required by the COLREGS to display two all-round red lights in a vertical line where they can best be seen.  If making way through the water, in addition to the all-round red lights, a vessel not under command is required to display sidelights and a stern light but must not display masthead lights.  COLREGS Rule 27(a).

The obligation to display proper lights is firmly established by international regulation as part of the law of the sea, *Cliffs-Nedrill Turnkey Int'l Oranjestad v. M/T Rich Duke*, 947 F.2d 83, 88 (3d Cir. 1991), and applies to all "all public and private vessels of the United States."  33 U.S.C.S. § 1603.  *See also Ocean S.S. Co. v. United States*, 38 F.2d 782, 786 (2d Cir. 1930).

"[T]he extreme blackness of water at night makes any departure from light rules 'one of the most wrecklessly [sic] unlawful acts a vessel can commit.'"  *Sunderland Marine Mut. Ins. Co. v. Weeks Marine Constr. Co.*, 338 F. 3d 1276, 1278 (11th Cir. 2003) (citations omitted).  Thus, improper light displays by a vessel not under command constitutes fault, and liability attaches when the fault caused or contributed to the collision.  *The Frosta* [1973] 2 Lloyds Rep 348 (overtaking vessel exhibiting red-over-red lights but failing to extinguish masthead lights held solely to blame for collision because, among other factors, watch officer on overtaken vessel "might well not notice that not-under-command had been switched on above the bridge of Frosta so long as the masthead lights continued to show.")

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

The United States has the burden of proving MCCAIN properly energized her not-under-command lights or, alternatively, that showing an improper lighting configuration was not confusing to ALNIC's watch officers, did not contribute to the collision, and that the collision would have still occurred if MCCAIN's lighting had conformed to law.  *The Chester O. Swain*, 76 F.2d 890, 892 (2d Cir. 1935); *H.M.S. DRAKE* [1919] P 362.

Claimants fail to meet their burden to prove MCCAIN properly energized her navigation lights to signify that she was "not under command" within the meaning of the COLREGS.  Indeed, the evidence in the record strongly indicates she did not.  Petty Officer Woolson, the Quartermaster of the Watch at the time of the collision, testified it was a two-step process to properly show lights indicating "not under command" status:

> Q. So you'd have to separately, when you go to the red-over-red, in order to be in compliance with the COLREGS, if you're underway, you also have to go to the masthead light and deenergize it; correct?
>
> A. That's correct.

(Trial Tr. at 710:16-20.)  (*See also, e.g.*, FOF ¶¶ 65-70.)  But, not a single MCCAIN crewmember testified that he or she de-energized the white masthead lights or even looked at the electrical panel holding the masthead light switches.  Indeed, there is no testimony in the record even identifying where the masthead lights are located.  And none of the MCCAIN crew members who testified that they went to MCCAIN's bridge wing to "verify" the red-over-red task lights were energized testified that they also saw that the white masthead lights were extinguished.  (FOF ¶ 234)

When the Commanding Officer ordered "red-over-red" after the loss of steering was announced, Lieutenant Hanna, MCCAIN's Navigator, testified that he turned on the red task lights. Even though he testified that he "owned" the navigation lights, as part of his responsibility as navigator (Trial Tr. at 666:13-19), when looking at a picture of the control panel with light switches

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

on MCCAIN's bridge he could not recall "where the not-under-command light switch" was located; "couldn't answer" whether any other lighting configuration needed to be changed after turning on the red-over-red lights; and did not remember whether he turned or adjusted any other lights after he claims to have energized the red-over-red lights.  (Trial Tr. at 667:2-668:16.)  And when he went out to the bridge wing to verify the condition of the task lights, only testified that "red-over-red was there."  (Trial Tr. at 434:10.)  (*See generally, e.g.*, FOF ¶¶ 233(a), (c).)

Petty Officer Scott, standing watch as the Shipping Officer at the SPS-73 radar console on MCCAIN's bridge at the time of the collision, testified as follows:

> Q.  Did you see anyone on the morning of 21 August go to that switch and energize the not-under-command lights?
>
> A.  I saw someone move from my left side to my right side to go -- he announced, saying that he was going to flip the switch for the red over red, and I saw him walk with just my peripherals. And then I heard a switch click.

(Trial Tr. at 108:23-109:6.)  Although Petty Officer Scott was specifically asked about energizing the "not-under-command" lights, his above response establishes only that someone flipped the switch for the red-over-red and that he heard only one switch "click," not the multiple switches needed to deenergize the masthead lights.  (Trial Ex. 4042 at 108:23-109:21.)  (FOF ¶ 234(a), (c).)

Chief Petty Officer Fields, MCCAIN's Assistant Navigator, testified at trial that he touched the barrel switch after hearing that loss of steering was called and after "someone" told him that they had energized the red-over-red lights, and from touching the switch, he could tell that "somebody changed something."  (Trial Tr. at 112:11-13.)  He did not know what, specifically, changed on the barrel switch[4] because "[i]t was dark on the bridge" and he "didn't have a flashlight

---

[4] The same barrel switch had several different settings, for restricted ability to maneuver, man overboard, and others. (Trial Ex. 3043, Hanna Dep. Tr. at 197:15-25.)  Fields testimony was that he couldn't determine which position it had been set to; he could only tell it had been switched to a different setting.

so [he] couldn't read it." (Trial Tr. at 112:14-16.) Chief Fields also testified that he "went out on the starboard bridge wing to the end and looked up at both lights" (Trial Tr. at 111:7-12), and that he "verified both the top and lower red-over-red lights were on." (*Id.* at 112:23-113:1.) Yet, when asked whether he saw any other lights on, Chief Fields responded equivocally: "no, not to my knowledge." (*Id.* 113:2-3.) Significantly, there is no evidence in the record to establish that from his position on the bridge wing Chief Fields could even have seen either of the masthead lights – one of which is located forward of the bridge wings.[5] (*See generally, e.g.*, FOF ¶¶ 233(b), (e)-(f).)

There is no contemporaneous log entry or other written record indicating that MCCAIN's red over red task lights were energized prior to the collision. (Trial Ex. 4025 at ¶ 103.) There is also no contemporaneous log entry or other written record indicating that MCCAIN's white masthead lights were de-energized at any time before or after the collision. (*Id.* at ¶ 104.) MCCAIN's only Deck Log entry concerning not under command status is for 05:34, *i.e.*, after the collision, stating "red over red lighted" with no reference to masthead lights. (Trial Ex. 116.) The logbook does not indicate that this was a late entry. (*See id.* at US0002669; Trial Ex. 3043 Hanna Tr. at 257:17-259:14.) (*See generally, e.g.*, FOF ¶¶ 233(e), 234(g)-(h).)

There is, moreover, credible eyewitness testimony that MCCAIN did not, in fact, deenergize its masthead lights to properly display a "not under command" lighting configuration. ALNIC's AB testified that when he saw MCCAIN during his lookout rounds, he "only [saw] the light for the warship on the starboard quarter, the side light" and reported it to the Chief Officer. (Trial Tr. at 624:3-6.) He also testified that, as MCCAIN came closer, he "saw this forward mast, the light is turning to forward," which prompted him to move to ALNIC's steering wheel. (*Id.* at

---

[5] It should also be noted that Chief Fields is a claimant and has a financial interest in the outcome of this matter. (Dkt No. 135.)

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

635:4-8.)  When asked if Master Nolasco told the AB that he saw red lights on MCCAIN's mast, the AB testified "No, sir.  I cannot see red lights.  Only the side light, red, sir, and the forward mast."  Trial Tr. at 640:14-17; *see also id.* at 640:18-19 ("Q:  Did the master tell you that he saw red lights on MCCAIN's mast?  A:  No, sir.").  (FOF ¶ 235.)

If MCCAIN had only turned on her red-over-red lights and failed to deenergize her white masthead lights – a violation of the COLREGS – then it is not difficult to understand why ALNIC's crew would not have noticed them.  As Lieutenant Hanna testified, when he came on to the bridge on the "very dark" morning of the collision, "there was a high contact picture, so I saw lots of lights. Not really able to distinguish between shore or contacts at that point."  (Trial Tr. at 665:24-666:2.)  As viewed from ALNIC, MCCAIN's white masthead lights would have been much brighter than the red task lights, and consistent with what ALNIC's crew would have expected to see.  Thus, the dimmer red lights could easily have been missed against the many background lights.  *See Ocean S.S. Co. of Savannah v. U.S. (CITY OF ROME - USS S-51)*, 24 F.2d 729, 733 (S.D.N.Y. 1928)(court found that the visibility of the relatively dim red light was materially reduced by the greater brilliancy of the nearby white masthead light).

## 4.  Even If MCCAIN Were Not Under Command, She Never Had Right Of Way Over ALNIC

Even if the Court were to find MCCAIN was entitled to the status of a vessel not under command, and that she properly energized her not-under-command lights, such status did not relieve MCCAIN of its obligation as an overtaking vessel to keep out of ALNIC's way.  As even Captain Putty fully conceded (Trial Tr. at 377:19-25), the plain wording of Rules 13 and 18 fully supports this conclusion.  First, Rule 13(a) applies "Notwithstanding anything contained in the Rules of Part B, Sections I and II."  (Rule 18(a)(i) falls within Part B of the COLREGS.)  Second, although Rule 18 provides that "[a] power-driven vessel underway shall keep out of the way of:

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

(i) a vessel not under command," that rule is expressly caveated by the words "Except where Rules 9, 10 and 13 [overtaking] otherwise require." These two phrases taken together make clear that the drafters of the COLREGS did not intend for Rule 18(a)(i) to override Rule 13.

While no Singapore, English, or U.S. case deals directly with the interplay between Rules 13 and 18, in *Nautical Challenge Ltd v Evergreen Marine (UK) Ltd* [2021] 1 WLR 1436, the English Supreme Court discussed the interplay between Rule 15 (governing crossing situations) and Rule 18. The court noted that Rule 18 qualifies Rule 15 because Rule 15 is not among the "exceptional rules mentioned at its commencement." *Id.* at 1454 (emphasis added). Notably, the "commencement" to Rule 18 referenced by the English Supreme Court is this: "Except where Rules 9, 10 and 13 otherwise require…." Unlike Rule 15, in other words, Rule 13 – addressing overtaking vessels – clearly is among the "exceptional rules" mentioned at the commencement of Rule 18, and therefore Rule 18 does not qualify Rule 13.

That Rule 13(a) still applies to vessels not under command despite Rule 18(a)(i) is also supported by every well-known treatise on the collision regulations. Marsden explains that the system of privileges in Rule 18 "expressly does not apply [to] a vessel not under command …ought, therefore, not to try to overtake if she is unable to keep clear." MARSDEN, *supra,* at 5-367). Similarly, Professor Allen affirms (FARWELL'S at p. 418) that a vessel not under command has no privilege when overtaking another vessel. Thus,

> The overtaking vessel's obligation to keep out of the way also prevails over the pecking order in Rule 18. Should a vessel not under command or restricted in her ability to maneuver decide, however imprudently, to overtake another vessel, she is obligated to keep out of the overtaken vessel's way.

*Id.* at 332. *See also* COCKCROFT & LAMEIJER, A GUIDE TO THE COLLISION AVOIDANCE RULES 90 (7th Ed. 2012) (Rule 13 takes precedence over Rule 18 so that "a vessel from any of the categories listed in Rule 18 must keep out of the way of any vessel which it is overtaking").

