UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Complaint

      of

ENERGETIC TANK, INC.,
as Owner of the M/V ALNIC MC,
for Exoneration from or Limitation of Liability

No. 18-cv-1359 (PAC) (RWL)

**OPINION & ORDER**

       This case concerns a collision that occurred on August 21, 2017, in the Singapore Strait between a United States Navy warship and an oil tanker. Petitioner Energetic Tank, Inc. filed this action seeking either exoneration or limitation of its liability. The United States and dozens of injured or deceased sailors (collectively the "Sailor-Claimants") then brought claims against Petitioner, seeking damages sounding in tort. The Court divided proceedings into two discrete phases: liability for the collision ("Phase I"), and damages resulting from the collision ("Phase II"). This Opinion resolves the Petitioner's outstanding contribution claim from Phase I and begins to lay the groundwork for Phase II.

       The Court assumes familiarity with the record as set forth in its previous Opinion and therefore only briefly summarizes it here. *See generally Matter of Energetic Tank, Inc.*, No. 18CV1359, 2022 WL 2159786 (S.D.N.Y. June 15, 2022) (the "Phase I Opinion"). In Phase I, following a bench trial, the Court determined Petitioner was 20% at fault for the collision, while the United States was 80% at fault. Accordingly, the Court concluded the Petitioner was liable to the United States for damages in the amount of $37,000,000 (20% of the United States' stipulated damages to its vessel, the U.S.S. JOHN S. MCCAIN), minus $353,956 (80% of the Petitioner's stipulated damages to its vessel, the M/V ALNIC), plus interest.

The Petitioner and the United States have both filed interlocutory appeals of the Phase I Opinion.[1]  *See* ECF Nos. 409, 412.  The United States' appeal also challenges the Court's determination that Singapore law applies to substantive matters of liability and damages in this case.

Before issuing the final Judgment from Phase I, the Court solicited additional briefing on whether the Petitioner could claim contribution from the United States in Phase II—where the Court will resolve claims by the individual Sailor-Claimants against the Petitioner alone.[2]  Having heard from the parties on this issue, the Court determines that (1) the Court need not stay this case pending the interlocutory appeals; and (2) Petitioner cannot claim contribution from the United States.

## I.   <u>NO STAY OF PROCEEDINGS IS WARRANTED</u>

The Court will press forward with the Phase II litigation notwithstanding the pending appeals from Phase I.  A party may take an interlocutory appeal from a decision that "determin[es] the rights and liabilities of the parties to admiralty cases" as the Phase I Opinion did by apportioning liability between the Petitioner and the United States.  28 U.S.C. § 1292(a)(3); *see also Chem One, Ltd. v. M/V RICKMERS GENOA*, 660 F.3d 626, 640 (2d Cir. 2011) (permitting interlocutory appeal where some, but not all, admiralty parties had their rights and liabilities determined).

---

[1] The Second Circuit remanded the case to this Court for the limited purpose of permitting the Court to correct the Phase I Opinion damage calculation and certify the opinion as a final judgement regarding the United States' claim for damages to the MCCAIN.  *See* ECF No. 416. The Court complied with that order, *see* ECF. Nos. 417, 418, after which jurisdiction automatically restored to the Second Circuit.  *See United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

[2] The Court continues to reserve decision on which Sailor-Claimants, if any, have a right to a jury trial in Phase II.

Unlike an appeal from a final decree, district courts typically do not stay proceedings pending an interlocutory appeal. *See* 16 Wright & Miller, *Federal Practice and Procedure* § 3921.2; *Fitzgerald v. Compania Naviera La Molinera*, 394 F. Supp. 402, 412 (E.D. La. 1974). Here, the Court divided proceedings into two phases: liability for the collision, and individual damage claims resulting from the collision.   While the cross-appeals divest this Court of jurisdiction to modify the liability issue, they do not divest jurisdiction over the unaddressed damages issue. *See In re Delphinus Maritima, S.A.*, No. 79 Civ. 2496, 1981 WL 6769661 (S.D.N.Y. Apr. 24, 1981) (in a bifurcated collision case, district court had "jurisdiction over the damages portion of the trial notwithstanding the appeals from its decision as to liability").

Nor, on balance, would a stay be in the interest of justice.   To be sure, the Phase II proceedings would be disrupted if the Second Circuit reverses the underlying decisions from Phase I that adopted Singapore law and apportioned liability.   Nevertheless, no party has sought a stay, and the risks from a possible years-long delay pending appeal—risks including stale evidence and testimony, and of deferred resolution of personal injury and wrongful death claims that are unquestionably significant to the Sailor-Claimants—weigh heavily in favor of proceeding as planned. *See Delphinus Maritima*, 1981 WL 6769661; *Coumou v. United States*, No. CIV. A. 93-1465, 1995 WL 144581, at *2 (E.D. La. Mar. 30, 1995).