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

Moreover, MCCAIN violated her obligation to proceed at a safe speed while she was attempting to regain control of her steering.  COLREGS Rule 6 provides:

> Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid a collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.  In determining a safe speed, the following factors shall be among those taken into account: (a) By all vessels . . . (iii) the manoeuvrability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions.

As Captain Putty conceded, Rule 6 applies to vessels not under command, such that a vessel traveling ahead at 18 knots or even 15 knots while not under command is under an obligation to reduce its speed to ensure it can be stopped within an appropriate distance.  (Trial Tr. at 380:25-382:25.)

Here, even if the court finds MCCAIN was a vessel not under command, Petitioner submits the court should still hold that MCCAIN, as the overtaking vessel, was obligated to keep out of ALNIC's way.  Even though MCCAIN's bridge watchstanders thought they were unable to change course, MCCAIN could at all times have kept out of ALNIC's way by further reducing speed or even stopping altogether, and was obligated to do so under Rules 16, 8(e) and 6.  In addition, MCCAIN's Commanding Officer also could have by-passed the computer issues altogether by ordering aft steering to take local control of the steering motors and manually put the rudder to the right to maneuver out of ALNIC's way.  (*See* Trial Ex. 61 at US0010848.)

CO Sanchez did none of these things because he had a fundamental lack of understanding of Rule 18.  As he stated in his court-martial stipulation, on the morning of the collision, CO Sanchez believed that upon setting a "Red-over-Red lighting configuration the USS MCCAIN became the stand-on vessel under 72 COLREGS"  (Trial Ex. 136 at ¶ 42.h), and that all other vessels "have an obligation to stand -- to stand clear…."  (Trial Tr. at 226:20.)  Even Captain Putty conceded, however, that CO Sanchez's understanding of the rule was and is wrong.  (Trial Tr. at

379:7-22)("I think when you get to Rule 18 and the way that it's taught, red-over-red, the captain

is dead, they don't teach it red-over-red, the captain is dead except for Rules 9, 10 and 13.").

**5.    ALNIC's Crew Took Proper Measures To Monitor MCCAIN In The Moments Leading Up To The Collision And Could Not Reasonably Be Expected To Have Avoided The Collision**

The main thrust of Claimants' liability argument in this matter is that ALNIC's crew failed

to maintain a proper lookout by failing to comply with its General Management System's

requirement to have 5 watchstanders, including a dedicated "anticollision officer," on the bridge

while transiting the Singapore Strait, which led to their failure to adequately monitor MCCAIN as

she overtook ALNIC while (allegedly) showing her not-under-command lights.   The evidence

adduced at trial in this matter, however, clearly establishes both that ALNIC was keeping a proper

lookout and was properly and appropriately monitoring MCCAIN at all relevant times.   The

evidence further establishes that this collision did not result from any watch-standing failure

aboard ALNIC but was caused solely by the many faults of MCCAIN which caused her to pass

ALNIC at twice her speed, within three-tenths of a nautical mile, such that when MCCAIN

suddenly lost control of her steering due to her own crew's gross negligence, she was already so

close to ALNIC that ALNIC's crew could not reasonably be expected to have reacted in time to

avoid the collision.   (*See generally, e.g.*, FOF ¶¶ 192-193, 214, 235, 241-244, 259.)

Claimants grossly overreach in their criticism of ALNIC's crew, arguing that Stealth's

safety management system, titled "General Management System" or "GMS" (Trial Ex. 9A), which

was created to comply with the International Safety Management (hereinafter, "ISM") Code,

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

constitutes positive law that created duties beyond what is required by the COLREGS and the general maritime law, such that the failure to comply with it constituted an act of negligence.[6]

This argument is critically flawed.  Claimants confuse Stealth Maritime's management standards with legal standards.  The standards implemented under the ISM Code impose no duties on Petitioner that would supersede existing legal obligations under the COLREGS or general maritime law establishing the "ordinary practice of seamen."  *See Ill. Constructors Corp. v. Logan Transp.*, 715 F. Supp. 872, 883 n.25 (N.D. Ill. 1989)(industry custom or practice relevant to the determination of negligence).

Captain Putty fully admitted that the COLREGS contain no requirement for how many crew must be on the bridge in any given circumstance, nor what their individual responsibilities must be.  (Trial Tr. at 370:21-371:5.)  Similarly, the ISM Code contains no requirement that a vessel have a certain number of crew on the bridge nor that it sail with a dedicated "anticollision officer."  (Trial Tr. at 552:24-553:4.)   Indeed, Captain Hight testified that in his extensive experience spanning many years, it was customary during transit of the Singapore Strait to have "the mate on watch, the captain, and a helmsman lookout."  (Trial Tr. at 553:5-8.)  It is not disputed that, on the morning of the collision, ALNIC had her two senior-most officers and an able-bodied seaman on the watch.  (*See generally, e.g.*, FOF ¶¶ 106, 125.)

Contrary to Claimants' arguments, their navigation expert, Captain Putty, fully acknowledged that the actual *legal* requirement for any vessel under the COLREGS is only that she "maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions …."  (Trial Tr. at 370:21-371:5.)   *See also*

---

[6] The Code, which is part of the International Convention for the Safety of Life at Sea ("SOLAS"), is applicable to the Liberian-flagged ALNIC pursuant to Liberian Maritime Regulation 2.35.

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

COLREGS Rule 5.  Under the COLREGS and the "ordinary practice of seaman," if the person assigned is experienced, vigilant, and properly stationed, a *single* lookout will ordinarily be sufficient.  *Virgin Offshore U.S.A., Inc. v. Tex. Crewboats, Inc.*, No. 04 CV 740, 2007 U.S. Dist. LEXIS 41484, at *10 n.6 (W.D. La. May 29, 2007)(under the circumstances, not improper for vessel to have sole lookout at time of allision).  Similarly, when the risk of collision is great, the ordinary practice of seamen only requires that the master should be on the bridge.  *In re M.V. Atl. Hope*, 493 F. Supp. 192, 199 (S.D.N.Y. 1979)(absence of master from the bridge despite the number of ships in the immediate area was "contrary to good seamanship").  It is clear, therefore, that the COLREGS and the general maritime law, in and of themselves, do not demand that a vessel post a second lookout or station a dedicated "anti-collision officer."

No Singapore, English, or U.S. court has addressed the question whether the ISM Code creates duties running between vessels beyond what is provided for by the COLREGS.  In a different context, however, several district courts have concluded that a plaintiff in a maritime action cannot rely on the ISM Code to support a negligence claim.  *See Horton v. Maersk Line, Ltd.*, 603 F. App'x 791, 795-97 (11th Cir. 2015)(rejecting the ISM Code as a basis for the breach of a duty for a negligence claim in excess of the Longshore and Harbor Workers' Compensation Act); *O'Brien v. NCL (Bah.) Ltd.*, No. 16-23284-CIV, 2016 U.S. Dist. LEXIS 195694, at *8-9 (S.D. Fla. Nov. 18, 2016)(citing *Aronson v. Celebrity Cruises, Inc.*, 30 F. Supp. 3d 1379, 1396 (S.D. Fla. 2014)("[T]he International Safety Management Code does not create any duties and thus cannot be the basis for a negligence claim against a cruise line."); *Johnson v. Horizon Lines, LLC*, 520 F. Supp. 2d 524, 533 (S.D.N.Y. 2007)(regulations implemented under the ISM Code should not be construed as imposing additional duties).

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

Petitioner submits the Court should not confirm the adage that "no good deed goes unpunished" by confusing company policies set out in a company management manual with the legal standard governing tort liability, *see* FARWELL'S at 36-36,[7] to find fault where ALNIC's watch standers fully met the legal standard of good seamanship but failed to conform their conduct to company policy.

As to what ALNIC's crew actually did to monitor MCCAIN and other surrounding vessels in the minutes leading up to the collision, the following facts are not legitimately in dispute:

1. As reflected on ALNIC's X-Band radar VDR recording, in the time leading up to the collision, ALNIC was tracking TEAM OSLO, which had just overtaken ALNIC, and LONG HU SAN, which was directly astern, using AIS tracking. This allowed ALNIC to receive contemporaneous information directly from those two vessels' GPS units, including their courses and speeds, and also allowed the ARPA to calculate their closest points of approach and times to closest point of approach. (Trial Ex. 4019; Trial Tr. at 398:3-25; 429:13-23.) (*See generally, e.g.*, FOF ¶¶ 192-193.)

2. Additionally, ALNIC's X-Band radar VDR recording reflects that, in the time leading up to the collision, ALNIC was tracking GUANG ZHAO WAN, which was overtaking and moving across ALNIC's stern, as a "tracked target" with ARPA. (Trial Ex. 4019; Trial Tr. at 399:4-400:4.)

3. At 05:20:06, ALNIC's VDR bridge recording captured a bridge door opening to the bridge wing. The recording reflects that the door closed at 05:21:07. (Trial Ex. 4021 at p. 3). Captain Putty testified that his understanding based on Captain Nolasco's

---

[7] "[P]roactive employers should not be penalized by the courts through the imposition of vicarious liability when their employees met standards of reasonable care but fell short of the company's higher internal standard. Such a practice punishes employers for voluntarily engaging in a practice that ought to be encouraged." FARWELL'S at 36.

testimony was that he "went out on the starboard bridge wing [and] that he was aware that there was a warship in the area from hearing it on the VHF." (Trial Tr. at 320:21-25.) (FOF ¶ 214(a).)

4. At 05:21:19, ALNIC's AB/lookout was recorded on the VDR saying "Warship, I see a warship." (Trial Ex. 4021 at p. 3; Trial Tr. at 321:9-13.) The AB testified that when he saw MCCAIN, she was traveling on a parallel course and had not yet come abeam of ALNIC. (Trial Tr. at 625:14-25.) He testified that he notified the Chief Officer of this sighting, (Trial Tr. at 623:7-24), who checked the radar and stated to the AB that the warship was traveling "too fast and will – and will overtake from us." (Trial Tr. at 626:16-22)(*see also* Trial Tr. at 627:5-18.) (FOF ¶ 214(b).)

5. The parties have stipulated that, with audio enhancement, MCCAIN's PA announcement that they had lost steering can be heard on ALNIC's bridge wing recorder at 21:21:23, as captured by ALNIC's VDR. (Trial Ex. 4021 at p. 4). Claimants argue that ALNIC's crew should have heard this announcement, which would have alerted them to the nature of MCCAIN's problems, but the parties expressly specified that they "reach no stipulation as to whether these words, detected by bridge wing microphones, would or would not have been aurally discernable from ALNIC's bridge wing." *Id.* This means that it was Claimants' burden to prove that this announcement would have been audible, and they presented no such proof at trial. Indeed, given that it required audio enhancement to even detect the announcement in the recording, the plain inference must be that it would not have been audible. Captain Putty expressly confirmed he was offering no opinion as to whether this announcement

would have been audible from ALNIC's bridge wings.  (Trial Tr. at 370:14-20; 432:3-12.)