## II.   PETITIONER'S CONTRIBUTION CLAIM IS BARRED

The Petitioner has claimed a right to contribution from the United States in the event that the Petitioner pays damages to the Sailor-Claimants in Phase II. *See* Pet'r's Verified Counterclaim ¶ 37, ECF No. 40.  The Court concludes that United States sovereign immunity bars this contribution claim. [3]

---

[3] The Petitioner's counterclaim also sought indemnity, where any loss to the Sailor-Claimants would shift entirely to the United States.  Given that Petitioner was found liable in tort for the

### A.  United States Law Applies to Determine the United States' Sovereign Immunity.

The Sailor-Claimants have all sued the Petitioner, but none have sued the United States.  In admiralty, however, a joint tortfeasor who pays more than its apportioned share of an injured party's damages may generally seek contribution from the other tortfeasors.  *See* Singapore Maritime Conventions Act 1911, § 3(1) (Cap. IA3, 2004 Rev. Ed.); 2 Schoenbaum, *Admiralty and Maritime Law* § 5:16 (6th Ed.) (same result under American law).  Since the Petitioner was only 20% at fault for the collision, Petitioner could seek contribution from the United States—were the United States a private party—as joint tortfeasor for 80% of any damages it pays to the Sailor-Claimants in Phase II.  The sovereign status of the United States, however, complicates that picture.

Before the Phase I trial, the Court issued a choice-of-law decision, holding that Singapore law applies in this case to substantive issues of liability and damages.  To do so, the Court analyzed the choice-of-law factors from *Lauritzen v. Larsen*, 345 U.S. 571 (1954), and concluded that on balance, Singapore law was better suited than American law to litigate liability and damages from a collision that occurred in Singapore territorial waters.  *See Matter of Energetic Tank, Inc.*, No. 118CV1359PACRWL, 2020 WL 114517, at *7 (S.D.N.Y. Jan. 10, 2020) ("Choice of Law Opinion"), *reconsideration denied*, No. 118CV1359PACRWL, 2020 WL 978257 (S.D.N.Y. Feb. 28, 2020).  The parties now dispute whether Singapore law would *incorporate* American sovereign immunity law to bar Petitioner's contribution claim.

The Court disagrees, however, with the underlying assumption that Singapore law provides the correct analytical framework.  The Court can instead substitute that complicated two-step analysis

---

collision and that its liability to the Sailor-Claimants is not limited, Petitioner would likely not prevail on the merits of an indemnity claim.  *See Hillier v. Southern Towing Co.*, 714 F.2d 714, 717–22 (7th Cir. 1983).  In any event, an indemnity claim would be subject to the same sovereign immunity bar as a contribution claim, *id.* at 22, so the Court's contribution discussion applies to Petitioner's indemnity claim as well.

with a straightforward analysis under purely American law. That is, as a United States federal court, the Court must apply federal sovereign immunity law as a jurisdictional matter, even though foreign law still applies to substantive issues in the case.

Subject-matter jurisdiction is a quintessentially threshold issue—one that does not implicate the Court's previous *Lauritzen* choice-of-law analysis. "A federal court's authority to hear cases in admiralty flows initially from the Constitution, which 'extend[s]' federal judicial power 'to all Cases of admiralty and maritime Jurisdiction.'" *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995) (quoting U.S. Const., Art. III, § 2). The analytical inquiry into subject-matter jurisdiction "decides only whether Congress intended to confer judicial power, and whether it is authorized to do so by Article III. The choice of law inquiry is a much broader one, primarily concerned with fairness; consequently, it looks to wholly different considerations." *Filartiga v. Pena-Irala*, 630 F.2d 876, 889 (2d Cir. 1980) (citations omitted). Indeed, Courts of Appeals that have addressed the issue have concluded the *Lauritzen* analysis only applies to a choice-of-law analysis, not a subject-matter jurisdiction analysis. *See Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 177–78 (3d Cir. 1995) (en banc); *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 580 (4th Cir. 2015); *Warn v. M/Y Maridome*, 169 F.3d 625, 627–28 (9th Cir. 1999), *as amended* (May 3, 1999). Thus, determining subject-matter jurisdiction over the Petitioner's contribution claim does not disturb this Court's previous *Lauritzen* analysis about choice-of-law.

The United States' sovereign immunity, in turn, goes to the Court's Article III jurisdiction. "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). "Indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction

to entertain the suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (internal quotations and alterations omitted).