6. The AB further testified that "during my watch, sir, I'm checking in forward part – in the forward side and starboard side, in the starboard quarter, forward quarter, sir.  And if I see any lights, any kind of lights I saw, I reported to the officers on duty, sir." (Trial Tr. at 627:25-628:4)(*see also* Trial Tr. at 629:1-630:7.)  He testified that it is possible to see all around the vessel from inside the wheelhouse.  (Trial Tr. at 628:7-13.)  He further testified that, during this time, he was doing his lookout using both his natural vision and also binoculars.  (Trial Tr. at 642:2-18.)  (*See generally, e.g.*, FOF ¶¶ 214(c)-(d).)

7. Although the vessel was in autopilot at the time, the AB confirmed that taking it out of autopilot and going to hand steering required only the turn of one switch on the helm station, and nothing more.  (Trial Tr. at 638:8-21.)  Claimants presented no evidence to indicate that the vessel's being in autopilot prevented the crew from making any intended maneuver.

8. Claimants contend that the first time MCCAIN can be seen altering course slightly to port on ALNIC's X-band radar was at 05:21:52. (Trial Tr. at 324:16-21; Trial Ex. 4019).

9. *Two seconds later*, at 05:21:54, according to Captain Putty's own analysis based on his discussions with Furuno, the manufacturer of ALNIC's ECDIS, Captain Nolasco manually started an ARPA track of MCCAIN on the S-band radar.  (Trial Tr. at 328:18-329:17; 390:18-391:17.) (*See generally, e.g.*, FOF ¶¶ 242-244.)

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

10. Captain Putty testified that the radar trails were the best tool for monitoring MCCAIN during this period.  (Trial Tr. at 395:17-21.)  This is because the trails are generated in real time by the radar itself, whose antenna rotated every two and a half seconds, (Trial Tr. at 487:5-7), with a "ghost" image left on the screen after each sweep for a pre-set period of time.  (*See generally* Trial Tr. at 358:8-359:14.)  Unlike ARPA, which is constantly updating a computer calculation based on historical data collected over a period of time to predict a vector for future course and speed, the radar trails are purely historical and generate an immediate visual picture of the surrounding vessels' course and speed, which can be determined based on the length and direction of the trail.  (Trial Tr. at 396:9-397:17.)

11. Captain Putty posited the theory that no one was actively using the X-Band radar during this period because the cursor never moved between 05:14 and the time of the collision. (Trial Tr. at 413:15-414:7.)  But this is pure speculation, and it is entirely reasonable that the Chief Officer would have set the radar up how he wanted it and then would have had no need to touch any controls while the ship was proceeding.  Indeed, Captain Nolasco testified that he was on the S-Band radar during the period leading up to the collision and that the Chief Officer was manning the X-Band radar.  (Trial Ex. 3047, Nolasco Dep. Tr. at 164:5-165:21; 166:2-5.)  Additionally, Captain Nolasco testified that although the S-Band radar was having some difficulty maintaining an ARPA track on MCCAIN, the radar trail remained visible during this entire time.  (*Id.* at 165:11-21.)

12. Captain Putty agreed, moreover, that ARPA is not an ideal tool for tracking vessels in close quarters situations in any event, particularly when they are slowing and turning,

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

because the target's calculated vector is always going to lag behind the current situation.  (Trial Tr. at 372:17-373:14.)

13. Captain Putty further agreed that visually detecting changes in aspect of a vessel abeam at night is very difficult.  (Trial Tr. at 388:20-389:5.)[8]  This is why the radar trails are so useful.

14. Accordingly, ALNIC's crew had available to them, and were using, the best available tools to track MCCAIN in the moments leading up to the collision.  Captain Hight confirmed in response to Claimants' questioning that "whether it's a chief mate or a collision officer, when they are looking at the radar, they are not radaring to collision; they are looking at the radar and they are looking at the target constantly…."  (Trial Tr. at 544:15-19.)  In other words, it is pure instinct that an officer watching a target on the radar will also use visual observations to confirm what they are seeing.

15. Captain Hight explained that VHF radio is not a useful tool for inquiring about a nearby vessel's intentions because it leads to confusion.   (Trial Tr. at 483:1-9.)   This is consistent with Singapore and English case law, which makes clear that vessels generally should not use VHF to attempt to learn another vessel's intentions in a close quarters situation. As explained in *The Dream Star* [2018] 4 SLR 473 at [89], "[t]he English authorities have consistently criticized the use of VHF when mariners should have been concentrating on avoiding collision by appropriate navigation according to the COLREGS and the dictates of good seamanship."[9]

---

[8] Captain Putty confirmed that it would be even more difficult to detect a change in aspect if the vessel abeam were showing only a red sidelight and red-over-red task lights, all of which are in almost a perfect vertical line.  (Trial Tr. at 389:6-17.)

[9] In contrast, as reflected in MCCAIN's CO's Standing Order No. 9 (Trial Ex. 61, US 10848), VHF is a very useful tool when a vessel needs to broadcast a danger situation to nearby vessels, such as when it has lost steering control. (Trial Tr. at 483:7-9.)

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

16. Captain Putty testified that at 05:22:44, ALNIC's S-Band ARPA "collision alarm" sounded, as soon as the ARPA had finished calculating a CPA and TCPA for MCCAIN.  (Trial Tr. at 375:2-12.)  He admitted, however, that this alarm is triggered when a tracked vessel comes within the CPA range set by the operator, and not because ARPA has calculated a collision course.  (Trial Tr. at 394:19-21.)  Captain Putty testified that his opinion was that the CPA alarm range set that morning was likely 0.5 nautical miles.  (Trial Tr. at 390:18-25.)  He further admitted that, at the time the alarm sounded, ALNIC's ARPA was calculating a CPA for MCCAIN of ██████████ and that it never calculated a CPA of 0.0 for the entire time it was tracking MCCAIN.  (Trial Tr. at 375:9-17.)

6.     **Petitioner's Model of ALNIC's Maneuvering Capabilities Is Accurate And Reliable**

Rule 702 of the Federal Rules of Evidence provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 412 F. Supp. 3d 392, 405 (S.D.N.Y. 2019).

The parties stipulated to the admissibility of expert Erland Wilske's "visualization tool," (Trial Ex. 4028), which reflects his computer modeling analysis and conclusions about when the last time was that ALNIC could have avoided the collision by either stopping engine or making a hard turn to starboard.  (*See* Dkt. No. 316).  The court, however, is also tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *United*

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

*States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004)(quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court set forth a list of non-exclusive factors, in addition to the criteria set forth in Rule 702, that bear on the determination of reliability, including whether a technique has been tested; whether it has been subjected to peer review and publication; the rate of error; standards controlling the technique's operation; and whether the technique is based on principle that are generally accepted in the relevant scientific community. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert* at 593-94).

The trial testimony of Erland Wilske clearly demonstrates the reliability of his methodology for modeling ALNIC and its performance characteristics. SSPA's simulation model is derived from peer reviewed publications, is based upon hydrodynamic principles that have gained general acceptance in the relevant naval architecture community, and has been tested and carefully analyzed to determine and account for errors.

The Court heard evidence of steps taken by Mr. Wilske to create and validate his model. Mr. Wilske testified that SSPA used its SEAMAN software to create three separate semi-empiric models of ALNIC at three different loading conditions. (Trial Tr. at 568:4-5, 570:9-10, 577:1-2, 577:23-578:1.) The SEAMAN software simulates the vessel's accepted hydrodynamic parameters of roll, pitch, yaw, surge, sway, and heave. (Trial Tr. at 568:7-10.) The description of the SEAMAN software has been published in numerous scientific reports and journals, (Trial Tr. at 568:14-22), and its accuracy has been verified against SSPA's extensive database of tank and seakeeping tests. (Trial Tr. at 568:24-569:3.)

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

Mr. Wilske further explained that the speed, turning performance, and stopping performance of the three ALNIC models were verified against ALNIC's sea trials data (Trial Tr. at 571:8-9), the vessel's wheelhouse poster (Trial Tr. at 577:12-15), and ALNIC's VDR data recorded prior to the collision.  (Trial Tr. at 578:11-15.)  As was demonstrated, the models showed good comparison to the reference standards.  (*See, e.g.*, Trial Tr. at 574:22-575:4 (comparing the model output advance and tactical diameter to the sea trials data).)

ALNIC's sea trials data shows, based on actual tests of the vessel's performance at the time of delivery, how long it takes for ALNIC to stop engine, slow forward motion and to make hard turns to port and starboard.[10]  (Trial Tr. at 571:19-572:23.)  Based on SSPA's analysis of errors, its computer model of ALNIC demonstrated good agreement with ALNIC sea trials performance. (Trial Tr. at 582:22-25.)

SSPA's incident condition model used an assumed draft of 8.72 meters even keel based on the ALNIC's computer-generated loading plan prepared at departure from the loadport.  (Trial Ex. 4004; *See* Trial Tr. at 578:2-6.)   Based on SSPA's modeling and simulation of ALNIC's maneuvering capabilities, Mr. Wilske's opinion is that a crash stop or engine stop maneuver would have to have been initiated no less than 100 seconds prior to avoid the collision.  (Trial Tr. at 591:7-12.)  Based on SSPA's modeling and simulations of ALNIC's maneuvering capabilities, moreover, Mr. Wilske's opinion is that a hard to starboard maneuver would have needed to have been initiated 60 second prior to avoid the collision.  (Trial Tr. at 591:13-18.)  Mr. Wilske did not

---

[10] Captain Murphy agreed with the use of the sea trials data, calling it "the gold standard for maneuvering information for the ALNIC or any other vessel."  (Trial Tr. at 301:9-21.)

offer an opinion of when the last moment that a turn to port could have been executed to avoid collision with MCCAIN.[11]

Mr. Wilske also analyzed ALNIC's stopping performance assuming an alternate draft of 7.55 meters forward and 8.55 meters aft, *i.e.*, with the vessel trimmed down by the stern, to compare with the trim conditions assumed by Claimants (*i.e.*, 7.55 meters forward and 8.95 meters aft). Using Claimants' assumption concerning drafts, Mr. Wilske determined the last time to stop engines to avoid the collision would change from 100 seconds to 95 seconds prior. (Trial Tr. at 593:9-22.)

Captain Murphy assumed drafts of 7.55 and 8.95 meters based on ALNIC's Pilot Card and an annotation made after the collision on a "white board" on ALNIC bridge. (*See* Trial Ex. 337 and Ex. 338.) Captain Murphy credited the testimony from ALNIC's second mate, Mr. Torculas, that he had completed the pilot card with the drafts prior to the collision and had not changed it after the collision. (Trial Tr. at 305:18-23.) But the Second Officer was not on watch at or after the collision, and Claimants adduced no evidence as to whether the officer actually on watch at the time changed the card and the white board after the collision. Indeed, it is far more logical to assume that ALNIC would have remained on even keel, at or near her departure drafts, throughout the voyage, including at the time of the collision, and that she de-ballasted her forepeak tank only after the collision so that the crew could inspect the damage.

Mr. Wilke also considered ALNIC's turning performance assuming two rudder pumps were running instead of one pump, as used in his simulation. Even assuming ALNIC was using two rudder pumps, the impact on turning analysis is no more than 5 seconds – *i.e.*, the time to turn

---

[11] Although the SSPA model does not account for ship-to-ship interactions, Mr. Wilske explained the ship interactions would not have been a factor in this kind of collision because the vessels were in close proximity for only a few seconds. (Trial Tr. at 605:5-11.)

to starboard avoid the collision changes from 60 seconds to 55 seconds prior. (Trial Tr. at 609:8-610:19, 617:4-618:6.)