One such jurisdictional bar is the *Feres-Stencel* doctrine, which maintains the United States' sovereign immunity against certain claims by military servicemembers—and by extension, claims by third parties who seek indemnity or contribution for those servicemembers' claims. *See generally Feres v. United States*, 340 U.S. 135 (1950); *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666 (1977). Since the *Feres-Stencel* doctrine defines the contours of federal sovereign immunity, it likewise defines the contours of the Court's jurisdiction over Petitioner's counterclaim. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 204, 208 (2d Cir. 1987) ("*Feres* . . . has been held in some cases to go to the very jurisdiction of the court. It precludes [servicemember-plaintiffs] from recovering the contribution they seek." (citations omitted)); *Matthew v. United States*, 311 F. App'x 409, 411 (2d Cir. 2009) (noting the application of the *Feres* doctrine precluded servicemember-plaintiffs "from carrying their jurisdictional burden").

Indeed, the *Feres-Stencel* doctrine is designed, in part, to avoid thorny choice-of-law problems in the first place. One of the doctrine's key rationales is the desire for uniform application of federal sovereign immunity law—regardless of the place of injury. The *Feres* Court observed "the scope, nature, legal incidents and consequence of the relation between persons in service and the Government are fundamentally derived from federal sources and governed by federal authority." 340 U.S. at 143–44 (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 305–06 (1947)).

Acknowledging the military's activities in all 50 states, the *Stencel* Court concluded "it would make little sense to have the Government's liability to members of the Armed Services dependent on the fortuity of where the soldier happened to be stationed at the time of the injury."

431 U.S. at 671; *see also Standard Oil Co.*, 332 U.S. at 305 (holding that federal, not state, law must determine "the creation or negation" of the United States' right to indemnity for a soldier's injury by third persons (citing *Clearfield Tr. Co. v. United States*, 318 U.S. 363 (1943)). Problems with a disunified state law approach to federal sovereign immunity would also apply—perhaps even more so—to the international sphere, given the breadth of the United States military's global footprint.[4] Accordingly, this Court must apply the law of its own sovereign—the United States—to determine the immunity of that sovereign.

### B. Under United States Law, the *Feres-Stencel* Doctrine Bars the Petitioner's Contribution Claim.

The United States generally maintains its sovereign immunity except where Congress expressly promulgates a waiver by statute. *See Liffiton v. Keuker*, 850 F.2d 73, 77 (2d Cir. 1988). The Petitioner has the burden of proving, by a preponderance of the evidence, that jurisdiction exists over its claim against the United States. *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 84 (2d Cir. 2001).

Here, the Petitioner bases its contribution claim on two federal statutes: the Public Vessels Act ("PVA"), 46 U.S.C. §§ 31101 *et seq.*, and the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 30901 *et seq. See* Pet'r's Verified Counterclaim ¶ 2. Through the PVA, Congress waives the United States' sovereign immunity for "damages caused by a public vessel," including a Navy vessel like MCCAIN. 46 U.S.C. § 31102. Similarly, the SIAA waives sovereign immunity when an equivalent civil action in admiralty could have been brought against a private owner or operator

---

[4] Consider the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, which contains a categorical exception to its sovereign immunity waiver for "[a]ny claim arising in a foreign country," *id.* at § 2680(k), evidencing Congress's "unwilling[ness] to subject the United States to liabilities depending upon the laws of a foreign power." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 707 (2004) (quoting *United States v. Spelar*, 338 U.S. 217, 221 (1949)).

of the United States' vessel. *See* 46 U.S.C. § 30903(a). These waivers allowed the Petitioner to assert a claim against the United States, in Phase I, for the collision damages to ALNIC caused by MCCAIN.[5]

However, both the PVA and SIAA incorporate a key exception to their immunity waivers: the *Feres-Stencel* doctrine. In *Feres*, the Supreme Court held that under the Federal Tort Claims Act ("FTCA"), the United States is immune to claims regarding injuries to military servicemembers "where the injuries arise out of or are in the course of activity incident to service." 340 U.S. at 146. Subsequently, in *Stencel*, the Supreme Court extended *Feres* to bar third parties' claims against the United States for contribution or indemnity when those third parties are sued by servicemembers seeking to recover for injuries arising from their service. *See* 431 U.S. at 673–74.

The Second Circuit has held that the *Feres* bar, although originating in the FTCA, also applies to suits brought under the PVA or SIAA. *See Cusanelli v. Klaver*, 698 F.2d 82, 85 (2d Cir. 1983). Thus, no matter which statute applies, *Feres* would bar any direct claims by the Sailor-Claimants' against the United States. And critically, *Stencel* extends that sovereign immunity to bar Petitioner's third-party claim against the United States for contribution arising out of those Sailor-Claimants' claims.

The *Feres-Stencel* doctrine applies squarely to the facts of this case. The Sailor-Claimants' claims undisputedly arise out of their military service: they were serving aboard the U.S.S. JOHN S. MCCAIN, in the middle of a six-month deployment, when their warship collided with the M/V

---

[5] The United States could selectively submit to Petitioner's counterclaim regarding vessel damages without necessarily submitting to a counterclaim for contribution. Courts assess federal sovereign immunity on a claim-by-claim basis. *See Brownback v. King*, 141 S. Ct. 740, 746–77 (2021). And by filing a claim against Petitioner, the United States did "not thereby consent to be sued on a counterclaim based upon a cause of action as to which it had not otherwise given its consent to be sued." *United States v. Forma*, 42 F.3d 759, 764 (2d Cir. 1994) (internal quotation omitted).