In sharp contrast to the detailed trial presentation by Captain Wilske concerning his qualifications and methodology for preparing his model and reaching his conclusions, Claimants' "modeling expert," Captain Murphy, is a master mariner and claimed no expertise in creating the MITAGS model.  (Trial Tr. at 291:19-20, 293:6-11.)  Claimants offered no evidence about how the MITAGS simulation software was created, how the ALNIC model was generated, what was done to validate the ALNIC model, nor what assumptions they used in simulating the incident conditions, apart from the assumed draft.  And despite their criticism of Mr. Wilske's work, Claimants offered no evidence of how, or even whether, the MITAGS model accounted for ship-to-ship interactions.  Claimants also offered no evidence how their model would change if MITAGS had used the drafts assumed by SSPA.  Captain Murphy conceded he did no analysis of any documents to assess the validity of any drafts other than the ones he assumed as the incident drafts.  (Trial Tr. at 305:18 ("We did not analyze other drafts.").)  Claimants have not met their burden to prove that the loading plan drafts used by SSPA are not accurate and that the assumed drafts recorded after the collision used by MITAGS are accurate.

MITAGS also did not create a maneuvering model for MCCAIN.  No one did any work using the MITAGS simulator to try to find out if MCCAIN could have made any maneuvers to avoid the collision.  (Trial Tr. at 311:2-9 ("MITAGS was not tasked with determining what the MCCAIN could do.").)  Therefore, Claimants are unable to offer any opinions as to how quickly MCCAIN could have stopped its forward motion after it stopped or reversed engines.  (Trial Tr. at 311:10-12, 380:5-8.)

7.      **Claimants' 3-D Model Does Not Accurately Reflect What ALNIC's Crew Would Have Seen**

Claimants rely heavily on their 3-D "simulation" video, which purports to simulate what ALNIC's crew would have seen from the bridge in the moments leading up to the collision.  (Trial Ex. 3001P.)  As a reminder, here is a screen shot from the video at 05:22:30 – the precise second after which Claimants' experts fully agree ALNIC could no longer have avoided collision by her own stop engine maneuver.



The Court heard Captain Hight's testimony as to all the ways in which this video – and any screenshots from it – do not fairly and accurately reflect what ALNIC's crew would have seen in the pre-dawn hours leading up to the collision.  (Trial Tr. at 483-486.)  In the first place, the simulation does not accurately reflect the bridge windows and doors, nor any bridge equipment – all of which would be visual obstructions.  (Trial Tr. at 483:21-484:2.)

More fundamentally, the evidence is well established that it was a very dark night, with no moon and overcast sky.  (Trial Ex. 136 at ¶ 2.)  Even Claimants' navigation expert, Captain Putty,

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

agreed.  (Trial Tr. at 362:22-363:10).[12]  In the CO's night orders, navigator Lt. Hanna wrote that they should expect 0% illumination, (Trial Ex. 47 at p. US 0000284), and he testified it was a very dark night.  (Trial Tr. at 665:6-14.)  The Navigation Briefing confirmed this and also confirmed that sunrise was at 06:59 local time that morning.  (Trial Ex. 134 at p. US0032476).  Captain Hight explained that the collision thus occurred well before astronomical twilight, when the sun is 12-18 degrees below the horizon, (Trial Tr. at 484:9-23), during which time it is completely dark, with no horizon visible.  This is in sharp contrast with Claimants' simulation, which shows a clear horizon, land features, and outline details of both MCCAIN and TEAM OSLO.  Captain Hight testified it would have been very dark, with only surrounding navigation lights visible.  (Trial Tr. at 483:25-486:15; 523:23-524:9.)

The simulation also does not show any background shore lights or surrounding vessel contacts.  But navigator Lt. Hanna testified that when he looked out from the bridge wing at the beginning of his watch, it was a "high contact picture" and he was "not really able to distinguish between shore or contacts at that point."  (Trial Tr. at 665:17-666:2.)  The simulation also assumes MCCAIN both energized her red-over-red task lights *and* deenergized her masthead light.  But as detailed above, the evidence strongly indicates that MCCAIN did *not* deenergize her white masthead lights.  Accordingly, the simulation is misleading for these reasons as well.

Notably, even if this simulation were an accurate representation of what ALNIC would have seen from the bridge during the pre-dawn hours on the morning of the collision – which is

---

[12] Captain Putty's suggested that Captain Nolasco's subsequent writings that he "sighted" MCCAIN indicates that he visually saw the ship, (Trial Tr. at 363:18-24), but vessels can be within "sight" under the COLREGS even if only their lights are visible.  COLREGS Rule 3(k)(vessels deemed to be in sight "when one can be observed visually from the other"); FARWELL'S at 61 ("A single light . . . might be enough to render the vessel in sight."); *Otal Invs. Ltd. v. M.V. Clary*, 494 F.3d 40, 54-55 (2d Cir. 2007)(although operating in restricted visibility, where lights of overtaken vessel were visible court applied COLRGS rules for vessels in sight of one another, holding overtaking vessel at fault for decision to overtake at eighteen knots in a TSS);   Moreover, ALNIC's crew could easily surmise from the radar contact that MCCAIN was a warship given her speed and also the fact that she was not transmitting an AIS signal.

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

denied – Petitioner submits that the video actually reinforces its argument that by 05:22:30 – *i.e.*, the last moment by which claimants contend ALNIC could have avoided the collision by her own stop engine maneuver – no reasonable master of ALNIC would have looked out the starboard bridge windows at MCCAIN and concluded that within 90 seconds MCCAIN would sharply cross ALNIC's bow in an uncontrolled hard port turn.  To the contrary, even if MCCAIN's full profile were fully visible, and not just her lights, the roughly 15-degree change in aspect between the time MCCAIN shifted steering until that moment would not have been visibly perceptible.  Even Captain Putty agreed that visually detecting changes in aspect of a vessel abeam is very difficult, and even more so if she is only showing a red sidelight and red-over-red task lights, all of which are in almost a perfect vertical line.  (Trial Tr. at 388:20-389:17.)  Given this, even assuming ALNIC's crew had a visual sighting of MCCAIN with properly configured not-under-command lights at about this time, it still would not have "become apparent" under Rule 17(a)(ii) by this time that MCCAIN was not taking proper action to keep clear.  Consequently, ALNIC remained the stand on vessel under Rule 17(a)(i) at this time.

This simulation also reinforces Petitioner's argument that no master in his right mind would ever have considered a turn to starboard as an appropriate evasive action in this circumstance. ALNIC's master's justifiable concern that he not violate Rule 17(a)(i) by prematurely altering course and speed would only be amplified by the obvious fear that any maneuver to starboard would be directly towards MCCAIN and could create an even more serious risk of collision.  (Trial Tr. at 498:14 – 500:7.)  And even Captain Putty agreed that he would not expect any master to have seriously considered a turn to port, because such a turn would have been an "unnatural reaction."  (Trial Tr. at 362:5-15.)  This would be all the more so given that HYUNDAI GLOBAL

was overtaking to port and would have been a clear obstruction for any maneuver by ALNIC to port.

8. **By The Time It Became Apparent That MCCAIN Was Not Properly Keeping Clear, It Was Too Late For ALNIC To Avoid The Collision**

The parties do not dispute that MCCAIN was overtaking ALNIC in the moments leading up to the collision.  (Trial Tr. at 318:14-17.)  Rule 13(a) of the COLREGS provides that "[n]otwithstanding anything contained in the Rules of Part B, Sections I and II, any vessel overtaking any other shall keep out of the way of the vessel being overtaken."  As detailed above, even if MCCAIN was properly not-under-command, she at all times remained the give way vessel. (Rule 13(a) and Rule 18; Trial Tr. at 377:19-25; 378:15-379:6.)  Moreover, when MCCAIN made a hard turn to port across ALNIC's bow, that did not turn it into a crossing situation.  (Rule 13(d); Trial Tr. at 378:8-13.)

In an overtaking situation, Rule 16 establishes the obligation of the overtaking – *i.e.*, give-way – vessel:  "Every vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear."  Correspondingly, Rule 17(a)(i) establishes the core obligation of the "stand-on" vessel: "Where one of two vessels is to keep out of the way the other shall keep her course and speed."

The fundamental interaction between these two rules is to impose on the give-way vessel the absolute duty to take all appropriate action to keep clear and on the stand-on vessel the clear obligation to be *predictable*, so that the give-way vessel can fulfil that duty.  In *The Roanoke* [1908] P 231 at [240], it was stated that the stand-on vessel had a duty to keep her course and speed in order for the give-way vessel to be able to fulfil her own duty of keeping out of the way of the stand-on vessel and to keep clear.  This view was also reflected by the English court in *The Otranto* [1931] A.C. 194 at [201], where it was observed that the give-way vessel, in discharging her duty

to give way, is entitled to rely upon the stand-on vessel's observance of the rule to maintain her course and speed.

The stand-on vessel's duty to maintain course and speed is not absolute, and Rules 17(a)(ii) and (b) state the exceptions. Rule 17(a)(ii) provides: "The latter vessel *may* however take action to avoid collision by her maneuver alone, as soon as it *becomes apparent* to her that the vessel required to keep out of the way is *not taking appropriate action* in compliance with these Rules." (Emphasis added). And Rule 17(b) provides: "When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision."

Rule 8, titled "Action to Avoid Collision," also comes into play. Rule 8(a) states: "Any action taken to avoid collision shall be taken in accordance with the Rules of the this Part and shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship." And Rule 8(e) states: "If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion."

The English Supreme Court recently explained the interaction among Rules 8, 16 and 17:

> Rule 16 imposes an almost unqualified obligation on the give-way vessel to take early and substantial action to keep well clear. … Rule 8 contains detailed guidance as to whether a give-way vessel should alter course, slow down or even stop. At paragraph (a) it requires avoidance action to be undertaken 'with due regard to the observance of good seamanship.'
>
> By contrast, rule 17 imposes only a qualified obligation on the stand-on vessel to 'keep her course and speed'. It is abrogated when it appears to the stand-on vessel that the give-way vessel is not complying with the Rules: see rule 17(a)(ii), or when action by both vessels has become necessary to avoid a collision: see rule 17(b). The abrogation of the stand-on vessel's obligation does not relieve the give-way vessel of her obligation to keep clear: see rule 17(d).

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

> This reinforces the almost unqualified nature of the give-way vessel's obligation.

*Nautical Challenge Ltd. v. Evergreen Marine (UK) Ltd.* [2021] 1 WLR 1436, 1454.

Critically, Rule 8(a)'s admonishment that "[a]ny action taken to avoid collision shall be taken in accordance with the Rules of the this Part" makes clear that the overriding obligation of the stand-on vessel under Rule 17(a)(i) to maintain course and speed supersedes any right or duty a vessel may have under Rule 8(e) to "slacken speed or take all way off."  As *Nautical Challenge* makes clear, Rule 8(e) is directed at the give-way vessel and "contains detailed guidance as to whether a give-way vessel should alter course, slow down or even stop."  *Id.*

The central legal question this Court must decide, therefore, is whether and when it "became apparent" to ALNIC that MCCAIN was "not taking appropriate action" to keep clear of ALNIC, such that she should, as a matter of good seamanship, have made the decision to take action on her own to avoid collision.  In other words, when did ALNIC become relieved of her obligation under Rule 17(a)(i) to maintain course and speed such that she "may," under Rule 17(a)(ii), or "shall," under Rule 17(b), take action to avoid collision.