ALNIC in the Singapore Strait.  Those Sailor-Claimants have sued the Petitioner, who in turn has asserted a contribution claim against the United States for its role in the collision.  The United States has not waived its sovereign immunity for this contribution claim, and the Petitioner has not proven otherwise.

Moreover, the "three broad rationales underlying the *Feres* decision" all apply here.  *United States v. Johnson*, 481 U.S. 681, 688 (1987).  First, the *Feres-Stencel* doctrine protects the uniquely federal nature of the sovereign-soldier relationship.  As discussed in the jurisdictional analysis above, that rationale is strongly present here because "[p]erformance of the military function" aboard a guided-missile destroyer "in diverse parts of the country and the world entails a '[s]ignificant risk of accidents and injuries.'"  *Id.* at 689 (quoting *Stencel*, 431 U.S. at 672).  Second, the United States has implemented a statutory no-fault compensation scheme for the Sailor-Claimants through the Veterans' Benefits Act.[6]  That "compensation scheme provides an upper limit of liability for the Government as to service-connected injuries.  To permit [P]etitioner's claim would circumvent this limitation, thereby frustrating one of the essential features of the Veterans' Benefits Act."  *Stencel*, 431 U.S. at 673.  Third and finally, allowing the Sailor-Claimants to sue the United States for the collision would have serious effects on military discipline.  It would "involve second-guessing military orders, and would often require members of the Armed Services to testify in court as to each other's decisions and actions," perhaps in the hopes of a large recovery.  *Id.*

---

[6] The United States represents (Br. at 16 n.12, ECF No. 392) that it has paid the Sailor-Claimants under the following statutes: 10 U.S.C. §§ 1475 *et seq.* (military death gratuity); 10 U.S.C. § 1074 (military medical and dental care); 38 U.S.C. § 1131 (basic veterans' benefit entitlement for disability suffered in the line of duty); 38 U.S.C. §§ 1310 *et seq.* (VA dependency and indemnity compensation for survivors of servicemembers who die in the line of duty); 38 U.S.C. § 1710 (continuing medical care for veterans' service connected disability); and 38 U.S.C. §§ 2301 *et seq.* (VA burial benefits).

The Petitioner argues this third "military discipline" justification is absent because the Court already second-guessed Navy decisions when MCCAIN's negligence was litigated in the Phase I trial. *See* Pet'r's Br. at 8, ECF No. 395. On this point, *Vulcan Materials Co. v. Massiah*, 645 F.3d 249 (4th Cir. 2011) is persuasive. In that collision case involving a United States vessel, the Fourth Circuit rejected the argument that already-litigated liability would moot concerns about military discipline. Multiple Navy witnesses had already testified in depositions and at trial, yet the *Vulcan* Court held that the *Feres-Stencel* doctrine still applied after trial. *See id.* at 266.

Put another way, nothing in the *Feres-Stencel* doctrine suggests the United States suddenly waives its sovereign immunity against its servicemembers' claims once those servicemembers have finished testifying about military decisions. Rather, "a suit based upon service-related activity" will "necessarily implicate[] the military judgments and decisions that are inextricably intertwined with the conduct of the military mission[,]" even if "military negligence is not specifically alleged." *Johnson*, 481 U.S. at 691. And, as a general matter, a broader interpretation is appropriate because "[s]uits brought by service members against the Government for service-related injuries could undermine the commitment essential to effective service and thus have the potential to disrupt military discipline in the broadest sense of the word." *Id.*

Given that *Feres* and *Stencel* are directly on point, the Petitioner ultimately asks this Court to overrule these cases as wrongly decided because a party bearing far less responsibility for the collision cannot seek any reimbursement from the more responsible tortfeasor for the Sailor-Claimants' multi-million-dollar claims. *Feres-Stencel*, however, was "specifically intended" to bar government contribution from massive, service-related torts, including those at issue here. *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d at 206. The Supreme Court has repeatedly reaffirmed both *Feres* and *Stencel* over the course of seventy years, *see, e.g., Johnson*, 481 U.S. at 692, and this Court must

10

follow directly applicable Supreme Court precedent, *see United States v. Donziger*, 38 F.4th 290, 303–04 (2d Cir. 2022).  The Court lacks jurisdiction over Petitioner's contribution claim, and that claim is therefore dismissed.

Dated: New York, New York        SO ORDERED
      October 12, 2022

HONORABLE PAUL A. CROTTY
United States District Judge

11