Singapore law, as guided by the English courts, fully recognizes the practical difficulty for a stand-on vessel in determining when it has to take action under Rule 17(b) and consequently allows some latitude to stand-on vessels in this situation. MARSDEN, *supra, at* at [5-407]; *The Otranto* [1931] AC 194 at [201]; *The Jaladhir* [1961] 2 Lloyd's Rep 13 at [17]. In *The Jaladhir*, the court stressed that the actions of a stand-on vessel must be regarded "with leniency and understanding" such that the court "must not be too wise after the event."

The conduct of a prudent seaman in such circumstances is not to be tried by mathematical calculations subsequently made.  Rather,

> The duty of the court is to look at the circumstances as they would have presented themselves to the officer in charge of the ship which

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

[was] called upon to act. In those circumstances it has been repeatedly held that a stand-on ship is not lightly to be blamed because it can be shown, in the light of hindsight, that the action which she took was too soon or too late.

*The Aracelio Iglesias* [1968] 2 Lloyd's Rep 7 at p. 13. *See also The Frosta*, [1973] 2 Lloyd's Rep 348, 356 ("Even if it could be shown by calculation after the event that the chief officer acted a little early or late, his decision made at the time would have to be judged with latitude.")

As far as potential actions ALNIC could have taken, even Claimants' own expert ruled out a port turn as a reasonable action in such a situation. (Trial Tr. at 362:5-15.) It is not hard to understand why this would be the case – here is a view of the radar picture at 05:23:00 (Trial Ex. 4019):



HYUNDAI GLOBAL was overtaking ALNIC to port, traveling considerably faster (as can be seen by her longer trail) and aiming to pass ALNIC at no more than about three-tenths of a nautical mile to port. A turn to port would have violated ALNIC's duty vis-à-vis HYUNDAI GLOBAL to maintain course and speed under Rule 17(a)(i), would have created a potential collision scenario with HYUNDAI GLOBAL, and would, at a minimum, have threatened to squeeze ALNIC in

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

between MCCAIN's and HYUNDAI GLOBAL's converging paths, with no escape route.  As Captain Hight testified, no reasonably prudent master would have made such a maneuver.  (Trial Tr. at 498:4-13.)

Captain Putty contended that ALNIC could have avoided the collision with a turn to starboard at or before the time pictured in the above image, but it is equally clear from this picture why no reasonably prudent master would have considered this a viable option.  Here again, ALNIC's primary duty was to maintain course and speed to allow MCCAIN to fulfill her duty to keep clear.  At this time, MCCAIN was both turning and slowing, and no master in ALNIC's position would have been able to determine in the moment whether he would be able to clear behind MCCAIN's stern if he had initiated a turn to starboard.  We know now, with the benefit of scientific modelling and 20/20 hindsight, just when ALNIC would have to have made such a maneuver to clear behind MCCAIN's stern, but Captain Nolasco did not have the benefit of that analysis as the events were unfolding.  A tanker vessel is not a "highly maneuverable" vessel, and it would be counter-instinctive for a master of such a vessel to initiate such a crash evasive maneuver – especially when tightly surrounded by several vessels all traveling in the same direction at different speeds in a traffic separation scheme.  Captain Hight testified that no reasonable master would have made a turn to starboard at this time.  (Trial Tr. at 498:14-500:7.)

That leaves a stop engine order as the only viable evasive maneuver that was available to ALNIC before the collision.  The parties' respective experts reached similar conclusions as to when the last second was when ALNIC could have avoided collision by stop engine order alone: Claimants experts say 88 seconds, or 5:22:30; Petitioner's expert says 100 seconds, or 05:22:18.  For context, the U.S.'s own thrust control log shows that MCCAIN's crew mismatched the thrust controls, precipitating MCCAIN's hard turn to port, at 05:22:20.  (Trial Ex. 94 at p. 4).  Up until

that time, MCCAIN had come left no more than about 15 degrees as a result of their no longer compensating for current.  (Trial Ex. 4013 at p. 3).

Captain Hight testified that even at 05:22:30 – *i.e.*, the last second when Claimants say ALNIC still could have stopped engine to avoid the collision – and even assuming MCCAIN actually *did* correctly energize her not-under-command lights, *and* even assuming ALNIC's crew had seen MCCAIN's not-under-command lights, ALNIC would *still* have been bound under Rule 17(a)(i) to maintain her course and speed, because by this time it still would not have "become apparent" to ALNIC that MCCAIN was not "taking appropriate action" to keep clear of ALNIC. (Trial Tr. at 497:12-498:3.)  Here is ALNIC's X-Band radar image from 05:22:34, four seconds *after* even claimants admit that it was too late for ALNIC to have avoided the collision by stop engine order (Trial Ex. 4019):



Captain Putty agreed that, under the COLREGS, MCCAIN remained the keep-clear vessel even if she truly was not under command and even if she had properly energized her not-under-command lights.  (Rule 13 & 18; Trial Tr. at 379:2-22.)  Accordingly, the mere fact that MCCAIN energized her not-under-command lights, by itself, is *not* sufficient trigger to relieve ALNIC from

her continuing responsibility to maintain course and speed under Rule 17(a)(i).  As Captain Hight testified, it might have been enough to prompt ALNIC's master to say to himself, "what is he doing?"  (Trial Tr. at 498:1-3.)  But that is very different from saying that it would be sufficient to *require* ALNIC to take evasive action at that time.

Petitioner submits that, even in hindsight – even after watching the radar replay multiple times and knowing now that a collision would occur within less than 90 seconds – it would be unfair to conclude that any master aboard ALNIC should have determined by this time that there was a reasonable probability MCCAIN would initiate a sharp turn to left across its bow.[13]  As cited above, Singapore law is clear that a master in ALNIC's position – the victim of circumstance entirely of MCCAIN's creation – should not be judged with mathematical precision but should be judged with leniency and understanding.

The courts have widely held that hindsight criticisms by an expert should be viewed with great skepticism.  In *The Mary T. Tracy*, 298 F. 528, 530 (S.D.N.Y.1920), *rev'd on other grounds*, 8 F.2d 591 (2d Cir. 1925), the court observed:

> It was argued that the captain should have done one of several things other than to go ahead with all the power at his command. I think he decided on the best plan, but, whether he did or not, his decision was the result of a fair exercise of judgment under very difficult circumstances. The contrary view as testified by Capt. Nott called as an expert is but the old story of being able to tell, after the event, what should have been done, where the critics were not there, and were not confronted with the problem nor the emergency. There is always a Capt. Nott. Sometimes he sits by the cozy fireside, and sometimes he testifies in a courtroom. He recites how it could have been better managed, but, if the responsibility had been his, he would have been worried sick, and probably would not have done half as well.

---

[13] Claimants' insistence that ALNIC should have assumed and prepared for this possibility as the "worst case scenario" is an obvious overreach.  No ship master could possibly anticipate every possible eventuality, no matter how improbable, and Rule 17(a)(ii) is quite clear that the COLREGS require no such clairvoyance on a shipmaster's part.

It is important to recall that this "*in extremis*" situation was created entirely by MCCAIN, and not by ALNIC.  The Singapore High Court in *The Tian E Zuo* [2019] 4 SLR 475, citing the "*locus classicus* case" of *The Bywell Castle* (1879) 4 PD 219 (ship collision case where the *in extremis* defense was successfully raised), noted as follows on this point:

> In the words of James LJ (at 223):
>
> … But I desire to add my opinion that a ship has no right, by its own misconduct, to put another ship into a situation of extreme peril, and then charge that other ship with misconduct. My opinion is that if, in that moment of extreme peril and difficulty, such other ship happens to do something wrong, so as to be a contributory to the mischief, that would not render her liable for the damage, inasmuch as perfect presence of mind, accurate judgment, and promptitude under all circumstances are not to be expected.…
>
> And in the speech of Brett LJ (at 226–227):
>
> I am clearly of the opinion that when one ship, by her wrongful act, suddenly puts another ship into a position of difficulty of this kind, we cannot expect the same amount of skill as we should under other circumstances. The captains of ships are bound to shew such skill as persons of their position with ordinary nerve ought to shew under the circumstances. But any Court ought to make the very greatest allowance for a captain or pilot suddenly put into such difficult circumstances; and the Court ought not, in fairness and justice to him, to require perfect nerve and presence of mind, enabling him to do the best thing possible.

*See also In re Harris*, 216 F. Supp. 176, 180 (E.D. La. 1963) ("A mistake in judgment when viewed from the vantage point afforded by hindsight is not to be imputed as a fault."), *rev' on other grounds*, *Walker v. Harris*, 335 F.2d 185, 197 (5th Cir. 1964); *Cent. R. Co. v. Tug Marie J. Turecamo*, 238 F. Supp. 145, 148 (E.D.N.Y. 1965) (judgement of competent master cannot be impugned "from the shelter of the lawyer's well")(citing *The Oregon*, 158 U.S. 186, 204 (1895)("the judgment of a competent sailor in extremis cannot be impugned")).

In *The Fogo* [1967] 2 Lloyd's Rep 208, an overtaking vessel which experienced a fault in its automatic steering was held wholly to blame for a collision and the other vessel was held not

to have acted negligently in failing to take avoidance action sooner.  There, the English court found

the plaintiff wholly to blame for the collision notwithstanding that the collision had occurred owing

to an equipment fault in the automatic steering system of the plaintiff's vessel. The plaintiff

contended that, in light of the close overtaking to port, the defendant vessel should have sounded

warning whistles and should have turned to starboard to avoid the collision, but the court concluded

that "*I cannot see that any situation of imminent danger had arisen until the [plaintiff] veered to

starboard.*" (Emphasis added).  The court further observed:  "And no such situation had arisen as

would have required, *or even excused*, a departure of the [defendant] from her primary duty as the

stand-on ship." *Id.* at p. 220 (emphasis added).  In considering the plaintiff's contention that the

defendant had failed to react sufficiently promptly to turn to starboard and/or stop her engine, the

court found that the plaintiff had failed to prove negligence and, moreover, as to the timing of

stopping engine, the court concluded that "even if he was wrong, I should hold it to be no more

than a pardonable error of judgment in a difficult situation."  Accordingly, the overtaking plaintiff

was found to be 100% at fault for the collision.  *Id.* at p. 221.

Similarly, in *The Frosta* [1973] 2 Lloyd's Rep 348, the defendant's vessel had been

overtaking the plaintiff's vessel slowly on the latter vessel's port side. However, while she was

doing so, she swung suddenly and unexpectedly to starboard. The plaintiff's vessel took avoiding

action by putting her wheel hard to starboard; however, this was too late to avoid the collision.

The court found the defendant overtaking vessel at fault on three grounds: "first, overtaking too

close; second, having the defect in her steering gear; and third, not stopping her engines and

keeping them stopped." *Id.* at 356.  In particular, as to this last point, the court noted "*it seems to

be clear that, as soon as it became apparent that the [defendant's] rudder was jammed to

starboard, her engines should have been stopped and thereafter kept stopped, unless and until it*

*was certain that the defect had disappeared and the rudder could be put to port.*"  *Id.* at 355 (emphasis added).

The *Frosta* court then considered defendant's arguments of comparative fault on the plaintiff's side for not switching from automatic to hand steering, failing to alter course to starboard earlier and/or failing to go full astern in sufficient time or at all.  As to the first point, the court noted that "about one second" was necessary to switch from automatic to hand steering, and the fact the vessel was in automatic steering therefore had no significant impact on the vessel's ability to take avoiding action when required.  *Id.* at 356.  As to the second, the court noted that the plaintiff, as the stand-on vessel, had the obligation to keep her course and speed until it was apparent that the defendant could not avoid the collision by its own actions and, in any event, "[e]ven if it could be shown by calculation after the event that the chief officer acted a little too early or late, his decision made at the time would have to be judged with latitude." *Id.* at 356.  The court further found that the plaintiff was not at fault for not noticing the defendant's not-under-command lights and that, even if he had seen them, his reaction would not have been so much quicker that it would have made any material difference in light of the short time during which the collision unfolded.  *Id.* at 357.  Accordingly, the overtaking defendant was held solely to blame for the collision.

Claimants criticize Petitioner's reliance on *The Fogo* and *The Frosta* on the basis that they are pre-1972 COLREGS cases.  But Petitioner's Singapore law expert, Leong Kah Wah, explains in his supplemental memorandum filed along with this Post-Trial Brief that this objection is unfounded because those courts conducted precisely the same analysis that would be called for under the present wording of Rule 17.  These two cases are squarely on point and strongly support a finding that ALNIC should bear no liability for this collision.

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

Claimants' insistence that ALNIC "caused" the collision is all the more offensive when one considers all of the actions MCCAIN still could have taken after this time to avoid the collision.  One press of the emergency override to manual button at any time in the minute thereafter would immediately have returned steering control to the helm station.  And one press of the "all stop" button on the lee helm station would immediately have stopped the engines.  As established above, when MCCAIN stopped engines it was "like opening two parachutes behind the ship."  (Trial Tr. at 209:14-210:25.)  *See also* FARWELL'S p. 151, n.24 (noting that an Arleigh Burke's stopping distance at 20 knots is "reportedly, less than two ship lengths)(citing James A. Barber, *Naval Shiphandling Guide* (2005), at 242).  In any event, whatever MCCAIN's actual maneuvering characteristics – which the U.S. never modeled – the evidence is indisputable that MCCAIN still had ample time to avoid this collision long after ALNIC no longer could do so.

**9.      Claimants Present No Evidence To Indicate Any Different Collision Scenario Would Have Been "Better"**

At trial, Claimants for the first time sought to suggest that if only ALNIC had initiated a turn to port before the collision, the resulting impact between the vessels would have been relatively minor and "if it didn't avoid a collision, a hull plate collision, it would have avoided the death and injury part of the case and we probably would be talking about a million or two in property damage to both vessels."  (Trial Tr. at 742:21-25.)  This, however, is pure speculation.  Claimants proffered no expert qualified to offer such opinions, and Claimants' experts who testified at trial offered no such opinion.  Indeed, Claimants' navigation expert, Captain Putty, expressly confirmed he was offering no such opinion:

> Q. And so you've not expressed any opinions here that by having taken some action in the very last moment, the ALNIC might have mitigated the collision in some way, correct?  That's not one of your opinions; correct?
>
> A.  Correct.  That is not my opinion.

(Trial Tr. at 408:24-409:3.)  And Claimants' ship modeling expert, Captain Murphy – who is not even a naval architect or marine engineer – was never asked any questions on this subject, and expressed no opinions on the point whatsoever.

Claimants suggest that Petitioner's modelling expert, Mr. Wilske, somehow conceded this point, (Trial Tr. at 742:7 *et seq.*), but this is inaccurate.  Mr. Wilske's actual testimony on this point was as follows:

> Q. So even as late as 5:23:13, even if collision was already unavoidable, according to your simulation, ALNIC could still wind up *in a very different position than the angle of impact in the historic collision*; correct?
>
> A. That's correct.

(Trial Tr. at 600:19-23)(emphasis added).  Asking whether the vessels would have wound up "in a very different position" is a far different question from whether the resulting theoretical collision might have caused more or less damage.  That question was never asked.

It is not difficult to imagine a collision at a "finer angle" – *i.e.*, resulting from a partial turn by ALNIC – that could have been much worse.  For instance, a smaller-angled collision might have opened MCCAIN's hull into more compartments, resulting in more rapid and widespread flooding.  It also could have directly impacted ammunition storage magazines or engine room spaces, which might have had their own serious consequences.  A different collision might also have ruptured one of ALNIC's cargo tanks which, given the highly flammable Pyrolysis Fuel Oil cargo that ALNIC was carrying, (*see* Trial Exs. 3 at box 16; 335), could have resulted in a massive explosion and the loss of both vessels.  Simply put, any argument that a different collision might have been "better" is pure speculation, and Claimants have failed to meet their burden to prove that any maneuver by ALNIC would have mitigated the loss in any measurable way after a collision was already inevitable.

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

**10.      Post Collision False Log Entries Did Not Cause The Casualty Nor Impede The Claimants From Litigating This Case**

In its pre-trial brief (Dkt. No. 323 at pp. 34-36), the U.S. argues that the false logbook entries and false statements of ALNIC's crew warrant entry of judgment against Petitioner in this matter.  It is quite notable, however, that notwithstanding the long list of cases cited in support of its argument, the U.S. conspicuously omits any reference to the controlling authority on this point, namely *Otal Investments Ltd. v. M.V. Clary*, 494 F.3d 40, 58 (2d Cir. 2007).  Whether intentional or by mere oversight, this omission is clearly significant, because *Otal Investments* addresses the exact issue presented here.

As Petitioner has repeatedly acknowledged throughout these proceedings, ALNIC's crew admittedly did make false log entries after the collision and made false statements during the post-collision casualty investigation. (*See generally, e.g.*, FOF ¶¶ 299-310.)  But in the first place, Claimants have presented no evidence indicating that any of these post-collision acts *caused or contributed* to the collision.

And no evidentiary presumption against Owner is appropriate in the circumstances, where these post-collision actions by the crew have been fully acknowledged and disavowed by the Owner in this matter, where it is common ground between the parties that the ALNIC's electronic VDR data is valid and untainted and where, moreover, that electronic data was always going to be the primary source of evidence for all parties in this matter.  Neither the Claimants' claims nor Owner's defense turns on any "suspect" piece of evidence in this matter.

In *Otal Investments Ltd.*, 494 F.3d at 58, the Second Circuit explained that where, as here, false log entries are fully acknowledged as such and, moreover, where the true facts are entirely known from other sources of information that are not subject to question or dispute, no such

presumption is warranted.  As the *Otal Investments* court concluded, noting that the vessel owner had admitted the false entries:

> Toncic's admissions sharply diminish, if not eliminate, the relevance of the presumption normally arising from the alteration of a logbook. The presumption is especially useful in cases where the facts that should have been entered are not known, or at least are in dispute. *See, e.g., Tokio Marine & Fire Ins. Co. v. M/V Flora*, 1999 WL 14000, *9–10, 1999 U.S. Dist. LEXIS 267, *30–31 (E.D. La. Jan. 11, 1999); *General Trading Co. v. S.S. Hellenic Carrier*, 1982 U.S. Dist. LEXIS 9462, *19 (S.D.N.Y. April 14, 1982). Here, however, those facts are known, indeed, admitted by the Clary's officer. Thus, as to these facts, which were deemed adverse to the Clary by the district court, the presumption would add nothing.

*Id.* at 58-59.  *See also, Petition of Energetic Tank, Inc.*, 1:18-cv-1359, Dkt. No. 221, n.10 (S.D.N.Y. October 19, 2019)(PAC)(RWL)("The Second Circuit further stated in *Otal Investments* that the adverse presumption that should properly arise at trial from "unexplained alterations of logbooks" is "a rule of evidence."  *Otal Invs.*, 494 F.3d at 58.  The presumption's value is lessened where the party (as in the present case) has admitted the alterations.  *Id.* at 59.").  In the present case, no adverse evidentiary presumption is warranted.

## 11.   Petitioner Is Entitled To Recover All of its Claimed Damages, Plus Pre-Judgment Interest

Because Claimants have failed to meet their burden to prove that ALNIC caused or contributed to the collision, and because the evidence overwhelmingly establishes that MCCAIN was solely at fault for the collision, Claimants' claims should be denied in full and Petitioner's claim for collision-related damages should be granted in full.  The parties have stipulated that Petitioner's collision-related damages were $442,444.67.  (Dkt No. 310).  Judgment should be entered against the U.S. and in favor of Petitioner in that principal amount, plus pre-judgment interest.

The rate of interest, if any, to be applied is a matter within this Court's discretion, as is the date when interest accrues. *See, e.g., Mentor Ins. Co. v. Brannkasse*, 996 F.2d 506, 520 (2d Cir. 1993); *Ameejee Valleejee and Sons v. M/V Victoria U.*, 661 F.2d 310, 313 (4th Cir. 1981). The Second Circuit does not prescribe any particular rate of prejudgment interest, *see Mentor Ins. Co.*, 996 F.2d at 520, and cases in the Second Circuit have established the clear rule that the Court is not limited to any one particular standard when exercising its discretion in setting the rate of interest. *See id.* (stating that interest can be awarded at "the cost of borrowing money, if measured for example by the average prime rate or adjusted prime rate rather than by actually paid rates."); *Nittetsu Shoji America, Inc. v. M.V. Crystal King*, No. 90 Civ.2082, 1992 WL 116430, at *13, 1992 U.S. Dist. LEXIS 7615, at *43–45 (S.D.N.Y. May 21, 1992) (stating that, with respect to calculating the rate of prejudgment interest, "[s]everal standards have been utilized" within the Second Circuit); *see also Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 311 (2d Cir. 1987) (noting that "the rate of interest used in awarding prejudgment interest rests within the sound discretion of the trial court"), *cert. denied*, 484 U.S. 1042 (1988).

Similarly, under Singapore law, there is a discretion as to whether to award interest; if so, what the relevant rate should be; what proportion of the claim should bear interest; and the period for which interest should be awarded. This discretion is generally unfettered, subject only to the caveat that it must be exercised judicially.  *See* Section 12 of the *Civil Law Act* (Cap 43, 1999 Rev Ed); Paragraph 6 of the *First Schedule of the Supreme Court of Judicature Act* (Cap 322, 2007 Rev Ed) *Atkin's Court Forms Singapore* (LexisNexis Singapore*)* ("*Atkins*") at [251]; *Singapore Court Practice* (LexisNexis Singapore, 2021) ("*Singapore Court Practice*") at p. 1336. The underlying purpose of pre-judgment interest is to compensate claimants for the cost of being kept out of use of their money.  *See Koh Tiam Ting v Soon Li Heng Civil Engineering Pte Ltd* [2020]

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

SGDC 172 citing *Grains and Industrial Products Trading Pte Ltd v Bank of India* [2016] 3 SLR 1308 ("*GRIPT*") at [137].

In the event the Court determines ALNIC and MCCAIN are both comparatively liable, the Court should exercise its discretion to deny or limit any claim by the U.S. for pre-judgment interest. In the first place, the U.S. should be denied any claim for interest in view of its overwhelming proportion of fault in this matter and in light of the gross disproportionality between any degree of fault on ALNIC's part and the quantum of principal damages claimed by the U.S.

Moreover, the U.S. presents no justification for its request for interest calculated at 5.33%, (*see* Dkt No. 323, p. 83), particularly considering the 5-year historical average interest rate on 10-year U.S. Treasury Note – *i.e.*, the U.S.'s own cost of capital – is approximately 1.8%.[14]  Moreover, although the U.S. presents two possible calculation start dates – either the date of commencement of this action or the "mid-point" of repairs, assumed to be 225 days after the collision[15] – neither methodology accounts for the fact that substantial elements of its claim, including for depreciation and loss of use, were only incurred well after either date.  In *Great Lakes Business Trust v. M/T ORANGE SUN*, 855 F. Supp. 2d 131 (S.D.N.Y. 2012), for instance, involving a vessel allision, the court calculated simple interest at the average prime rate between the time of the collision and the time of judgment but awarded interest only for the period from when the damaged dredge was back in productive use and the date of payment.  The court concluded that allowing interest on a claim for lost profits from the date of the allision "would be unfair since the lost profits accrued

---

[14] See https://www.macrotrends.net/2016/10-year-treasury-bond-rate-yield-chart (last visited November 15, 2021).

[15] The U.S. presented at trial the testimony of Robert Overbaugh, Trial Tr. 452 *et seq.*, to explain the *methodology* for the calculations referenced at p. 38 of their trial brief.  (Dkt No. 323).  While Overbaugh explained that he used the assumption of 225 days after the collision as the logical starting point for the calculation of interest, however, he provided no testimony explaining *why* he considered that date – as opposed to some later date – to be the appropriate starting date.  While the parties stipulated that the vessel was out of commission for 450 days as a result of the collision, the trial record is devoid of any evidence supporting the assumption that the midpoint of this period is a reasonable starting point for the calculation of interest.

gradually over time." Based on the foregoing, the U.S.'s interest calculation is clearly overstated, and this Court should exercise its discretion to limit such claim accordingly.

**12.**     **Alternatively, ALNIC Is Entitled To Limit Its Liability**

Although Singapore law applies in respect of liability and damages, U.S. law applies with respect to Petitioner's claim for limitation of liability. Petitioner submits that it should be exonerated from liability for the collision. But in the event Petitioner is found partly at fault for the collision, it is nevertheless entitled to limit its liability pursuant to the U.S. Shipowner's Limitation of Liability Act. 46 U.S.C. § 30501, *et seq.*[16]

The determination of whether the owner of a vessel is entitled to limitation of liability requires a two-step analysis. *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999) (limitation of liability proceedings "lend themselves to a bifurcated analysis"). First, the Court must determine what acts of negligence or conditions of unseaworthiness caused the accident. *In re Moran Towing Corp.*, 166 F. Supp. 2d 773, 775 (E.D.N.Y. 2001). Second, the Court must determine whether the ship owner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness. *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976).

This two-step analysis engenders a divided burden of proof. *Carr*, 191 F.3d at 4. The claimant bears the initial burden of proving negligence or unseaworthiness. *In re Molai Shipping Corp.*, 569 F. Supp. 523, 523-24 (S.D.N.Y. 1983) (claimant has the burden of proving that the ship was unseaworthy or the owner was negligent, and that the unseaworthiness or negligence was a cause of the injury or death). Once the claimant has proved negligence or unseaworthiness, the

---

[16] Where the Petitioner is found entitled to limit its liability, the claimants' claims, collectively, are limited to a *pro rata* share of the value of the limitation fund posted pursuant to the Limitation Act. Here, Petitioner has posted a limitation fund of $16,768,480.40, representing the value of the vessel at the conclusion of the voyage, plus pending freight for the voyage. No party has contested the quantum of the fund.

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

burden of proof shifts to the petitioner shipowner to prove lack of privity or knowledge. *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978) (stating that the burden of proof as to the absence of privity or knowledge is on the petitioners). Section 30506, Subsection (e) of the Limitation Act provides that with respect to loss of life or bodily injury, the privity or knowledge of the master of the vessel at or prior to the commencement of the voyage is deemed the privity or knowledge of the owner. *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 9 (5th Cir. 1976).[17] If the claimants do not meet their burden of establishing a negligence cause of action, the burden does not shift to the petitioner shipowner to establish lack of privity or knowledge. *Nassau Bay Water Sports, Inc. v. McClelland*, No. 94-20252, 1995 U.S. App. LEXIS 42653, at *12-14 (5th Cir. July 19, 1995) (limitation of liability justified where claimants did not establish act of negligence causing accident).

"The phrase privity or knowledge is a term of art meaning complicity in the fault that caused the accident." *In re Messina*, 574 F.3d 119, 126 (2d Cir. 2009) (internal quotation marks omitted). "'Privity or knowledge,' the absence of which is the touchstone of innocence according to the statute, is understood to be an owner's 'personal participation . . . in the fault or negligence which caused or contributed to the loss or injury.'" *Great Lakes Dredge & Dock Co. v. City of Chicago*, 3 F.3d 225, 231 (7th Cir. 1993)(quoting *Coryell v. Phipps*, 317 U.S. 406, 411 (1943)).

A shipowner is entitled to limit its liability if the owner demonstrates that it could not, through the exercise of reasonable diligence, "have taken action . . . that would have prevented the [crew's] negligent acts at sea." *Empresa Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir. 1984) (citing *Spencer Kellogg Co. v. Hicks*, 285 U.S. 502, 511-12 (1932)).

---

[17] The court will separately decide the issue of limitation of liability for each category of claimants. *Moore-McCormack Lines, Inc. v. Armco Steel Corp.*, 272 F.2d 873, 879 (2d Cir. 1959) (affirming judgment awarding unlimited damages for loss of life or personal injuries but limiting liability for damages for loss of cargo).

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

Thus, if the collision resulted from navigational errors made in the moment that the shipowner had no reason to anticipate, the shipowner is entitled to limit its liability for the negligence of its crew, such as failing to recognize the risk of collision at or before the time it could be avoided. (These are classic "errors of navigation" for which limitation would be appropriate.) *See Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 813 F.2d 634, 638 (4th Cir. 1987). In other words, if the navigational error was caused by the instantaneous negligence of the crew or captain, the shipowner cannot be charged with privity and knowledge of that negligence. A shipowner is not required to make the ship "failsafe." *Farrell Lines, Inc. v. Jones*, 530 F.2d 7 (5th Cir. 1976). Mere "[e]rrors in navigation or other negligence by master or crew are not attributable to [the vessel owner] for limitation purposes." *Mac Towing, Inc. v. Am. Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982).

A petitioner shipowner will not be able to carry its burden to show lack of privity or knowledge if it fails to properly train its crew. *See, e.g., Hercules Carriers, Inc. v. Florida*, 768 F.2d 1558, 1576-77 (11th Cir. 1985) (privity or knowledge existed in collision case due to "shipowner's failure to provide an adequate training program"). To defeat an owner's assertion of lack of privity or knowledge, however, a claimant must first establish a causal connection between the "failure to inquire and train" and the accident. *Nassau Bay Water Sports, Inc., supra*, ("no evidence suggesting that but for the alleged lack of instruction, the accident would not have occurred"); *Kristie Leigh Enters. v. Am. Commercial Lines*, 72 F.3d 479, 482 (5th Cir. 1996) (without knowledge that captain was inadequate or unsafe, record does not support conclusion that captain was incompetent and needed additional training or instruction in performing his duties); *Nissan Fire & Marine Ins. Co. v. M/V Hyundai Explorer*, 93 F.3d 641, 646 (9th Cir. 1996) (under the facts of case, there was nothing to implicate the crew's training).

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

A shipowner will not be charged with the negligence of third persons employed by the shipowner such as a crewing agency to put the vessel in seaworthy condition where the owner has, "in good faith, exercised due diligence and care in the selection of such persons" to ensure that they are "trustworthy, experienced, and capable of performing the service, and of good reputation in the business."  *Pocomoke Guano Co. v. Eastern Transp. Co.*, 285 F. 7, 10 (4th Cir. 1922); *see also In re Nat'l Shipping Co. of Saudi Arabia*, 147 F. Supp. 2d 425, 444-46 (E.D. Va. 2000)(owner acted reasonably and satisfied its duty of due diligence in employing experienced and reputable crewing agency to recommend competent deck officers, and in hiring mate based upon recommendation and information received regarding mate's qualifications).

In the event Owner is held entitled to limit its liability, the United States, as joint tortfeasor, will be equitably estopped from claiming any part of the limitation fund until and unless innocent third parties – *i.e.*, the injury and death claimants – are fully satisfied.  *See Petition of Marina Mercante Nicaraguense, S.A.*, 364 F.2d 118, 125 (2d Cir. 1966)(finding in both-to-blame collision that "McAllister is thus entitled to recover half the damage suffered … from the balance of the ship's limitation fund remaining after satisfaction of the death claims."); *Petition of A.C. Dodge*, 282 F.2d 86, 89 n.1 (2d Cir. 1960)(harmonizing its ruling with *The Catskill's* holding that "the vessel sustaining the heavier losses is not entitled to share in the other vessel's limitation fund on an equal footing with third party claimants.")(citing *The Catskill*, 95 F. 700 (S.D.N.Y. 1899)("[a]s between these different claimants the owners of the Catskill are equitably estopped from withdrawing in this proceeding any part of the fund whereby the other damage claimants might lose any part of their demands.")).

Petitioner here lacked privity or knowledge of any act of negligence or condition of unseaworthiness which may be found to have caused or contributed to the collision; consequently,

it is entitled to limit its liability to the value of the limitation fund established in this matter pursuant to the Limitation Act.

Preliminarily, as detailed in Point 5 above, Claimants' argument that Stealth's "General Management System" (Trial Ex. 9A), created to comply with the ISM Code, constitutes positive law that created additional watchkeeping duties beyond what is required by the COLREGS and the general maritime law is misplaced.  The standards implemented in the GMS do not supersede or supplant ALNIC's legal obligations under the COLREGS or general maritime law establishing the "ordinary practice of seamen."  *See Ill. Constructors Corp. v. Logan Transp.*, 715 F. Supp. 872, 883 n.25 (N.D. Ill. 1989) (industry custom or practice relevant to the determination of negligence).

Rule 5 of the COLREGS establishes the legal standard for maintaining a proper lookout, and as noted above Captain Putty fully admitted that the COLREGS contain no requirement for how many crew must be on the bridge, nor what their individual responsibilities must be.  (Trial Tr. at 370:21-371:5.)  Similarly, the ISM Code contains no requirement that a vessel have a certain number of crew on the bridge nor that it sail with a dedicated "anticollision officer."  (Trial Tr. at 552:24-553:4.) Captain Hight testified it is customary for a vessel such as ALNIC to sail in the Singapore Strait with the watch officer, the master and a helmsman lookout.  (Trial Tr. at 553:5-8.)

Claimant's argue that the lack of competence and training of ALNIC's crew establishes privity and knowledge and negates any "navigational error" argument.  Petitioner submits that this argument is misplaced because it is founded on evidence that has nothing to do with the cause of the collision.  The sole issue with whether ALNIC's fault contributed to the collision is whether Captain Nolasco took appropriate action under the COLREGS when it became apparent that

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

MCCAIN was not taking appropriate action to keep clear.  Claimants have produced no evidence, however, to suggest that Captain Nolasco was incompetent and needed additional training to carry out this COLREGS obligation.

The Crewing Department of ALNIC's vessel manager, Stealth Maritime ("Stealth"), contracted with Selandia Crew Management Philippines Inc. ("Selandia") to supply qualified crew for the vessel.  (Trial Ex. 4032.)  Stealth has rigorous minimum standards for its seafarers, including that a seafarer must have at least six years of sea service and three years of experience at the same rank on a similar vessel in order to be a master or chief officer.  (Trial Ex. 4024 at Energetic 003750).  Stealth also has a "rank specific" interview process for senior officers, which involves a thorough evaluation and interview process.  (*Id.* at Energetic 003727-003729, 003733.)  Once the seafarers were hired, Stealth provided the master and senior officers with a pre-embarkation briefing, and Selandia provided all crew with shipboard familiarization training.  (Trial Ex. 4024 at Energetic 003729.)  (*See generally, e.g.*, FOF ¶¶ 110-116.)

ALNIC's crewmembers on the bridge at the time of the collision were required to be – and were in fact – properly credentialed and trained in compliance with governing international laws:  Captain Nolasco held a Philippine unlimited tonnage certificate of competence to sail as master with the required Liberian endorsements, and, at the time of the collision, had sailed as a master for at least eight years.  (Trial Ex. 4009.)  Chief Officer De Gracia also held a Philippine unlimited tonnage certificate of competence to sail as master with the required Liberian endorsements and at the time of the collision, Chief Officer De Gracia had been qualified as a master for nearly four years.  (Trial Ex. 4010.)  AB Ambrocio held a Philippine Seafarer's Registration Certificate for the position of able-bodied seaman and had sailed as an AB for more than six years as of the time of the collision.  (Trial Ex. 4012.)  (*See generally, e.g.*, FOF ¶¶ 117-119.)

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

The ALNIC crewmembers achieved satisfactory reviews of their performance of navigation tasks and received shipboard training. Captain Zisimos, Stealth's superintendent, sailed aboard ALNIC from May 27 through June 24, 2017, interviewed ALNIC's officers, evaluated the crew's skills and knowledge of the GMS (Trial Ex. 3045, Zisimos Dep. Tr. at 39:14-40:14; Trial Ex. 21 at Energetic 005954), and completed crew appraisal reports for each of ALNIC's officers, giving each officer a grade in several categories, including position-specific skills, such as ship handling, collision avoidance, chartwork, and knowledge of ship's equipment for deck officers. (*See, e.g.*, Trial Ex. 552 at 012873-012875 (Chief Officer appraisal).)   The Master received satisfactory scores of 4 out of 5 for ship handling and collision avoidance, and 3 out of 5 for chart work, navigation conduct, passage planning, and knowledge of electronic navigational aids, while the Chief Officer scored 3 out of 5 on all of those categories, and both were recommended for reemployment in their positions.  (Trial Ex. 552 at Energetic 012873-012878.)  Nothing in Captain Zisimos' appraisal reports suggests the Master or Chief Officer were not knowledgeable of or unable to satisfactorily carry out their obligations under the COLREGS.  (*See generally, e.g.*, FOF ¶¶ 120-123, 134-135.)

On the other hand, although the Chief Officer scored 3 out of 5 for his knowledge of the GMS, the Master and Second Officer scored only 2 out of 5 (*id.* at Energetic 012873-012878, 012888-12890), indicating that that their performance in that area was below expectations but could be sufficiently improved with training.  (Trial Ex. 3045 at 80:19-22.)  Captain Zisimos was not surprised to find that ALNIC's crew members required additional training on the GMS.  The management manuals are voluminous, it takes time for new crew members to familiarize themselves with the specific procedures required by a new management company, and these crew members had only been with Stealth for about one month at the time of these appraisals.  (Trial

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

Ex. 3045 at 31:16-32:9, 51:25-53:9; *see also id.* at 33:5-34:8 (discussing Stealth's evaluation of the Master's competency as a captain at the time of hire and understanding that the Master would require time to learn the GMS); *see also* Trial Ex. 3045, Zisimos Dep. Tr. at 31:4-11 ("No.  I didn't have any [concern about his ability] being a captain.  My only concern was if he was familiar with the IMS 100 percent, because he had – he was newly in the company, and he had only on board [sic] one month.") (emphasis added); Trial Tr. at 512:25-513:2, 513:21 ("[T]here is no possible way that you could be an expert in the safety management system in that amount of time. . .It's continuous education.)  Captain Zisimos provided continuous shipboard training on Stealth's management procedures while aboard ALNIC until he departed on June 24, 2017.  (*See, e.g.*, Trial Ex. 3045 at 50:14-51:18.)[18]  (*See generally, e.g.*, FOF ¶¶ 129-131, 136-138, 142-146.)

During his observation of ALNIC's crew, Captain Zisimos noticed the vessel sailing in the Singapore Strait with a manning level other than the one specified in Stealth's management procedures.  (Trial Ex. 3045 at 74:24-75:22.)  Zisimos immediately conducted shipboard training for deck watchstanders relating to Stealth's policy concerning the proper bridge manning level when sailing in heavy traffic, such as in the Singapore Strait, and the proper steering modes for each manning level.  (Trial Ex. 3045 at 72:24-73:14, 75:12-76:4, 76:23-77:16.)  Captain Nolasco acknowledged and confirmed that he understood Captain Zisimos' shipboard trainings.  (*Id.* at 77:17-24.)  Nowhere did Captain Zisimos note that ALNIC's were not keeping a proper lookout,

---

[18] Captain Zisimos also identified the need for all of the officers to have additional ECDIS training.  (Trial Ex. 3045. at 31:16-32:9, 84:3-7, 90:23-91:18, 93:24-94:2; Trial Ex. 552 at Energetic 012874, 012877, 012889.)  Captain Zisimos also was not surprised that the deck officers required training on the Vessel's ECDIS, as there are different makes and models aboard different ships.  (Trial Ex. 3045 at 171:25-172:25 (comparing switching between different types of ECDISs to smart phones (e.g., iPhone to Samsung) and indicating that training is required because a seafarer could be knowledgeable about one ECDIS and not another).  Nothing in Captain Zisimos' recommendations concerning ECDIS training suggests ALNIC's watch officers were unable to competently operate the ECDIS and comply with their obligations under the COLREGS.

not using all appropriate means to assess the risk of collision, or otherwise not in compliance with their obligations under the COLREGS.

Claimants have adduced no evidence contrary to the above that suggests ALNIC's bridge watchstanders were incompetent or not knowledgeable of their COLREGS obligations.   Thus, even if the watchstanders had been instructed and trained on Stealth's management policies, as Claimants argue they should have been, Claimants have adduced no evidence to even to suggest such instruction would have prevented the collision.   Accordingly, Petitioner submits that the Court should find that any lack of instruction in management policies does not prevent Petitioner from limiting its liability for damages resulting from the collision.

13.     **If Petitioner Is Partially At Fault For The Collision, It Is Nevertheless Entitled To Contribution From The United States For Any Liability It May Have To The Injury And Death Claimants**

Petitioner's argument in favor of contribution – and against any assertion of sovereign immunity by the U.S. – in respect of any liability it may be found to have to the injury and death claimants is fully set forth in its pre-trial brief, (Dkt No. 327 at pp. 24-27), and its post-trial proposed conclusions of law, (¶¶ 137-146), and will not be repeated here except to reiterate a critical distinction between the present case and the *Feres*/*Stencil* line of cases.[19]   In those cases, and as has been reaffirmed in subsequent decisions, the primary surviving justification for why courts have found in favor of sovereign immunity notwithstanding the clear waiver of immunity expressed in both the Federal Tort Claims Act, 28 U.S.C. § 2671, and the Public Vessels Act, 46 U.S.C. § 31102, arises out of the concern that claims for injuries incident to service are the "types of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at

---

[19] See *Feres v. United States*, 340 U.S. 135 (1950) and *Stencil Aero Engineering Corp. v. United States*, 431 U.S. 666 (1977).

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

the expense of military discipline and effectiveness." *United States v. Johnson*, 481 U.S. 681, 690 (1987).[20]

But where, as here, it is the United States who has affirmatively put its "sensitive military affairs" squarely before the Court in connection with its affirmative claim against Petitioner, it would be grossly unfair to allow it to simultaneously hide behind the cloak of a judicially inferred sovereign immunity when defending a counterclaim or claim for setoff arising out of the exact same facts.  It was the United States, after all, who elected to call MCCAIN's commanding officer, Cdr. Alfredo Sanchez, as well as Chief Petty Officer Phillip Fields, Chief Warrant Officer Joshua Patat and Chief Engineer Lt Cdr. Jonathan Ling as live witnesses at trial in support of its claim for damages against Petitioner arising out of the collision.   The United States. also submitted the deposition transcripts of five other MCCAIN crew members in support of its claim, as well as relying on numerous U.S. Navy documents and records – many of which are subject to confidentiality protective orders.  Having relied on this evidence in support of its case, the United States cannot very well be heard to contend that it would be disruptive to "military discipline and effectiveness" to allow Petitioner to rely on this very same evidence to support its claim for contribution against the U.S.  This is particularly so where Petitioner is already relying on this exact same evidence to support its own claim against the U.S. for vessel damage, as to which claim the U.S. fully concedes it is not immune from suit.  Accordingly, the justification present in *Feres* and *Stencil* makes no sense in the present application, and those cases are distinguishable.

Claimants argue that contribution is also not allowed in these circumstances under Singapore law, but despite considerable analysis, the crux of Claimants' Singapore law expert's

---

[20] Other considerations, expressed in some of the early case law, have subsequently been held by the Supreme Court to be "no longer controlling."  *U.S. v. Shearer*, 473 U.S. 52, n. 4 (1985).

CONFIDENTIAL – CONTAINS ITAR/NDI - SUBJECT TO PROTECTIVE ORDERS

analysis is merely that since U.S. law does not allow a claim for contribution under principles of sovereign immunity, so too would Singapore law bar such a claim.  (Dkt No. 323-2, ¶ 180).  For the reasons set forth above, however, the U.S. is not immune from Petitioner's contribution claims here; accordingly, Singapore law provides the U.S. no additional protection.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully submits that judgment should be entered in its favor, and against claimants, exonerating it from liability, and awarding all of its collision-related damages plus pre-judgment interest against the United States, or alternatively allocating fault and damages between Petitioner and the United States on the basis of the parties' comparative fault, limiting  Petitioner's liability to the value of the Limitation Fund and granting  Petitioner a right of contribution against the United States for its proportionate share of any liability Petitioner may be found to have to the injury and death claimants, and that it be granted such other and further relief as may be just and equitable.

Dated: New York, New York
        November 22, 2021

By: *Thomas H. Belknap, Jr.*
Thomas H. Belknap Jr.
BLANK ROME LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone:  212-885-5270
Fax:  917-332-3795
Email:  tbelknap@blankrome.com

*Attorney for Petitioner*
*Energetic Tank, Inc.*